1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   SHANNON SECREASE,

11            Petitioner,              2:  09 - cv - 299 JAM TJB

12       vs.

13   JAMES WALKER,

14            Respondent.         ORDER, FINDINGS AND

15                                RECOMMENDATIONS

16   _____/

17                        I.  INTRODUCTION

18       Petitioner Shannon Secrease is a state prisoner proceeding through counsel with a petition

19   for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a sentence

20   of life without the possibility of parole after a jury convicted him of first-degree murder and

21   carjacking.  Petitioner raises a multitude of claims in his amended federal habeas petition;

22   specifically:

23       1.   ineffective assistance of trial counsel for failing to present any evidence at trial

24            ("Claim I");

25       2.   ineffective assistance of appellate counsel by only raising three weak appellate

26            arguments ("Claim II");

1

3.     ineffective assistance of trial counsel for failing to call Jamila King as a witness ("Claim III");

4.     ineffective assistance of trial counsel for failing to call Terrence Mullins as a witness ("Claim IV");

5.     ineffective assistance of trial counsel for failing to call Petitioner's mother as a witness and her refusal to use available character witnesses ("Claim V");

6.     ineffective assistance of trial counsel for failing to conduct any investigation into a duress defense ("Claim VI");

7.     ineffective assistance of trial counsel for failing to investigate Petitioner's mental state ("Claim VII");

8.     ineffective assistance of trial counsel for failing to investigate and rebut that Petitioner had planned the crime ("Claim VIII");

9.     ineffective assistance of trial counsel due to an uninformed and ill-prepared opening statement, cross-examination and voir dire ("Claim IX");

10.     ineffective assistance of trial counsel for failing to object to inadmissible prosecution testimony ("Claim X");

11.     ineffective assistance of trial counsel for failing to request a mistrial due to statements made by a prospective juror during voir dire ("Claim XI");

12.     ineffective assistance of trial counsel in failing to advise Petitioner that the ultimate decision of whether to testify at trial was his to make ("Claim XII");

13.     the cumulative effect of Petitioner's trial counsel's errors denied Petitioner a fair trial ("Claim XIII");

14.     trial court error in failing to hold a <u>People v. Marsden</u>, 2 Cal. 3d 118, 84 Cal. Rptr. 156, 465 P.2d 44 (1970) hearing ("Claim XIV");

15.     trial court error in excluding Ericc Pickett's out-of-court statements ("Claim XV");

2

16.     trial court error in excluding evidence about Ericc Pickett which showed that Petitioner had reason to fear Pickett ("Claim XVI");

17.     trial court error in failing to instruct the jury on the elements of the lesser included offense of taking a vehicle under California Vehicle Code Section 10851 ("Claim XVII")

18.     trial court error in impermissibly shifting the burden of proof to the Petitioner during the jury instructions ("Claim XVIII");

19.     trial court error in failing to *sua sponte* instruct the jury on a duress defense ("Claim XIX");

20.     Petitioner was denied his Constitutional right to testify on his own behalf at trial ("Claim XX");

21.     there was insufficient evidence to convict Petitioner of carjacking and first-degree murder ("Claim XXI");

22.     there was insufficient evidence that Petitioner acted as a major participant with reckless indifference to human life ("Claim XXII");

23.     Petitioner's sentence must be vacated because the jury verdict does not reflect a special circumstance finding ("Claim XXIII");

24.     Petitioner was improperly convicted of an offense not charged in the information ("Claim XXIV");

25.     Petitioner's conviction for carjacking is barred as it is a necessarily included offense of the first-degree murder while engaged in the commission of a carjacking conviction ("Claim XXV"); and

26.     cumulative error ("Claim XXVI").

For the following reasons, the petition should be denied.

## II.  PROCEDURAL HISTORY

The record reflects the following chronology of relevant proceedings:

1.   On February 26, 1998, Petitioner was convicted of:  (1) first-degree murder under Section 187(a) of the California Penal Code; (2) a carjacking-murder special circumstance allegation under section 190.2(a); and (3) carjacking under section 215(a), by a jury in Solano County Superior Court.  (See Resp't's Answer Ex. A, at p. 134-36.)  The jury found two firearm use allegations, under section 12022.5, to not be true.  (See id. at p. 135-36.)

2.   On May 21, 1998, Petitioner filed a motion pursuant to Marsden, 2 Cal. 3d 118, 84 Cal. Rptr. 156, 465 P.2d 44,[1] and a motion for a new trial, due to ineffective assistance of counsel.  (See Resp't's Answer Ex. A, at p. 170.)

3.   On May 28, 1998, the trial court granted the Marsden motion, relieved trial counsel (Diane Bylund), and appointed Carl Spieckerman to represent Petitioner.  (See id. at p. 201.)

4.   On July 27, 1998, the trial court denied Petitioner's motion for a new trial.  (See id. at p. 218.)

5.   On September 18, 1998, the trial court sentenced Petitioner to life without the possibility of parole on the first-degree murder conviction, and stayed the sentence on the carjacking conviction pursuant to Cal. Penal Code § 654.  (See Resp't's Answer Ex. A, at p. 250.)

6.   Petitioner filed a notice of appeal.  (See id. at p. 251.)

7.   On July 27, 2000, Petitioner filed his state habeas petition in the California Court of Appeal, First Appellate District.  (See Resp't's Answer Exs. L, O.)

8.   On August 3, 2000, the California Court of Appeal issued an order stating it would consider Petitioner's direct appeal and his state habeas petition together for decision.

---

[1] In Marsden, 2 Cal.3d 118, 84 Cal.Rptr. 156, 465 P.2d 44, the California Supreme Court held that a trial court must permit a defendant seeking a substitution of counsel after the commencement of the prosecution's case to specify the reasons for his request.

4

(<u>See</u> Resp't's Answer Ex. O.)

9. On February 21, 2001, the California Court of Appeal issued a reasoned decision vacating the sentence and remanding the matter for resentencing "to allow the trial court to exercise its discretion pursuant to section 190.5, either to sentence [Petitioner] to a term of 25 years to life, or to the term of life imprisonment without the possibility of parole, as previously imposed."  (Resp't's Answer Ex. I at p. 43.) "In all other respects[,] the judgment [wa]s affirmed."  (<u>Id.</u>)

10. Also on February 21, 2001, the California Court of Appeal denied Petitioner's state habeas petition.  (<u>See</u> Resp't's Answer Ex. O.)

11. On March 30, 2001, Petitioner filed a state habeas petition in the California Supreme Court, Case No. S096406 (<u>See</u> Resp't's Answer Exs. P, Q.)  In that petition, Petitioner raised the following claims:  (1) ineffective assistance of trial counsel for failing to request a mistrial and dismissal of the entire jury panel; and (2) ineffective assistance of trial counsel for failing to advise Petitioner that the ultimate decision over whether to testify was his to make.

12. On April 2, 2001, Petitioner filed his petition for review in the California Supreme Court, Case No. S096478  (<u>See</u> Resp't's Answer Exs. J, K.)  In that petition for review, Petitioner raised the following issues:  (1) whether a defendant's failure to personally assert his right to testify constitutes a waiver when the defendant was not advised by counsel that the decision was his alone to make and whether any such error is per se reversible or subject to harmless error analysis; (2) whether a co-defendant's statement that he acted alone is an admissible statement against interest; (3) what is the proper standard of review for determining whether a statement is against penal interest under Cal. Evid. Code § 1230; (4) does <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000) overrule the California Supreme Court's holding that a special circumstance finding is not an element for purposes of determining whether an

offense is a necessarily included offense; (5) does the rule of <u>People v. Santamaria</u>, 8 Cal. 4th 903, 35 Cal. Rptr. 2d 624, 884 P.2d 81 (1994) – that acquittal of a weapon use allegation does not bar retrial for murder on a theory that the defendant was the actual killer – permit affirming a special circumstance finding on a theory that the defendant was the actual killer where the defendant was acquitted of personal use and the jury was instructed that if it could not determine his role it could not find the special circumstance true under an actual killer theory; (6) should the court overrule the <u>Santamaria</u> rule, particularly where the jury was never instructed that it could convict the defendant of felony-murder without determining the defendant's role; (7) was the evidence of carjacking and murder sufficient; (8) did the court err in failing to hold a <u>Marsden</u> hearing; (9) did the exclusion of the co-defendant's statements violate Petitioner's right to due process and to put on a defense; (10) did the exclusion of evidence about the co-defendant violate Petitioner's rights to due process and to put on a defense; (11) was Petitioner denied his right to effective representation; (12) did the trial court err in failing to instruct the jury on the elements of the lesser included offense of taking a vehicle; (13) did the third-party culpability instruction shift the burden of proof; (14) was the evidence of the special circumstance finding sufficient; (15) did the jury verdicts fail to reflect a special circumstance finding; (16) was the trial court's answer to the jury's question erroneous; (17) was Petitioner convicted of an uncharged offense in violation of his federal and state constitutional rights to due process; and (18) did the cumulative effect of the errors deprive Petitioner of his federal constitutional rights to due process.

13. On June 13, 2001, the California Supreme Court denied the petition for review (Case No. S096478) without comment or citation.  (<u>See</u> Resp't's Answer Ex. K.)

14. Also on June 13, 2001, the California Supreme Court denied the state habeas petition (Case No. S096406) without comment or citation.  (<u>See</u> Resp't's Answer Ex. Q.)

15. On January 3, 2002, "the trial court once again imposed a term of life without the possibility of parole." People v. Secrease, No. A097806, 2002 WL 31769077, at *1 (Cal. Ct. App. Dec. 11, 2002).

16. Petitioner filed an appeal to the California Court of Appeal after he was resentenced.

17. On December 11, 2002, the California Court of Appeal denied Petitioner's direct appeal on his resentencing, and affirmed judgment. See id. at *8.

18. On February 25, 2003, the California Supreme Court denied Petitioner's petition for review on his resentencing without comment or citation.[2]

19. On February 24, 2004, Petitioner filed the original federal habeas petition in the United States District Court for the Northern District of California.

20. Also on February 24, 2004, Petitioner filed a motion to hold the federal habeas petition in abeyance so he could exhaust certain unexhausted claims in state court.

21. On April 12, 2004, the Honorable Charles R. Breyer, the assigned United States District Judge at the time, granted Petitioner's motion to hold his petition in abeyance. The district court noted, "[i]f he fails to timely file his state petition, the Court will proceed with his petition in this Court as it is currently pled." (See Dkt. No. 9.)

22. On December 6, 2007, Petitioner filed a state petition for habeas corpus with the California Supreme Court. (See Pet'r's Am. Pet. Ex. R.) Petitioner raised the following claims in that state habeas petition: (1) ineffective assistance of counsel for failing to call Jamila King and Terrence Mullins as witnesses at trial; (2) ineffective assistance of counsel for failing to present or investigate a duress defense; (3) ineffective assistance of counsel for failing to investigate Petitioner's post-traumatic stress disorder; (4) ineffective assistance of counsel for failing to investigate the

_____

[2] Petitioner's second round of appeals to the California Court of Appeal and the California Supreme Court related to issues that arose during his resentencing. The issues raised in Petitioner's second round of appeals are not at issue in this federal habeas petition.

prosecution's evidence regarding Petitioner's singing of a song which the prosecutor argued showed that he was anticipating his participation in an upcoming crime; (5) ineffective assistance of trial counsel for failing to develop a theory of the case, failing to present a competent voir dire, failing to present a coherent opening or closing statement, failing to object to testimony that was admissible, failing to object to the introduction of incomplete song lyrics, failing to object to allowing inadmissible evidence to be admitted, failing to object to repeated misstatements of the evidence by the prosecutor as well as a cumulative ineffective assistance of counsel argument; and (6) trial court error in failing to *sua sponte* instruct the jury on the defense of duress.

23. On June 11, 2008, the California Supreme Court denied the state habeas petition, citing In re Clark, 5 Cal. 4th 750, 21 Cal. Rptr. 2d 509, 855 P.2d 729 (1993); In re Robbins, 18 Cal. 4th 770, 780, 77 Cal. Rptr. 2d 153, 959 P.2d 311 (1998). (See Pet'r's Am. Pet. Ex. R.)

24. On July 23, 2008, the California Supreme Court sent notice to Petitioner's counsel that the petition was denied. (See id.)

25. On September 11, 2008, Petitioner filed an amended federal habeas petition.

26. On December 8, 2008, Petitioner filed a motion for change of venue to transfer this action to the United States District Court for the Eastern District of California.

27. On January 23, 2009, Judge Breyer granted the motion for change of venue to the United States District Court for the Eastern District of California.

28. On August 17, 2009, Respondent filed a motion to dismiss. The Honorable John F. Moulds, the assigned United States Magistrate Judge at the time, summarized Respondent's arguments as follows:

> Respondent asserts that the amended petition should be stricken because [P]etitioner failed to comply with the district court's April 12, 2004 order requiring [P]etitioner to file his state exhaustion

> petition within 30 days from the date of that order, and failed to comply with the thirty day time limit required under *Rhines v. Weber*, 544 U.S. 269, 277 (2005).  In the alternative, [R]espondent argues that the novel claims 2, 3, 6, 8, 16 and one unnumbered claim involving cumulative prejudice from ineffective assistance of counsel on the amended petition must be dismissed as they were not exhausted until after the one-year statute of limitations and do not relate back to any claim alleged in the original petition. Respondent argues that the Supreme Court's decision in *Mayle v. Felix*, 545 U.S. 644 (2005), mandates dismissal of the new claims at issue.

> (See Dkt. No. 38 at p. 3.)

29. On October 30, 2009, Judge Moulds issued an order, findings and recommendations on Respondent's motion to dismiss.  Since "Petitioner failed to file a timely opposition to the motion," Judge Moulds ordered that a District Judge be assigned to the case, and recommended that:  (1) Respondent's August 17, 2009, motion to dismiss be granted; (2) Petitioner's September 11, 2008, amended petition be stricken; and (3) the case proceed on Petitioner's February 24, 2004, original petition. (See Dkt. No. 33 at p. 1, 5.)

30. On November 3, 2009, Petitioner filed an opposition to Respondent's motion to dismiss.

31. On November 24, 2009, Judge Moulds issued an order vacating the October 30, 2009, findings and recommendations after deeming Petitioner's opposition to Respondent's motion to dismiss timely.

32. On January 26, 2010, Judge Moulds issued findings and recommendations which recommended that:  (1) Respondent's August 17, 2009, motion to dismiss be denied; and (2) this action proceed on the September 11, 2008, amended petition.  (See Dkt. No. 38.)  The court reasoned that "all of the disputed claims relate back to the original petition," and "the court need not reach [P]etitioner's actual innocence arguments or the issue of equitable tolling."  (Id. at p. 13.)

33. On March 15, 2010, the district court adopted the findings and recommendations.

34. On June 2, 2010, Respondent filed an answer.

35. On July 28, 2010, Petitioner filed a traverse.

36. On December 1, 2010, the matter was reassigned to the undersigned by Chief Judge Ishii.

### III.  FACTUAL BACKGROUND[3]

> On September 15, 1996, a police officer found David Iano lying on a road near the Vallejo waterfront; he was bleeding profusely from a gunshot wound to the head.  He died from the gunshot wound, which was fired from a range of two to twelve inches.  The bullet entered the right front of his head and exited the left rear, with a slightly upwards trajectory.  Earlier that afternoon the victim left his pickup truck at his residence with a "for sale" sign on it.
>
> On September 29, 1996, a San Pablo police officer found the victim's pickup truck parked across the street from Ericc Pickett's house.  The engine was lying on the ground.  There was blood spatter on the passenger floorboard.  Pickett approached the officer and claimed that the vehicle belonged to him.  He had the keys to the truck.  A search of his residence led to the discovery of a manual on how to rebuild similar truck engines.  [FN 3]  A criminalist later found human blood smears across the truck seat from left to right and inside the frame of the passenger door.  There was human blood spatter on the ceiling of the truck cab.
> [FN 3]  Ericc Pickett ultimately entered a no contest plea to first degree murder.
>
> [Petitioner] made two statements to the police regarding the crime.  On the date that the victim's truck was discovered, the police contacted [Petitioner] at his sister's house in San Pablo.  [Petitioner] indicated that two weeks earlier he had given his friend Ericc Pickett a ride to Vallejo to purchase a pickup truck.  [Petitioner's] girlfriend [FN 4] accompanied them.  [Petitioner] said he gave Pickett a ride to a gas station, dropped him off, and observed him go to a pay phone.  [Petitioner] stated that he and his girlfriend then drove back to Contra Costa County.  According to [Petitioner], a day or two later he went to Pickett's house and helped him remove the engine from the truck, which was parked across the street from Pickett's house.  [Petitioner] claimed that he

---

[3] These facts are from the California Court of Appeal's opinion issued on February 21, 2001.  (See Resp't's Answer Ex. I (hereinafter the "Slip Op.").)  Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state court is presumed to be correct unless Petitioner rebuts that presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); see Moses v. Payne, 555 F.3d 742, 746 n.1 (9th Cir. 2009); Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004).

did not see any blood in the truck.  He returned to Pickett's house a couple of other times and the truck was still there.

[FN 4]  Apparently [Petitioner's] girlfriend's true name was Vivian Patton; defendant identified her as Belinda Anderson to the police.

The next day, September 30, 1996, [Petitioner] was arrested and interviewed by a detective.  [Petitioner] stated that on September 15, 1996, he and the woman he referred to as Belinda Anderson drove to Vallejo; he gave Ericc Pickett a ride.  [Petitioner] said that Pickett was interested in a pickup truck that had a large engine he wished to remove.  [Petitioner] told the detective that Pickett indicated during the drive to Vallejo that after he looked at the truck, he would return and steal it and that if the owner got in his way, he was going to "whip his ass," or something to that effect. [Petitioner] believed that Pickett was carrying a gun.  [Petitioner] indicated that while Pickett did not directly state that he had a firearm, his comments made [Petitioner] believe that he did.

According to [Petitioner], he parked the car at a Raley's shopping center across the street from the victim's home.  [Petitioner] said that "Anderson" stayed in his car, while he walked with Pickett to the victim's house.  [Petitioner] told the detective that Pickett contacted the victim and arranged for a test drive.  [Petitioner] indicated that the victim drove, [Petitioner] sat in the middle, and Pickett sat by the passenger door.  They drove toward south Vallejo, with Pickett giving directions.  [Petitioner] said that Pickett indicated that he had to go to the bathroom and told the victim to drive toward the water.

According to [Petitioner], as the victim slowed to make a U-turn, Pickett pulled out a gun and shot him once in the head.  The victim collapsed into [Petitioner's] lap as the truck came to a stop. [Petitioner] said that he asked Pickett why he shot the victim; Pickett replied, "Shut up or you'll get yours."  [Petitioner] stated that he then crawled over Pickett and got out of the car.  Pickett dragged the victim out of the vehicle and left him on the road. [Petitioner] claimed that Pickett yelled at him to get back into the truck.  The floor of the truck was covered in blood and [Petitioner] had blood on his face, arms, and hands.  Pickett also had blood on his body and clothes.  [Petitioner] said that he got back into the truck and they drove to the Raley's shopping center, where he retrieved his car, and then drove back to San Pablo with "Anderson."  According to [Petitioner], Pickett threatened him if he talked about the incident.  [Petitioner] told police that he would not have accompanied Pickett had he known what was going to happen; he thought Pickett was going to return later, on his own, to steal the truck.

[Petitioner] stated that he returned to Pickett's house on at least two occasions to assist in removing the engine from the pickup and to clean up the blood.  He said that he spoke to Vivian Patton (his

girlfriend's real name) in order to arrange for an alibi.

[Petitioner] made statements to two civilian witnesses, indicating that *he* had shot the victim.  Ericc Pickett's former girlfriend, Renea Monique Webb, was at Pickett's house a few days after the shooting.  [Petitioner] was present.  She asked them how they acquired the truck.  [Petitioner] told her the whole story – that they went to Vallejo and stole a truck from a man and "Shannon stated that he shot the man.  And I don't know who pushed him out [*sic*] the truck."  Webb directly asked [Petitioner], "Did you shoot him?"  He replied, "Yes."  When first interviewed by the police, Webb indicated she did not know anything about the offense.  She was once again Pickett's girlfriend at this time.  She said she lent Pickett, or both him and [Petitioner], money to buy a truck.  [FN 6]  She testified that later, after Pickett was in custody, she called the police back, at her grandmother's urging, and told the truth.  Although she testified that she never told the police where the gun was and did not know where it was, the police officer who interviewed her indicated that she stated that [Petitioner] said he buried it in his backyard. The police never located the murder weapon, although Pickett's mother gave them her .38 caliber firearm.

[FN 6]  She told police that she lent Ericc Pickett, alone, $300 to purchase a pickup truck.  She testified that she lent the money to both Pickett and [Petitioner].

[Petitioner's] now former girlfriend, Vivian Patton, testified that she accompanied [Petitioner] and Ericc Pickett to Vallejo on September 15, 1996; she intended to visit her mother in Vallejo.  During the drive, [Petitioner] sang along with a rap song that referred to killing someone and taking their possessions.  They parked near a Raley's store and [Petitioner] and Pickett got out of the car; Patton remained behind.  Approximately 30 to 45 minutes later, [Petitioner] returned without Pickett.  He drove back to Patton's home.  When they got to her residence, she noticed blood on his jacket, jeans, and shoes.  She confronted him and asked what had happened.  She said that [Petitioner] told her that he and Ericc went to Vallejo about a truck and that "he had shot the guy. Like I said, he said he shot the guy."  Because the odor of blood disturbed her, she gave [Petitioner] a change of clothing.  He did not appear to have a gun with him.  [Petitioner] later called and asked her to tell the police that she had been with him on a certain date; she refused.  She had never known [Petitioner] to have a gun or to be violent.

Patton's account to the police changed over time.  When interviewed, she first told the police that she knew of Pickett, but that she had never seen him.  She later said she went to Raley's with [Petitioner] and Pickett, but denied knowing anything else.  She subsequently told them about seeing the blood on [Petitioner's] clothing and told them that [Petitioner] said he was

1        the shooter.

2  (Slip Op. at p. 2-6.)

3              IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

4        An application for writ of habeas corpus by a person in custody under judgment of a state

5  court can only be granted for violations of the Constitution or laws of the United States.  See 28

6  U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v.

7  Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

8  Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

9  and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S.

10  320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

11  decided on the merits in the state court proceedings unless the state court's adjudication of the

12  claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

13  clearly established federal law, as determined by the Supreme Court of the United States; or (2)

14  resulted in a decision that was based on an unreasonable determination of the facts in light of the

15  evidence presented in state court.  See 28 U.S.C. 2254(d).  Where a state court provides no

16  reasoning to support its conclusion, a federal habeas court independently reviews the record to

17  determine whether the state court was objectively unreasonable in its application of clearly

18  established federal law.  See Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009); see also

19  Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000), overruled on other grounds, Lockyer v.

20  Andrade, 538 U.S. 63 (2003).  When no state court has reached the merits of a claim, de novo

21  review applies.  See Chaker v. Crogan, 428 F.3d 1215, 1221 (9th Cir. 2005).

22        As a threshold matter, this Court must "first decide what constitutes 'clearly established

23  Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71

24  (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law' under § 2254(d)(1) is the

25  governing legal principle or principles set forth by the Supreme Court at the time the state court

26  renders its decision.'"  Id. (citations omitted).  Under the unreasonable application clause, a

1   federal habeas court making the unreasonable application inquiry should ask whether the state

2   court's application of clearly established federal law was "objectively unreasonable."  See

3   Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may not issue the writ

4   simply because the court concludes in its independent judgment that the relevant state court

5   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

6   application must also be unreasonable."  Id. at 411.  Although only Supreme Court law is binding

7   on the states, Ninth Circuit precedent remains relevant persuasive authority in determining

8   whether a state court decision is an objectively unreasonable application of clearly established

9   federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only the

10  Supreme Court's precedents are binding . . . and only those precedents need be reasonably

11  applied, we may look for guidance to circuit precedents.").

12         Respondent admits in his answer that Petitioner has exhausted all of his Claims.

13                          V.  ANALYSIS OF PETITIONER'S CLAIMS

14         A.  Claim I

15         In Claim I, Petitioner argues that trial counsel's decision to present no evidence at trial

16  constituted ineffective assistance of counsel.  The Sixth Amendment guarantees effective

17  assistance of counsel.  In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court

18  articulated the test for demonstrating ineffective assistance of counsel.  First, the petitioner must

19  show that considering all the circumstances, counsel's performance fell below an objective

20  standard of reasonableness.  See id. at 688.  Petitioner must identify the acts or omissions that are

21  alleged not to have been the result of reasonable professional judgment.  See id. at 690.  The

22  federal court must then determine whether in light of all the circumstances, the identified acts or

23  omissions were outside the range of professional competent assistance.  See id.

24         Second, a petitioner must affirmatively prove prejudice.  See id. at 693.  Prejudice is

25  found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

26  result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a

                                                  14

1   probability sufficient to undermine the confidence in the outcome." Id.  A reviewing court "need

2   not determine whether counsel's performance was deficient before examining the prejudice

3   suffered by defendant as a result of the alleged deficiencies . . . [i]f it is easier to dispose of an

4   ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

5   followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (citing Strickland, 466 U.S. at

6   697).

7          In Claim I, Petitioner alleges in conclusory fashion that trial counsel was ineffective for

8   presenting no evidence at trial.  While Petitioner is more specific in several of his other

9   arguments of ineffective assistance of counsel that will be discussed infra, this conclusory

10   allegation of ineffective assistance should be denied.  See James v. Borg, 24 F.3d 20, 26 (9th Cir.

11   1994) ("Conclusory allegations which are not supported by a statement of specific facts do not

12   warrant habeas relief.").

13         B.  Claim II

14         In Claim II, Petitioner alleges that appellate counsel was ineffective.  Petitioner argues

15   that appellate counsel was ineffective in his initial state petition for writ of habeas corpus

16   because appellate counsel only included three weak arguments.  Petitioner asserts that this caused

17   some of his claims to initially be unexhausted for federal habeas purposes.  However, Petitioner

18   states that all of his Claims have since been exhausted as does Respondent in his answer.  (See

19   Resp't's Answer at p. 2.)  Therefore, Claim II should be denied as Petitioner fails to show that he

20   was prejudiced as all of his Claims are considered exhausted.

21         C.  Claim III

22         In Claim III, Petitioner alleges that trial counsel was ineffective for failing to call Jamila

23   King[4] as a witness.  The last reasoned decision on this Claim was from the February 21, 2001

24   decision from the California Court of Appeal which stated the following:

25   _____

26         [4] Jamila King's name is now Jamila Moye.  For purposes of this findings and
     recommendations, she will be referred to as Jamila King.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

     Jamila King, a girlfriend of Pickett, would have potentially testified that around the time of the shooting it was Pickett's habit to carry a .38-caliber firearm in his waistband.  However, the murder weapon in this case was never recovered (although Pickett's mother turned her .38-caliber firearm over to police).  The bullet that was used in the shooting was identified only has [sic] having a medium caliber, in the .38 to 9-millimeter range.  Since the actual murder weapon was never identified, this testimony would have added little to the defense arguments and certainly would not have established defendant's innocence.  Indeed, it would not negate the prosecution theory that defendant was the direct shooter, because defendant could have used his gun, Pickett's gun, or someone else's gun to accomplish the act.  This testimony would have done nothing to negate the prosecution theory that defendant was, at the least, an aider and abettor in the homicide.  At most it might have bolstered, as defendant now argues, his argument that he had a reason to fear Pickett and thus not to report the crime and to assist in cleaning up the blood.  There was, however, no indication that defendant was aware of Pickett's gun-toting habit.  Furthermore, Ms. Bylund was never specifically asked why she elected not to call King as a witness.  [FN 23]

[FN 23]  At the earlier <u>Marsden</u> motion, Ms. Bylund indicated that the proffered testimony of Jamila King was the subject of an in limine motion and that the trial court excluded all of her testimony "except for one possible bit of evidence, and I – it wasn't clear to me whether she had firsthand knowledge of that or if she was told by a second person.  And I had to clarify that, so we had to have a 402 hearing."  It would appear from the record that once Ms. Bylund decided that the prosecution has not proven its case, she rested without having this 402 hearing.

17  (Slip Op. at p. 31.)

18       In an in limine motion dated February 22, 1998, the prosecution objected to Jamila

19  King's proffered testimony.  (<u>See</u> Resp't's Answer Ex. A at p. 62).  The prosecution summarized

20  King's testimony as follows:

21
22
23

     Jamilla [sic] King has stated that she was with Ericc Pickett in Vallejo in August of 1996 when he first noticed the victim David Iano's truck with a for sale sign on it.  He told her that he was going to test drive the truck, steal the truck, and would murder the owner if necessary.

24  (<u>Id.</u>)  The prosecution "object[ed] to the admission of this statement in evidence because it is

25  hearsay, and falls under no exception to the hearsay rule."  (<u>Id.</u>)  The prosecution argued "[t]he

26  statement does not fall under the declaration against interest exception" because under section

16

1230, "the declaration must be against the declarant's interest 'when made,'" and the prosecution

contended "the declaration occurred prior to the murder."  (Id.)

On February 23, 1998, prior to trial, the parties appeared before the trial court to discuss

"a number of motions in limine that have been filed by the defense" and the prosecution.

(See Resp't's Answer Ex. B pt. 5, at p. 2.)  Ms. Diane Byland, Petitioner's defense counsel,

stated she had nine to ten witnesses under subpoena, including character witnesses, but she "may

not be calling all of them."  (Id. at p. 19.)

During this hearing, Ms. Bylund stated she would be offering Jamila King's testimony at

trial:

> MS. BYLUND: . . . I agreed I am not bringing in the . . . Richmond
> police officer on the shotgun.  And the only one I would be
> offering would be Jamilla [sic] King's testimony.  She was
> Pickett's girlfriend through September of 1996, and she knew him
> to carry a black .38 all the time in his waistband.  And I think that's
> highly probative, respecting his opportunity to commit this offense.

(Id. at p. 32.)  The trial court advised Ms. Bylund that it would hear what King would testify to:

> THE COURT:  Well, here's what I will do.  You have her under
> subpoena?
>
> MS. BYLUND:  Yes.
>
> THE COURT:  I'm going to have to hear from her and see what
> she has to say . . . in that regard.  Okay.
>
> So obviously that is evidence that you are going to want to present,
> but if you are prepared to make an opening statement tomorrow
> without hearing from her, you might lose that evidence.
> Depending on what she has to say.  Am I clear on that.
>
> MS. BYLUND: How is -- yes.

(Id.)

Later on in the hearing, the trial court confirmed that it would be "inclined" to admit

King's proffered testimony that Pickett habitually carried a black .38 in his waistband at or near

the time of the offense.  (Id. at p. 36.)  The trial court excluded King's proffered testimony that

Pickett "tried to run her down" since King "gave exculpatory statements to the police."  (Id. at 31, 36.

> THE COURT:  Okay.  Jamilla [sic] King.  Did we take care of Jamilla [sic] King this morning?  That Mr. Pickett possess[ed] a gun, he threatened her, tried to run her down?  I think we dealt with that this morning.  Is there something more you want to talk about that?  Maybe we haven't dealt with it.
>
> MS. BYLUND:  Judge, I thought the Court indicated the evidence he tried to run her down would not be admissible, and that the Court . . . would be inclined if she would say . . . [a]t or near the time that it was his habit to carry a black, . . . .38 in his waistband at the time.
>
> THE COURT:  Okay.
>
> MS. BYLUND:  The court would be inclined to admit it.
>
> THE COURT:  Right.
>
> MS. BYLUND:  I don't think the court made a further commitment.
>
> THE COURT:  I think you are right.  I think you are right.

(Id. at p. 36.)

The trial court held that it would exclude Jamila King's proffered testimony that Pickett stated he was interested in the truck, intended to steal it, and would kill the owner if needed.  (Id. at p. 49-50.)  The trial court, however, noted that Ms. Bylund could "try as [she] wish" during the trial to admit it into evidence:

> MS. BYLUND:  Actually there is a whole body of testimony that I believe . . . I would be offering, and it has to do with [Pickett] looking at the truck previously.
>
> . . . .
>
> . . . And looking at the truck, contacting Mr. Iano because of his interest in the truck, telling others he intended to get it, and he would steal it if he had to.
>
> THE COURT:  And that he'd kill the driver if he had to.  You have that in your moving paper somewhere.

MS. BYLUND:  I think that's probative as to his intent.

THE COURT:  Okay.  You have that written up here somewhere.
Let's see if I can find it.

. . . Okay.  This is through Jamilla [sic] King?

MS. BYLUND:  Yes, Judge.

THE COURT:  Mr. Keeney [the prosecutor], you want to be heard?

[PROSECUTOR:]  I was objecting that it's hearsay.

THE COURT:  Exactly.

Okay.  Okay these statements were made sort of prepatory, as it
were.  His plan or scheme to get this car at all costs, right?

MS. BYLUND:  Right.

. . . .

THE COURT:  Okay.  I'll make a finding that this is not a
declaration against the declarant's interests when those statements
were made, so I'm going to sustain [the prosecutor's] objection to
the introduction of those statements.

And now, is there anything else you want to take up at this time?

MS. BYLUND:  But that's -- he had been looking at this truck for
several months.  That is not a statement.  And whether or not I can
even get it in that form, I'm not sure.

THE COURT:  Okay.  *Obviously you can try as you wish*, but I
have made my ruling on the specifics today.

(Id. (emphasis added).)

The trial court also ordered that a 402 hearing should take place on the admissibility of

King's proffered testimony that Pickett told her he had broken up the gun and given it to a third

party:

MS. BYLUND:  Pickett made a statement to Ms. King [that] a
friend of his had the murder weapon.  He had given the murder
weapon to him. . . . Third party, Travalles (ph).

. . . .

[PROSECUTOR:]  I make a hearsay objection.

19

MS. BYLUND:  That is definitely, you know, on concealing evidence used in a homicide is a crime.

[PROSECUTOR:]  But giving it to somebody isn't.

. . . .

THE COURT:  What's the statement you are offering?

MS. BYLUND:  You know, I didn't realize this would be disputed. I would have to ask King, or the court can ask King about the precise language that Pickett used when he told her he had given Travalles the weapon. . . .

THE COURT:  Would you like to have a 402 hearing before that person testifies in that regard?

MS. BYLUND:  I think that would be fine, Judge.

(Id. at p. 52-54.)  The California Court of Appeal opined, in a footnote, "[i]t would appear from the record that once Ms. Bylund decided that the prosecution had not proven its case, she rested without having this 402 hearing."  (Resp't's Answer Ex. I, at p. 31 n. 23.)

On February 24, 1998, both parties gave opening arguments and on February 25, 1998, both parties finished closing arguments.  As Petitioner correctly points out, the record reflects that "Petitioner had no evidence and no witnesses introduced on his behalf."  (Pet'r's Points & Authorities Supp. Am. Pet. at 33 (emphasis omitted).)  On February 26, 1998, the jury returned its verdicts.

On May 28, 1998, the parties appeared "for a Marsden motion, a motion to discharge the trial lawyer, who would be Ms. Bylund."  (Reporter's Tr. May 28, 1998 Hr'g at p. 2.)  Ms. Bylund also orally moved to withdraw as attorney of record.  Under California law, a Marsden motion allows an indigent defendant the opportunity to state specific reasons why he should have a new attorney substituted for a previously appointed counsel.  See Marsden, 2 Cal.3d at 122-23, 84 Cal. Rptr. 156, 465 P.2d 44.

During the hearing, Petitioner stated "[i]t was clear to [him]" that Jamilla [sic] King, among others, was to testify, but King did not testify."  (Reporter's Tr. May 28, 1998 Hr'g at p.

20

13-14.)  When the trial court asked Ms. Bylund whether King was a character witness, Ms.

Bylund explained that the trial court ruled against all of King's proffered testimony except for

one possibility, which was subject to a 402 hearing:

> THE COURT: So [King] was a defense witness.  Was she going to
> be a character witness or what?
>
> [PETITIONER:]  No.
>
> THE COURT:  Ms. Bylund?
>
> [MS. BYLUND:]  No, Your Honor. . . . Her testimony was the
> subject of a motion in limine, and basically the Court ruled against
> all of the proffered testimony except for one possibility.
>
> THE COURT:  Was she the older woman?
>
> MS. BYLUND:  No. . . . [King's] proffered testimony was the
> subject of an limine motion.  The court ruled against all of our
> proffered testimony from Ms. King except for one possible bit of
> evidence, and . . . it wasn't clear to me whether she had firsthand
> knowledge of that or if she was told by a second person.  And I had
> to clarify that, so we had to have a 402 hearing.  So that's what she
> was going to testify to.

(Id. at p. 14.)  However:  (1) the trial court was inclined to admit King's proffered testimony that

Pickett habitually carried a black .38 at the time of offense; (2) the trial court ruled the 402

hearing was necessary to determine admissibility of King's proffered testimony that Pickett broke

up gun and gave it to third party; and (3) the trial court ruled that defense counsel could attempt

to admit at trial Pickett's statement to King that Pickett intended to steal truck and would kill

owner if needed.  King was not discussed any further in this hearing, and the trial court ultimately

relieved Ms. Bylund as attorney of record.

On July 27, 1998, Petitioner brought a motion for a new trial "on a number of grounds,"

including "an allegation that [Petitioner] did not receive effective assistance of counsel during the

trial."  (Resp't's Answer Ex. B pt. 8, at p. 5-6.)  The prosecution called Ms. Bylund as a witness.

Ms. Bylund testified she did not tell Petitioner she was going to call King as a witness at the end

of the prosecution's case:

1

[PROSECUTOR:]  Okay.  Did you say those things to him he
described.  Namely, at the end of the prosecution's case, did you
tell him that you were going to call King, Mullins and some
character witnesses and then you and [Petitioner] would discuss
whether he should testify?

2

3

4

[MS. BYLUND:]  No.

5   (Id. at p. 26.)  Ms. Bylund admitted she discussed with Petitioner whether she would put on any

6   defense evidence, including calling King as a witness.  (Id. at p. 26-27.)

7          When asked to "describe conversations" with Petitioner as to what, if any, defense

8   evidence would be put on, Ms. Bylund answered she discussed the advantages and disadvantages

9   of each witness, without any specific reference to King:

10

[MS. BYLUND:]  Throughout the trial we would constantly be
discussing defense witnesses and whether or not we would put on a
defense or rest.  And the advantages and disadvantages of each.
And the disadvantages of some of the respective defense witnesses,
especially Mr. Mullins.

11

12

13   (Id. at p. 28.)

14          Ms. Bylund also testified that she had "discussed at length" with Petitioner that "in

15   addition to no witnesses being called[,] he would not testify."  (Id. at p. 32.)  According to Ms.

16   Bylund, this was discussed before the prosecution rested its case.  (Id. at p. 32-33.)

17

[PROSECUTOR:]  So if [Petitioner] states that the first he heard
about no defense witnesses or evidence being put on, was after the
prosecution rested, that would be different than your recollection of
what was said between you and him?

18

19

[MS. BYLUND:]  Yes.

20

21   (Id. at p. 33.)  The California Court of Appeal determined that, "Ms. Bylund was never

22   specifically asked why she elected not to call King as a witness."  (Resp't's Answer Ex. I, at p.

23   31.)  The trial court ultimately denied Petitioner's motion for a new trial.  (See Resp't's Answer

24   Ex. B pt. 8, at p. 37.)

25          On September 11, 2008, Petitioner filed his amended federal habeas petition.  Petitioner

26   included a declaration from Jamila King dated May 9, 2005, over seven years after the trial

1   ended.  (See Pet'r's Am. Pet. Ex. E.)  In King's declaration, she stated that:

2   > I was a long-time friend and associate of Ericc Pickett and an
   > acquaintance of Shannon Secrease.

3

4   > About or in September/October, 1996, I resided at . . . Carolina
   > Street, Vallejo, California.  About that time, Ericc Pickett, having
   > no place to stay after being evicted from his parent's home, was
5   > allowed to stay at my residence.  He stayed at the residence for an
   > average of 4 nights per week during a three-week period.

6

7   > At several times during the period in which he stayed at my
   > residence, Ericc Pickett would examine the classified newspaper
   > advertisements in an attempt to locate a vehicle having a particular
8   > type [of] engine.  Pickett explained to me that he intended to steal
   > the vehicle and remove its engine and place the engine into his own
9   > vehicle.  *He further told me that his plan included, ". . . finding
   > someone stupid enough to drive me there."*  Pickett indicated that
   > he intended to dupe an unsuspecting person into driving him to the
10  > location of the vehicle he wanted to steal.

11

12  > At some point prior to the murder of the car owner, Pickett told me
   > that he had found the person that he was going to get him to drive
   > him to the location of the vehicle he intended to steal.  He told me
13  > that that person was [Petitioner].  I had not met [Petitioner] at that
   > time.

14

15  > Pickett described [Petitioner] to me as being stupid, a "mamas-
   > boy," and a looser [sic].  Pickett also told me that [Petitioner] could
   > easily be fooled and used.  A short time prior to the murder, I met
16  > [Petitioner] when he accompanied Pickett on a visit to my
   > residence.  During this visit, Pickett told me, again, that he
17  > intended to "use" [Petitioner] to drive him to the location where he
   > intended to steal a vehicle.  Pickett did not tell me that he had
18  > located the vehicle that he intended to steal.

19  > While Pickett was at my residence, I was aware that he was in
   > possession of a handgun, which I believe was the same gun used in
20  > the crime for which he and Secrease were subsequently arrested.
   > During a conversation, prior to the murder, Picket told me that he
21  > did not wish to kill anyone, but he would if he had to in order, ". . .
   > to get what I want."  I do not know what happened to the handgun.

22

23  > After I learned of the murder, I, of my own volition, provided a
   > statement to the Vallejo Police Detectives investigating the murder
   > and later to [Petitioner's] Attorney (a female) and her Investigator
24  > from the Solano County Public Defender's Office.  The Attorney
   > told me that my testimony was critical to the Defense.  On the date
25  > I was to testify, I was not called by the Defense.

26  (Id. at p.1-2.)

1    Petitioner argues that the testimony of Jamila King "would have helped explain how

2  [Petitioner] became involved in this incident; how Mr. Pickett planned and executed the crime;

3  why [Petitioner] did not report the crime to the police; and why [Petitioner] would have been

4  afraid of Mr. Pickett." (Pet'r's Traverse at p. 12.)  Under these circumstances it is easier to

5  analyze this argument under the <u>Strickland</u> prejudice prong.  To establish prejudice caused by the

6  failure to call a witness, Petitioner must show that the witness was likely to have been available

7  to testify, that the witness would have given the proffered testimony and that the witness would

8  have created a reasonable probability that the jury would have reached a verdict more favorable

9  to Petitioner.  <u>See</u> <u>Grisby v. Blodgett</u>, 130 F.3d 365, 373 (9th Cir. 1997) (speculating as to what a

10  proposed witness would say is not enough to establish prejudice); <u>United States v. Harden</u>, 846

11  F.2d 1229, 1231-32 (9th Cir. 1988) (no ineffective assistance because of counsel's failure to call

12  a witness where, among other things, there was no evidence in the record that the witness would

13  testify).

14    Petitioner argues that King's 2005 statement shows that Pickett was simply using

15  Petitioner to transport him to commit the crime unbeknownst to Petitioner.  (<u>See</u> Pet'r's Points &

16  Authorities Supp. Am. Pet. at p. 42-43.)  He also argues that King's statement helps explain why

17  Petitioner did not report the crime to the police and why Petitioner may have been afraid of

18  Pickett. (<u>See</u> Pet'r's Traverse at p. 12.)   Petitioner relies on the statements in King's declaration

19  that Pickett told her that he intended to dupe an unsuspecting person to drive him to steal the

20  vehicle.  At the outset, it should be noted that Petitioner does not suggest how this purported

21  testimony by King about what Pickett told her regarding the individual he wanted to "dupe"

22  would be admissible under a hearsay exception.

23    Nevertheless, assuming *arguendo* that the statements could have been admitted at trial,

24  Petitioner fails to show to a reasonable probability that they would have changed the outcome of

25  the trial.  Petitioner's own statements to police established that he was not an unknown

26  participant in the carjacking.  For example, Petitioner stated to police that Pickett had stated to

him that, "after looking at the pickup truck, he was going to come back and take it.  And they

discussed going back and taking the pickup truck."  (Resp't's Answer Ex. B pt. 5, at p. 72.)  The

detective then testified that taking it meant "stealing it."  (Id.)  Furthermore, the detective

testified that Petitioner told him that while driving down to Vallejo, Pickett made comments to

make Petitioner believe that he had a gun.  (Id. at p. 75.)  Additionally, the following colloquy

took place on direct examination between the prosecutor and the detective who interviewed

Petitioner:

> Q:  Okay.  Now, did Mr. Secrease give you any more details
> regarding the conversation between him and Pickett about this
> truck on the way to Vallejo?
> A:  Yes.  Shannon had told me when they were discussing the
> truck, just that he had mentioned he needed the engine, and he
> [Pickett] was to take the truck, steal it after he test drove it.  And if
> the owner got in the way, he [Pickett] was going to – I don't
> remember – I remember him saying whip his ass, something to that
> effect.  That would be the owner.

(Id. at p. 77-78.)  The detective also testified on direct that Petitioner went over to Pickett's home

on two separate days to assist him with the truck after the murder.  (See id. at 76-77.)

On cross-examination the following colloquy took place between Petitioner's trial

counsel and the detective:

> Q:  Okay.  He also told you during that interview that if he had
> known that Mr. Pickett was going to do anything, he would have
> never gone with him, didn't he?
> A:  Yes, he did.
> Q:  And respecting Pickett's intent to possibly steal the truck,
> return later and steal the truck, Mr. Secrease wasn't planning on
> doing that with him, was he?
> A:  He just mentioned that Ericc had mentioned he was going to go
> back and steal a truck.
> Q:  So he thought Ericc Pickett would go back at a later time and
> steal the truck; isn't that correct?
> A:  That's correct.
> Q:  So there was no indication that Ericc Pickett was going to steal
> the truck during that test drive, was there?
> A:  It's how you perceive that conversation, I guess.  I don't know
> what his intentions were.
> Q:  Well, he never said that Ericc Pickett said he was going to steal
> it during the test drive, did he?
> A:  No, Shannon never mentioned it.  No.

1          Q:  In fact, he told you that Ericc Pickett said, "I'm going to come
back to steal it," right?
2          A:  Correct.

3    (Id. at p. 83-84.)

4         The prosecutor proceeded on several theories of murder at trial.  One theory was that

5    Petitioner actually shot the victim.  The prosecutor presented evidence from two witnesses in

6    which Petitioner stated that he shot the victim.  However, the jury apparently rejected this theory

7    as illustrated by their finding that Petitioner did not personally use a firearm.  Another theory

8    posited by the prosecution was that Petitioner was guilty of first-degree murder under the felony-

9    murder rule.  The jury was instructed as follows:

10        If a human being is killed, by any one of several persons engaged
in the commission of the crime of carjacking, all persons, who
11        either directly and actively commit the act constituting the crime,
or who with knowledge of the unlawful purpose of the perpetrator
12        of the crime and with the intent or purpose of committing,
encouraging or facilitating the commission of the offense, aid,
13        promote, encourage or instigates by act or advise its commission,
are guilty of murder in the first degree, whether the killing is
14        intentional, unintentional or accidental.

15   (Resp't's Answer Ex. B pt. 5, at p. 190.)  If Petitioner was deemed to have aided and abetted the

16   carjacking, he would be guilty of first-degree murder under the felony-murder rule.

17        Under California law, an "aider and abettor is a person who, acting with (1) knowledge of

18   the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing,

19   encouraging, or facilitating the commission of the offense, (3) by act or advice, aids, promotes,

20   encourages or instigates, the commission of the crime.'"  People v. Jurado, 38 Cal. 4th 72, 136,

21   41 Cal. Rptr. 3d 319, 131 P.3d 400 (2006) (internal quotation marks and citations omitted).  The

22   requisite intent to render such aid must be formed prior to or during the commission of the crime.

23   People v. Cooper, 52 Cal. 3d 1158, 1164, 282 Cal. Rptr. 450, 811 P.2d 742 (1991).  Whether an

24   individual is an aider or abettor depends on whether the crime committed by the perpetrator was

25   reasonably foreseeable.  People v. Hayes, 21 Cal. 4th 1211, 1271 n. 20, 91 Cal. Rptr. 2d 211, 989

26   P.2d 645 (2000); see also People v. Karapetyan, 140 Cal. App. 4th 1172, 45 Cal. Rptr. 3d 245

(2006) ("[T]he question is not whether the aider and abettor *actually* foresaw the . . . crime, but whether, judged objectively, it was *reasonably* foreseeable." (citation and internal quotation marks omitted; emphasis in original)).  Factors that are probative on the issue of knowledge and intent include "presence at the scene of the crime, companionship and conduct before and after the offense, including flight."  See People v. Mitchell, 183 Cal. App. 3d, 330, 228 Cal. Rptr. 286 (1986).  "Mere presence at the scene of a crime is not sufficient to constitute aiding and abetting, nor is the failure to take action to prevent a crime, although these are factors the jury may consider in assessing a defendant's criminal liability."  People v. Nguyen, 21 Cal. App. 4th 518, 529-30, 26 Cal. Rptr. 2d 323 (1993).  One who aids and abets in the commission of the offense is liable for the offense as a principal.  See People v. Fauber, 2 Cal. 4th 792, 833, 9 Cal. Rptr. 2d 24, 831 P.2d 249 (1992) (citing Cal. Penal Code § 31.)

Petitioner argues in his amended federal habeas petition that King's testimony was crucial because King's testimony would have shown that Petitioner was not involved in any aspect of the crime and "was simply used, unbeknownst to Petitioner, as transportation to the crime scene." (Pet'r's Points & Authorities Supp. Am. Pet. at p. 43.)  For the following reasons, Petitioner fails to establish that he was prejudiced by the failure of trial counsel to call King as a witness.

In this case, based upon the Petitioner's own statements, he aided and abetted Pickett in the carjacking.  King's testimony would not have, to a reasonable probability, changed the outcome of the trial, due to the strength of Petitioner's statements.  Petitioner admitted to police that he knew Pickett had the intent to steal the pickup truck.  Possessing this knowledge, Petitioner still drove Pickett to Vallejo to look at the truck so that Pickett could purportedly come back and steal it.  Petitioner believed that Pickett was armed and Pickett stated to Petitioner that if the truck owner got in his way, he would "whip his ass" or words to those effect.  Petitioner also went on the test drive with Pickett and the victim.  After the crime was committed, Petitioner went to Pickett's home on two occasions to assist him with the truck he had stolen.  This included removing screws or bolts from the engine and cleaning up the blood from the

1   truck.  (See Resp't's Answer Ex. B, pt. 5 at p. 77.)

2          King's statement in her declaration that Pickett was going to "dupe" someone into driving

3   him to the location of the truck was directly contradicted by Petitioner's own statements to

4   police.  Petitioner knew that Pickett had the intent to steal the truck, believed that Pickett had a

5   gun on his person and was told by Pickett that he would whip the car owner's ass if he got in the

6   way.  Thus, Petitioner had knowledge of Pickett's intent to commit a carjacking, and facilitated

7   and aided the commission of the carjacking offense by driving Pickett to Vallejo and

8   accompanying him on the test drive.  Based on Petitioner's knowledge as he stated to the police

9   upon his arrest, the carjacking by Pickett was reasonably foreseeable.  Furthermore, Petitioner's

10  actions after the crime was committed further implicates him as an aider and abettor.

11         Petitioner also argues that the failure to call King as a witness constituted ineffective

12  assistance of counsel because she would have testified that Pickett carried a black .38 all the time

13  in his waistband.  (Pet'r's Traverse at p. 11-12).  Petitioner asserts that this evidence was relevant

14  to show that Pickett posed a threat to Petitioner.  Petitioner argues that this evidence would have

15  shown that Petitioner was afraid of Pickett and why he did not inform the police about the

16  murder after it was committed.  However, the evidence that Petitioner relies on occurred after the

17  shooting, not before.  This purported testimony from King would not have, to a reasonable

18  probability changed the outcome of the proceedings.  Petitioner's own statements implicated him

19  as an aider and abettor to the carjacking.

20         For the foregoing reasons, Petitioner is not entitled to federal habeas relief on Claim III.

21         D.  Claim IV

22         In Claim IV, Petitioner argues that trial counsel was ineffective for failing to call Terrence

23  Mullins as a witness at trial.  Petitioner has provided a declaration from Terrence Mullins dated

24  October 5, 2005 which states the following:

25              I am an acquaintance of Ericc Pickett and Shannon Secrease,
             having first met both men while we were incarcerated and waiting
26              trial in Solano County Jail - Fairfield, California in or about

January 1997.

From my contact with Pickett, I learned that Pickett and Secrease were arrested and waiting trial for a murder committed in Vallejo, California.  I further learned, when reminiscing about past friends and social activities with Pickett, that Pickett and my former girlfriend, Jamila King, had once been social friends.  This fact, at least in part, seemed to create a bond between Pickett and myself.  With respect to the case against the two men, Pickett told me the following:

Pickett related that he had a car that required a new engine.  He explained that he had been searching for the right car to steal so that he could remove the stolen vehicle's engine and place that engine in his vehicle.  He further related that he had searched the newspaper classified advertisements until he found the vehicle he wanted.

Pickett told me that he needed a ride to the vehicle and learn where and how the vehicle was stored so that he could return at a later time and steal the vehicle.

Pickett told me that he talked Secrease into giving him a ride to Vallejo, Pickett told me that Secrease had no knowledge that Pickett was "casing" the job in preparation for the intended theft of the vehicle.

Pickett made statements and implications to me, which indicated that he considered Secrease to be naive, not street-wise, and easily manipulated by others.

Pickett told me that the owner of the vehicle had offered to take him for a test drive.  Pickett told me that during the test drive, he asked the owner to stop the vehicle so that he (Pickett) could urinate use the bathroom [sic].  When the owner stopped the vehicle, ". . . it just happened.  I do not recall Pickett's exact words but he indicated that he shot the owner of the vehicle and that the shooting of the owner was an impulsive act rather than having been a preconceived act.

Pickett told me that Secrease had no prior knowledge that he, Pickett, was carrying a handgun and that Secrease had no prior knowledge of Pickett's plans to steal the vehicle.  Pickett told me that Secrease could not have had knowledge that he (Pickett) was going to shoot the owner because the act had been completed on impulse.

Picket [sic] told me that when the owner was shot, Secrease became hysterical and was unable to stop crying and screaming.  Pickett told me that, after the shooting, he had to tell Secrease what to do.  Pickett told me that he threatened to do harm to Secrease

and Secrease's family if he did not do what Pickett told him to do and assist Pickett in concealing the crime.

Pickett told me that he was trying to think of a way to tell authorities that Secrease was innocent, but was concerned about incriminating himself.  Pickett and I discussed this on several occasions prior to Pickett accepting a plea bargain from the Solano County District Attorney.  After Pickett accepted the plea bargain, the subject of Pickett telling authorities that Secrease had no prior knowledge or involvement in the shooting was not discussed again.

During Secrease's trial, I provided the above information to Secrease's Attorney (a female) and an Investigator (male) from the Solano County Public Defender's Office.  They informed me that my statement was extremely critical and that I was to testify in open court on behalf of Secrease's defense.  On the day that I was scheduled to testify, I was not called before the court.

From my perception of and interactions with Secrease and Pickett and the information related to me by Pickett, as described in the foregoing statement, I developed an opinion that Secrease was not intentionally involved in the crime for which he was convicted.  I make this Declaration because it is the just and right thing to do.

(Pet'r's Am. Pet. Ex. F.)

Before trial, the trial judge ruled that Mullins could be impeached with several felony convictions if called to testify.  (See Resp't's Answer Ex. B pt. 5, at p. 8-10.)  Among Mullins' crimes were pimping, terrorist threats, pandering, aggravated mayhem, assault with a deadly weapon, torture and battery with serious bodily injury.  (See id. at p. 8.)  During the motion for a new trial, Petitioner's trial counsel testified that the trial judge had ruled that Mullins could be impeached with eight felonies, some of which were heinous and that she felt "that might somehow effect the way the jury perceived my client when we had someone of that character as a defense witness."  (See Resp't's Answer Ex. B pt. 8, at p. 29.)

The California Court of Appeal provided the last reasoned decision of this Claim and stated the following:

Defendant also challenges Ms. Bylund's decision not to call Terrence Mullins as a witness.  The trial court ruled in limine that Terrance Mullins could testify only that he heard Pickett say that Pickett was the shooter.  At the motion for a new trial, Ms. Bylund explained that she made a tactical decision not to call Mullins as

1
> the trial court had ruled that he could be impeached with eight
> different felony convictions, "some of which were heinous." She
2
> felt that "that might somehow effect [*sic*] the way the jury
> perceived [her] client when [they] had someone of that character as
3
> a defense witness."

4  (Slip Op. at p. 32.)  Ultimately, the California Court of Appeal's determined that:

5
> Defense counsel testified at the new trial motion that her tactical
> decisions as to what defense evidence to put on were thoroughly
6
> discussed with defendant and that he apparently concurred in the
> decisions.  Defendant has failed to meet his burden of overcoming
7
> "the presumption that, under the circumstances, the challenged
> action 'might be considered trial strategy.'" (Strickland v.
8
> Washington, supra, 466 U.S. at p. 689.)  The trial court was in the
> best position to evaluate Ms. Bylund's competency and there has
9
> been no showing of clear and unmistakable abuse in its
> determination that Ms. Bylund's decisions were made for sound
10
> tactical reasons and that her performance was not ineffective.
> (People v. Aubrey, supra, 70 Cal. App. 4th at p. 1104.)

11

12  (Id. at p. 34.)

13      The failure to call a witness cannot establish ineffective assistance when defense counsel

14  is well-informed of the facts and circumstances of the witness's account.  Eggleston v. U.S., 798

15  F.2d 374, 376 (9th Cir. 1986).  Trial counsel's tactical decisions deserve deference when counsel

16  makes an informed decision based on strategic trial considerations, and the decision appears

17  reasonable under the circumstances.  Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).  The

18  ultimate decision not to call witnesses at trial is well within counsel's "full authority to manage

19  the conduct of trial."  Taylor v. Illinois, 484 U.S. 400, 418 (1988).

20      In United States v. Harden, 846 F.3d 1229, 1231-32 (9th Cir. 1999), the Ninth Circuit

21  denied an ineffective assistance of counsel claim for trial counsel's failure to call a witness who

22  had a Fifth Amendment right not to testify and who had credibility problems because he was a

23  convicted felon.  The Ninth Circuit reasoned that the witness's credibility issues made it a

24  reasonable trial tactic not to call him.  See id.  Similarly, in this case, Petitioner's trial counsel

25  noted her concern with numerous felony convictions that Mullins would have been impeached

26  with if called as a witness.  Trial counsel's decision not to call Mullins as a witness did not fall

1  below an objective standard of reasonableness.

2         Furthermore, even assuming that Petitioner's trial counsel's failure to call Mullins as a

3  witness did fall below an objective standard of reasonableness, Petitioner failed to show that he

4  was prejudiced under the Strickland standard.  Petitioner argues that Mullins' testimony

5  "amounts to an explanation by Mr. Pickett that Petitioner was not involved in the crime, and that

6  the crime – both the robbery and the murder – were committed independently by Mr. Pickett."

7  (Pet'r's Points & Authorities in Supp. Am. Pet. at p. 43.)  The problem with this argument is that

8  the statements within Mullins' declaration are directly contradicted by the statements that

9  Petitioner gave police upon his arrest.  As stated in supra Part V.C, Petitioner stated that he knew

10 Pickett's intention was to eventually steal the truck.  He also believed that Pickett was carrying a

11 gun on his person and that Pickett would "whip [the truck owner's] ass" if he got in the way of

12 Pickett.  Despite this knowledge of Pickett's intent, Petitioner drove Pickett to Vallejo and

13 accompanied him on the test drive anyway, thereby aiding and abetting him in the carjacking

14 upon which the murder was completed.  Thus, Petitioner's own statements to police upon his

15 arrest directly contradicted Mullins' declaration about the crime and Petitioner's knowledge.

16 Under these circumstances, and in light of Petitioner's own statements to police, Petitioner failed

17 to show to a reasonable probability that the outcome of the proceeding would have been different

18 had Mullins testified for the defense.  Therefore, Petitioner is not entitled to federal habeas relief

19 on Claim IV.

20        E.  Claim V

21        In Claim V, Petitioner argues that trial counsel was ineffective for failing to call his

22 mother as a witness as well as his attorney's failure to call character witnesses on Petitioner's

23 behalf.  The last reasoned decision on these issues was from the California Court of Appeal

24 which stated the following:

25              Defendant challenges his trial attorney's decision not to call his
              mother to testify that she overheard a conversation in which Pickett
26            admitted shooting the victim and threatened defendant if he told

anyone about the crime.  Although Ms. Bylund was never asked why she did not call defendant's mother as a witness, clearly defendant's mother's credibility would have been at issue due to her arguable bias towards her son.

With regard to her decision not to call character witnesses to testify that defendant was not a violent person, Ms. Bylund explained that "The character witnesses were disappointing.  We probably interviewed about a dozen people and many of them . . . . ¶ . . . ¶  I had a few character witnesses that were primarily Shannon's mom's friends who didn't have necessarily a lot of recent contact with him and/or they weren't my favorite-type character witnesses who would be teachers or ministers, people of that nature."  Ms. Bylund further explained that she felt she had gotten in "[m]ore powerful character witness testimony" through Vivian Patton, who testified that defendant was nonviolent and that it was totally out of character for him to use a firearm or to engage in any kind of violent conduct.  Defendant contends that this decision by trial counsel was not a reasonable tactical decision, however, because "it was an uninformed tactical decision:  the witnesses had significant recent contact with Shannon," citing declarations filed with his motion for new trial.  While it is true that there were four such declarations filed, one with a notation that the declarant was a minister and another with a notation that the declarant was a teacher, none of the declarations indicates how these individuals knew defendant, i.e., was this defendant's teacher or defendant's minister?  Did they know defendant well, or were they just friends of his mother?  The declarations are form, "fill-in-the-blanks" declarations, where the only personalized information provided by the declarant is how long he or show has known the defendant and how often "during that period" the individual has seen him ("at least __ times per __").  For example, the minister, one Sidney Handy, indicated that he had known defendant for at least 10 years and during that time had seen him at least 20 times per month.  Conspicuously missing from that information provided, however, is when the declarant's most recent contact with defendant took place.

Thus the information provided through declarations in support of defendant's motion for a new trial did little to negate defense counsel's explanation of her tactical reasons for not calling the character witnesses which her investigation revealed.  It is unclear if the declarations are even from individuals among the dozen or so potential character witnesses that she interviewed.  There is no evidence that the names of these declarants were even provided to Ms. Bylund as potential character witnesses.  There was no information provided that these individuals personally knew defendant well (as opposed to being friends of his mother), when they last had any contact with him, how substantial that contact was, or what the nature of their relationship with him really was . . . .

> Defense counsel testified at the new trial motion that her tactical decisions as to what defense evidence to put on were thoroughly discussed with defendant and that he apparently concurred in the decisions.  Defendant has failed to meet his burden of overcoming "the presumption that, under the circumstances, the challenged action 'might be considered trial strategy.'" (Strickland v. Washington, supra, 466 U.S. at p. 689.)  The trial court was in the best position to evaluate Ms. Bylund's competency and there has been no showing of clear and unmistakable abuse in its determination that Ms. Bylund's decisions were made for sound tactical reasons and that her performance was no ineffective. (People v. Aubrey, supra, 70 Cal. App. 4th at p. 1104.)

(Slip Op. at p. 32-33, 34.)

i.  Petitioner's Mother

Petitioner asserts that his mother would have testified that she overheard a phone conversation whereby Pickett admitted to shooting the victim and that he threatened Petitioner not to tell anyone.  The record is silent regarding Petitioner's trial counsel's reasons for not calling his mother to testify.  At the outset, unlike Petitioner's claims that trial counsel was ineffective for failing to call King or Mullins, Petitioner fails to provide an affidavit/declaration from Petitioner's mother that she would have so testified if called as a witness.  See Dows v. Wood, 211 F.3d 480, 486-87 (9th Cir. 2000) ("Dows provides no evidence that this witness would have provided helpful testimony for the defense - i.e., Dows has not presented an affidavit from this alleged witness.").

Nevertheless, even assuming *arguendo* that Petitioner's mother would have testified as he alleges she would have in his amended federal habeas petition, Petitioner fails to show that he was prejudiced by trial counsel's failure to call his mother as a witness under the relevant Strickland standard.  Petitioner's mother's testimony would not have changed, to a reasonable probability, the jury's verdict in that it would have had little to no effect on the prosecution's theory that Petitioner was guilty as an aider and abettor of the carjacking and thereby guilty of felony-murder.  The fact that Petitioner's mother would have testified that Pickett said he was the shooter would not have affected a finding of Petitioner as an aider or abettor under a felony-

murder theory.  Petitioner could be convicted even if he was not the actual shooter.  Thus, Petitioner's mother's purported testimony that Pickett admitted to the shooting would not have affected the outcome to a reasonable probability.  Furthermore, the fact that Petitioner's mother would have testified that Pickett threatened Petitioner would not have, to a reasonable probability, changed the jury's verdict in light of Petitioner's knowledge of Pickett's intent to steal the truck, his belief that Pickett was carrying a firearm, and Pickett's statement to him that he would "whip [the truck owner's] ass" if he got in his way when Petitioner drove Pickett down to Vallejo.

ii.  Character Witnesses

Next, Petitioner argues that "trial counsel inexplicably refused to use available character witnesses."  (Pet'r's Points & Authorities Supp. Am. Pet. at p. 41.)  As outlined by the California Court of Appeal, the following colloquy took place between Petitioner's trial counsel and the prosecutor during Petitioner's motion for a new trial hearing:

> Q:  What considerations did you relate or state to Mr. Secrease concerning the pros and cons of putting on character witnesses on his character for non-violence?
> A:  We discussed very specifically Vivian Patton's testimony, prosecution witness's testimony, and I felt I got in more powerful character witness testimony through her.  [¶]  She testified that these [sic] he's a non-violent person during cross-examination, totally out of character for him to use a firearm or to engage in any kind of violent conduct.  [¶]  On the other hand, the character witnesses – I had a few character witnesses that were primarily Shannon's mom's friends who didn't have necessarily a lot of recent contact with him and/or they weren't my favorite-type character witnesses who would be teachers or ministers, people of that nature.
> Q:  And did you discuss that concern with Mr. Secrease?
> A:  Yes.
> Q:  Okay.  So is it your – do you feel that you had discussed all these issues that have been mentioned which is specifically what defense evidence, if any, should be put on with him during the trial and prior to the resting of the prosecution's case?
> A:  Yes, it was all discussed with him.
> Q:  Was it discussed even before the trial started?
> A:  Yes.
> Q:  Okay.  Was a decision made as to what to do in the area of what defense evidence to present?  Was that decision made before

35

1   the prosecution rested or not until after the prosecution rested?
    A:  Before the prosecution rested.
2   Q:  Okay.  And was this decision communicated to Mr. Secrease?
    A:  Yes, it was.
3   Q:  Did he agree with that decision?
    A:  He said he did.

4

5   (Resp't's Answer Ex. B pt. 8, at p. 31-32.)

6        Petitioner cites to four declarations from character witnesses in his amended federal

7   habeas petition.  Each of these declarations lists the number of years that the individual has

8   known Petitioner as well as how often the individual has seen Petitioner.  Furthermore, each

9   declaration states that "I am in contact with a number of people who know Mr. Secrease . . . I

10  have not heard or learned anything which would lead me to believe that he is of violent character.

11  To the contrary his reputation is that of being a non-physical person . . . I have never been

12  convicted of a felony or any crime which involves moral turpitude."  (Resp't's Answer Ex. A at

13  p. 191-200).  The individuals providing these declarations purportedly include a teacher and a

14  minister.  Petitioner's counsel testified that she interviewed about twelve character witnesses but

15  that they didn't have any real contact with Petitioner and/or were not the type of witnesses (ie

16  teachers or ministers) that counsel preferred as character witnesses.[5]  Petitioner's trial counsel felt

17  that Petitioner's character was adequately addressed by Patton's testimony regarding his

18  nonviolent character.  Under these circumstances, the California Court of Appeal's decision that

19  trial counsel's decision was sound trial strategy regarding having additional character witnesses

20  testify was not an objectively unreasonable application of clearly established federal law.  In this

21  case, trial counsel interviewed multiple possible character witnesses.  Thus, this was not a case

22  where trial counsel failed to investigate possible character witnesses.  Furthermore, Petitioner's

23  character for nonviolent behavior was introduced as evidence through Patton's trial testimony.

24        Additionally, assuming *arguendo* that trial counsel's performance in not calling

25

26       [5] The fact that one witness was a teacher and another was a minister do not change the
    outcome of Petitioner's arguments for the reasons discussed infra.

1   additional character witnesses fell below an objective standard of reasonableness, Petitioner

2   failed to show to a reasonable probability that the outcome of the proceeding would have been

3   different had she done so.  As noted in supra Part V.C, there was strong evidence presented at

4   trial in the form of Petitioner's own statements to police as well as his actions after the crime was

5   committed to convict Petitioner under an aider and abettor felony-murder theory even with this

6   character evidence.  Therefore, Petitioner is not entitled to federal habeas relief on any of his

7   arguments within Claim V.

8        F.  Claim VI

9        In Claim VI, Petitioner argues that trial counsel was ineffective for failing to investigate a

10  duress defense and ask for a duress jury instruction at trial.  In support of this argument,

11  Petitioner states that he was yelling and crying after the shooting.  Furthermore, Petitioner told

12  the police that Pickett told him to get back in the car or that he would "get yours."  Petitioner also

13  relies on statements that he gave to a psychologist who analyzed Petitioner after his conviction.

14  He stated that after the shooting he was crying and terrified and looking for a place to run, but

15  realized that if he did Pickett would likely shoot him.  (See Pet'r's Am. Pet. Ex. G.)

16       Based on the state record, it appears as if Petitioner first raised this Claim in his petition

17  for writ of habeas corpus to the California Supreme Court that was filed on December 6, 2007.

18  As previously stated, the California Supreme Court denied that petition and cited to In re Clark, 5

19  Cal. 4th 750, 21 Cal. Rptr. 2d 509, 855 P.2d 729 and In re Robbins, 18 Cal. 4th 770, 780, 77 Cal.

20  Rptr. 2d 153, 959 P.2d 311.  The citation to these two cases indicates that the California Supreme

21  Court did not decide that habeas petition on the merits.  See Park v. California, 202 F.3d 1146,

22  1152 (9th Cir. 2000) (citation to In re Clark deals with the bar of untimeliness); see also Cooper

23  v. Brown, 510 F.3d 870, 1001-02 (9th Cir. 2007).  However, Respondent does not argue that this

24  Claim is procedurally barred, but instead asserts it should be denied on the merits.  Since no state

25  court has ever ruled on the merits of this Claim, it will be reviewed de novo.  See Chaker v.

26  Crogan, 428 F.3d 1215, 1221 (9th Cir. 2005).

1    Petitioner has the burden of establishing a reasonable probability that he would have

2 received a more favorable outcome but for trial counsel's failure to investigate this defense.  See

3 Young v. Runnels, 435 F.3d 1038, 1043-44 (9th Cir. 2006).  As the California Supreme Court

4 has stated:

5        The defense of duress is available to defendants who commit
         crimes, except murder, "under threats or menaces to show that they
6        had reasonable cause to and did believe their lives would be
         endangered if they refused."  (see People v. Anderson (2002) 28
7        Cal.4th 767, 780, 122 Cal.Rptr.2d 587, 50 P.3d 368.)  Although
         "duress is not a defense to any form of murder," (People v.
8        Anderson, supra, 28 Cal.4th at p. 780, 122 Cal.Rptr.2d 587, 50
         P.3d 368) "duress can, in effect, provide a defense to murder on a
9        felony-murder theory by negating the underlying
         felony.  [Citations.]  If one is not guilty of the underlying felony
10       due to duress, one cannot be guilty of felony murder based on that
         felony."  (Id. at p. 784, 122 Cal.Rptr.2d 587, 50 P.3d 368.)

11

12 People v. Wilson, 36 Cal. 4th 309, 331, 30 Cal. Rptr. 3d 513, 114 P.3d 758 (2005).  "The

13 common characteristic of all the decisions upholding [a duress defense] lies in the immediacy

14 and imminency of the threatened action:  each represents the situation of a present and active

15 aggressor threatening immediate danger; none depict a phantasmagoria of future harm."  (People

16 v. Vieira, 35 Cal. 4th 264, 290, 25 Cal. Rptr. 3d 337, 106 P.3d 990 (2005)

17    Petitioner cannot use his duress argument to negate the murder, but only the underlying

18 felony in this case, i.e., the carjacking.  See People v. Anderson, 28 Cal. 4th 767, 780, 784, 122

19 Cal. Rptr. 2d 587, 50 P.3d 368 (2002).  As previously outlined in supra Part V.C, Petitioner

20 drove Pickett to Vallejo knowing that he wanted to eventually steal the truck.  He believed that

21 Pickett was carrying a gun and that Pickett had told him he was going to "whip [the truck

22 owner's] ass" if he got in the way.  This evidence established that Petitioner aided and abetted

23 Pickett to commit the carjacking.  Petitioner does not assert that Pickett ever threatened him to

24 make him drive to Vallejo.  It was not until after the murder occurred that the facts upon which

25 Petitioner relies on to support his duress argument took place (i.e. Pickett's statement that

26 Petitioner will "get yours" when he demanded that Petitioner get back in the car).  Under these

circumstances, Petitioner failed to show to a reasonable probability that the outcome of the proceeding would have been different had trial counsel pursued a duress theory.  Therefore, Petitioner is not entitled to federal habeas relief on Claim VI.

G.  Claim VII

In Claim VII, Petitioner argues that trial counsel was ineffective for failing to investigate Petitioner's mental state because it would have revealed that Petitioner suffered from post-traumatic stress disorder (PTSD).  As with Claim VI, this Claim was first raised by Petitioner in his December 2007 state habeas petition to the California Supreme Court.  Respondent argues that this Claim should be denied on the merits.  As no state court has ever ruled on the merits of this Claim, it will be reviewed *de novo*.

In his amended federal habeas petition, Petitioner relies on the following facts to support this Claim:

> [H]is mental state at the time of the alleged offense should have been investigated because it was clear he was suffering the effects of having been traumatized.  At the time of the crime Petitioner was 17 years old.  He was unaccustomed to violence and lived a fairly sheltered life.  Bare inches from his face a gun exploded sending its charge into the skull of a human being sitting inches away from his person.  Brain matter, blood, and the lifeless body of Mr. David Iano splattered and fell on him.  Petitioner began screaming and crying.  He was ordered by the shooter to shut up and do what he said or he would "get his."
>
> Morever, Petitioner's statements to police further flag the fact that he was traumatized.  Specifically, in an interview with Detective Bennigson, he revealed the following:  (1) he was terrified of being charged with murder for a crime he did not commit; (2) that he was terrified during the incident (RT 64); (3) that he could not eat after the event (RT 81); and that, "I can close my eyes and see the man just like it's happening to me now.  I can't deal with no shit like that, man."  (RT 97).
>
> With this information in mind, a reasonably competent attorney would have investigated Petitioner's mental state.  Instead, trial counsel consulted no experts about the effects of trauma, asked no questions of anyone who knew Petitioner about his mental state, and did not evaluate him in any way.  Trial counsel did absolutely nothing.

1  (Pet'r's Points & Authorities Supp. Am. Pet. at p. 49.)  In 2004, Petitioner was seen by a

2  psychologist, Dr. Jules Burstein.  In his report, Dr. Burstein states that, "[t]here can be little

3  doubt, on the basis of my examination, that Mr. Secrease's account of what he witnesses on the

4  day of the offense was precisely the kind of event that would certainly lead to the development of

5  [PTSD]."  (Pet'r's Am. Pet. Ex. G.)  Furthermore, Dr. Burstein stated in his report that:

> It is my strong opinion that from the vantage point of these
> psychological factors, and especially given the fact that Mr.
> Secrease was continuing to attempt processing an event that
> seemed totally unreal to him, that contacting the police
> immediately after the shooting would not be a natural or expected
> course of action from him, despite the fact that "common sense
> might suggest that this would be the case.

10  (Id.)  Petitioner argues that this evidence negates the prosecutor's reliance on Petitioner's failure

11  to report the crime to the police after it happened.

12        Under these circumstances, Petitioner fails to show to a reasonable probability that the

13  outcome of the proceeding would have been different had trial counsel investigated Petitioner's

14  mental state.  As explained in supra Part V.C, Petitioner knowingly drove Pickett to Vallejo even

15  though Pickett told him he intended to steal the truck from the victim eventually.  Petitioner

16  believed that Pickett had a firearm on his person and that he would "whip [the truck owner's]

17  ass" if he got in the way.  As previously noted, this evidence was strong to support an aider and

18  abettor felony-murder theory.  The fact that Petitioner might have been suffering from PTSD

19  after the crime does not negate his actions, decisions and knowledge leading up to the crime in

20  aiding and abetting Pickett in the carjacking.  Thus, even if this evidence had been investigated, it

21  would not have, to a reasonable probability changed the outcome of the proceedings.

22        Petitioner argues that his mental state, and his purported PTSD would have supported his

23  duress defense.  Once again however, this relates to what occurred after the crime, and does not

24  negate that Petitioner was an aider and abettor to the carjacking, thereby making him guilty of

25  felony-murder.  Petitioner is not entitled to federal habeas relief on Claim VII.

26  //

40

1    H.  Claim VIII

2        In Claim VIII, Petitioner argues that trial counsel was ineffective in failing to investigate

3  and rebut evidence that Petitioner planned the crime.  Respondent argues that this Claim should

4  be denied on the merits.  Similar to Claims VI and VII, no state court has ever issued an opinion

5  on this Claim on the merits.  Therefore, it will be reviewed *de novo*.  In support of this argument,

6  Petitioner asserts the following:

> The state complemented its argument that Petitioner's behavior
> after the crime proved his guilt, by arguing that before the crime
> Petitioner had announced his intention to commit murder.  The
> prosecution pointed to testimony by Vivian Patton that Petitioner
> had stated, "I'm going to pull a lick," while driving to Vallejo
> where the crime was about to occur.  Ms. Patton had been
> Petitioner's passenger before he picked up Mr. Pickett.  Ms. Patton
> testified that "to pull a lick" was slang for an intent to commit a
> robbery and murder.  However, Ms. Patton was clear that:  (1) she
> didn't remember exactly what Petitioner was singing; and (2) that
> Petitioner was singing along to the lyrics of a song that was playing
> on the radio – not speaking extemporaneously.  Therefore, the
> specific lyrical content of the song that Petitioner was singing
> along should have been an important issue at trial.  Unfortunately,
> it wasn't as defense counsel made no attempts to find out what the
> lyrics of the song were and, therefore, what Petitioner was singing.

(Pet'r's Points & Authorities Supp. Am. Pet. at p. 56-57.)  Petitioner asserts that had trial counsel

made a minimal investigation into the lyrics of the song, she would have discovered that the lyric

is from a song "Dusted 'n' Disgusted" by the artist E-40.  Petitioner attaches a declaration from

Vivian Patton to his habeas petition in which she declares that the lyric in question was "What's

the definition of a lick?  Taking a niggaz shit."  (See Pet'r's Am. Pet. Ex. G.)  Patton declares

that the lyric only appears once in the song.  (See id.)  Thus, Petitioner argues that, "had the jury

been properly informed of the fact that Petitioner did not say, 'I'm going to pull a lick,'" the

prosecution's evidence linking Petitioner to planning the crime would be rebutted.  (See Pet'r's

Points & Authorities Supp. Am. Pet. at p. 59.)

        Respondent argues that this Claim can be denied under either prong of the Strickland

standard.  Under these circumstances, it is easier to analyze this Claim under the prejudice prong

of the Strickland test.  As explained in supra Part V.C, there was ample evidence to convict

Petitioner as an aider and abettor to carjacking and thereby felony murder in light of Petitioner's

statements that he made to police after he was arrested without the song lyric testimony or even if

the song lyric testimony had been discredited.  The fact that Petitioner's trial counsel purportedly

failed to investigate the song lyrics would not have, to a reasonable probability changed the

outcome of the proceedings.  Petitioner is not entitled to federal habeas relief on Claim VIII.

I.  Claim IX

In Claim IX, Petitioner argues trial counsel lacked a prepared strategy which resulted in

an ill-prepared opening statement, cross-examination and voir dire which prejudiced the result of

the trial.  Petitioner raised this Claim in his December 2007 state habeas petition to the California

Supreme Court.  As previously noted, that court did not reach the merits of the petition by

denying the petition citing In re Clark, 5 Cal. 4th 750, 21 Cal. Rptr. 2d 509, 855 P.2d 729 and In

re Robbins, 18 Cal. 4th 770, 780, 77 Cal. Rptr. 2d 153, 959 P.2d 311.  As no state court issued a

decision on the merits of this Claim, it will be reviewed *de novo*.

In his petition, Petitioner argues that trial counsel's voir dire, did not address any of the

potential issues that would have affected his case and that trial counsel's opening statement

lacked focus.  At the outset, to the extent that this Claim makes conclusory allegations, they are

insufficient to warrant federal habeas relief.  See James, 24 F.3d at 26 ("Conclusory allegations

which are not supported by a statement of specific facts do not warrant habeas relief.")  Unlike

the voir dire and trial testimony, the opening statements in this case were not transcribed.

However, a review of the opening statements is not necessary under these circumstances as it is

easier to analyze Petitioner's arguments under this Claim using the prejudice prong of the

Strickland test.  In light of Petitioner's statements to police upon his arrest as set forth in supra

Part V.C, the case against Petitioner under an aider and abettor felony-murder theory was strong.

Additionally, the voir dire transcript reveals that Petitioner's trial counsel was an active

participant and that her performance was not objectively unreasonable.  Furthermore, Petitioner

failed to show that he was prejudiced due to any purported failure of his trial counsel during voir dire and in her cross-examination of witnesses in light of the evidence against him that was presented at trial (most notably Petitioner's statements to police upon his arrest).  Claim IX should be denied.

J.  Claim X

In Claim X, Petitioner argues that trial counsel was ineffective when she failed to object to inadmissible prosecution testimony and evidence proffered during cross-examination.  Within this Claim, Petitioner makes three distinct arguments; specifically:  (1) trial counsel did not make any objections to the introduction of incomplete song lyrics; (2) trial counsel allowed inadmissible and unreliable evidence to be placed before the jury; and (3) trial counsel failed to object to the prosecutor's repeated misstatements of testimony.  Petitioner raised these issues in his December 2007 state habeas petition.  As with Claims VI, VII, VIII and IX, these arguments will be analyzed using a *de novo* standard of review.

i.  Failure to object to the introduction of incomplete song lyrics

Petitioner argues that a key piece of evidence of the prosecution was that Petitioner sang along to a song which purportedly contained the lyric, "I'm going to pull a lick."  (Pet'r's Points & Authorities Supp. Am. Pet. at p. 64.)  The following colloquy took place between the prosecutor and Vivian Patton during direct:

> Q:  Okay.  And now, did you hear Mr. Secrease on the way to Vallejo say anything about what he planned to do in Vallejo?
> A:  Like I said before, I assumed he was singing a song.  I wasn't taking anything serious by it.
> Q:  Okay.  And what is it that you heard him say?
> A:  Something like, "I'm going to pull a lick, or I'm going to do a lick," or something like that.  But like I said, I thought he was referring to a song.
> Q:  He is saying, "I'm going to pull a lick or do a lick"?
> A:  Uh-huh.
> Q:  And you heard who say that?
> A:  Shannon.
> Q:  Okay.  And what does it mean to pull a lick or do a lick?
> MS. BYLUND:  Objection.  Foundation, your Honor.
> THE COURT:  I'll sustain the objection.  You're going to have to

1    move closer to that microphone a little bit?
     MR. KEENEY:  Q:  Are you familiar with that slang expression
2    now?
     A:  Now.
3    Q:  And what does it mean?
     A:  Um, killing someone and taking their possession.
4    Q:  Okay.  And now, you said you didn't take this seriously when
     you heard him say it?
5    A:  Uh-huh.
     Q:  Can you explain what led you not to take it seriously?
6    A:  Because I figured he was going along with the song that was
     playing on the radio.
7    Q:  Okay.  And do you know the recording group that did that
     song.
8    A:  Well, the rapper's name is E-40.
     Q:  E-40?
9    A:  Uh-huh.
     Q:  And is that a lyric in that song?
10   A:  Yes, it's a lyric.
     Q:  About "I'm going to pull a lick"?
11   A:  Uh-huh.

12   (Resp't's Answer Ex. B pt. 5, at p. 143-44.)

13        Petitioner asserts that trial counsel should have, pursuant to California Evidence Code §

14   356, objected and sought admission of the full song lyrics.  California Evidence Code § 356

15   states that:

16        Where part of an act, declaration, conversation, or writing is given
          in evidence by one party, the whole on the same subject may
17        inquired into by an adverse party; when a letter is read, the answer
          may be given; and when a detached act, declaration, conversation
18        or writing is given in evidence, any other act, declaration,
          conversation or writing which is necessary to make it understood
19        may also be given in evidence.

20   Petitioner argues that the correct lyric is, "[w]hat's the definition of a lick," and that this evidence

21   should have been introduced at trial.

22        Under these circumstances, it is easier to analyze this argument under Strickland's

23   prejudice prong.  For the reasons stated in supra Part V.C, specifically Petitioner's statements to

24   police upon his arrest, there was strong evidence supporting Petitioner under an aider and abettor

25   felony-murder theory.  Thus, even if counsel's conduct fell below an objective standard of

26   reasonableness in not seeking to admit the full lyrics, it would not have, to a reasonable

44

1   probability changed the outcome of the trial in light of Petitioner's damaging admissions to

2   police making him liable as an aider and abettor to the carjacking.  Therefore, Petitioner is not

3   entitled to habeas relief on this argument.

4               ii.  Allowing inadmissible evidence to be admitted

5          Next, Petitioner argues that trial counsel was ineffective when it allowed Patton to testify

6   what "pulling a lick" means as stated in <u>supra</u> Part V.J.i.  Furthermore, Petitioner argues that trial

7   counsel compounded the problem during her cross-examination of Patton.  The following

8   colloquy took place during Petitioner's trial counsel's cross-examination of Patton:

9          Q:  . . . And when you were driving to Vallejo, the music was one
              real loud the whole way, wasn't it?
10         A:  Yes, pretty much.
           Q:  And when you heard Shannon say, "I'm going to pull a lick,"
11            he was actually singing along with the rap song, wasn't he?
           A:  That is the way I took it.  I didn't take it any other way.
12         Q:  Because there was a rap song on at this time, wasn't there?
           A:  That's correct.
13         Q:  And the rapper was saying, "I'm going to pull a lick," wasn't
              he?
14         A:  That's correct.
           Q:  And do you know how many times Shannon said it with him?
15            Did he say it one, or maybe he said it more times?  Do you know
              for sure?
16         A:  I heard him say it once.
           Q:  But he might have said it more times, because the rapper said it
17            more times, right?
           A:  Maybe.
18         Q:  And to "pull a lick" means any kind of stealing, doesn't it?
           A:  I guess, yeah.
19         Q:  So there doesn't have to be violence involved, just stealing?
           A:  I wouldn't know exactly.  I was told it meant killing somebody
20            and taking possession.  At the time, I didn't know what it meant.

21  (Resp't's Answer Ex. B pt. 5, at p. 152-53.)  Petitioner argues that trial counsel was ineffective

22  because the definition of a lick came from a witness who lacked sufficient knowledge to define

23  what it meant.

24         Under these circumstances, it is easier to analyze this argument under <u>Strickland</u>'s

25  prejudice prong.  For the reasons stated in <u>supra</u> Part V.C, specifically, Petitioner's statements to

26  police upon his arrest, there was strong evidence supporting Petitioner under an aider and abettor

                                          45

1   felony-murder theory.  Thus, even if counsel's conduct fell below an objective standard of

2   reasonableness in not objecting to Patton's definition of what it meant to "pull a lick" and her

3   purported errors on cross-examination of Patton, it would not have, to a reasonable probability

4   changed the outcome of the trial in light of Petitioner's damaging admissions to police.

5   Therefore, Petitioner is not entitled to habeas relief on this argument.

6                  iii.  Failure to object to the prosecutor's misstatement of testimony

7           Petitioner also argues within Claim X that the prosecutor misstated the testimony of

8   Patton.  As outlined above, the following colloquy took place on direct:

9               Q:  Okay.  And now, did you hear Mr. Secrease on the way to
                Vallejo say anything about what he planned to do in Vallejo?
10              A:  Like I said before, I assumed he was singing a song.  I wasn't
                taking anything serious by it.
11              Q:  Okay.  And what is it that you heard him say?
                A:  Something like, "I'm going to pull a lick, or I'm going to do a
12              lick," or something like that.  But like I said, I thought he was
                referring to a song.
13              Q:  He is saying, "I'm going to pull a lick or do a lick"?
                A:  Uh-huh.

14

15  (Resp't's Answer Ex. B pt. 5, at p. 143.)  Petitioner argues that the prosecutor's unequivocal

16  statement that Petitioner had said, "I'm going to pull a lick or do a lick" was not testified to by

17  Patton.  He states that she only testified that Petitioner said "something like 'I'm going to pull a

18  lick.'"

19          Under these circumstances, it is easier to analyze this Claim under Strickland's prejudice

20  prong.  For the reasons stated in supra Part V.C, specifically, Petitioner's statements to police

21  upon his arrest, there was strong evidence supporting Petitioner under an aider and abettor

22  felony-murder theory.  Thus, even if counsel's conduct fell below an objective standard of

23  reasonableness in not objecting to the prosecutor's purported mischaracterization of Patton's

24  testimony regarding what exactly Petitioner was singing, it would not have, to a reasonable

25  probability changed the outcome.  Therefore, Petitioner is also not entitled to habeas relief on this

26  argument such that Claim X does not warrant granting federal habeas relief.

                                              46

K.  Claim XI

In Claim XI, Petitioner argues that trial counsel was ineffective when she failed to request a mistrial during the voir dire proceedings after a prospective juror infected the entire jury pool with his answers.  Petitioner raised this Claim in his state habeas petitions which were summarily denied.  (See Resp't's Answer Ex. Q.)  A summary denial on this Claim is construed as a decision on the merits.  See Harrington v. Richter, 131 S.Ct. 770, 784 (2011)   During voir dire, the following colloquy took place:

> THE COURT: . . . . Now, in this case, according to Mr. Keeney, apparently one or more members of law enforcements [sic] are going to testify.  Now, the 12 of you in the box, would any of you give the testimony of a police officer only, just merely because they are a police officer, any greater or lesser weight than you would to anybody else?  Okay.  We have Mr. (Juror 9, Sealed.)
> JUROR #9:  Yes , sir, I would.
> THE COURT:  Okay.  Even if the person was a complete stranger to you?
> JUROR #9:  I think, you know, a member of law enforcement I think they come in here and sit in the jury box and said this is this, this is that, so on, yeah, I start regarding that, um, yeah, I think I could give that a lot more weight than the testimony of this, yeah, right here personally, yeah, of the accused.
> THE COURT:  Okay.  Well, I think if you asked everybody in this room, everyone would say you hope you have police officers that are credible and honest and so forth and so on.  But, as you know, all you have to do is read there is allegations of misconduct and unreasonable use of force, perjury, planting of evidence, allegations that are made by members of law enforcement all the time.  I don't know if they are true.  I don't know if they are not.  But I guess what I'm asking you is whether or not you believe a member of law enforcement if he testifies is just not automatically to be the truth, if that is so strong then there was evidence that was blue in the face of that person's testimony was wrong, you still wouldn't change your mind automatically as a matter of rule, accept the testimony of a police officer, is that what you are saying?
> JUROR #9:  I think if I sat here, your Honor, and heard 4 or 5 officers tell me basically the same type of thing, I think, yes, I would take that over anything else.  Yes, sir, I would.
> THE COURT:  Okay.  Supposed to be the devil's advocate somebody would say 4 or 5 officers, 4 or 5 anybody testified identically they could get together and put that together, I don't know if that's the case.  Anyway, obviously, you are leaning towards the members of law enforcement; is that right?
> JUROR #9:  I have a real strong leaning towards our system.

THE COURT:  Okay.

JUROR #9:  I think honestly once an individual gets to this point we are sitting here selecting a jury, enough people already took a look at the facts of the case, that is how I feel.

THE COURT:  Well, automatically if selected as a juror it will be your decision to make.

(Pet'r's Am. Pet. Ex. N.)  Subsequently, the following colloquy took place between this

prospective juror and Petitioner's trial counsel during the voir dire proceedings:

MS. BYLUND:  . . . . I do want to talk about some very general things, but I'm very interested in talking to Mr. (Juror 9, Sealed) about some of your ideas because I feel you and I probably have a lot in common, because I also have tremendous trust and belief in our system, criminal justice system in our country.  As far as we know it's the only country that has this system.  One of the comments that was somewhat surprising was, "Well, you know if it's gone this far."  What do you mean, it's gone this far?

JUROR #9:  I don't know anything about the case, if that is what you are asking.

MS. BYLUND:  What did you mean when you said that?

JUROR #9:  Process of investigation, putting together a case, getting everything to a point where it's coming to a trial, jury.

MS. BYLUND:  But did you mean that if it comes this far that you are more inclined to believe the person charged is guilty?

JUROR #9:  I spent 20 years in the U.S. Air Force defending democracy for this gentlemen to have a chance to come up here and say he's not guilty, for all of us to be here.  I have been in a lot of situations in a lot of parts of the world, and I agree this is the best legal system we have.  [¶]  But with my training in the military, the things I've seen, and the kind of people that I have dealt with, if he's already here for a murder charge, the charge the Judge has read off, having sat here and looked him in the eyes for about 10 minutes today, as far as I'm concerned, he's guilty already.  That is how I feel.

MS. BYLUND:  You think he's guilty because he's been charged with murder?

JUROR #9: That is the way I feel about this.  [¶]  In the course of this jury if you can bring out something that brings out something that tells me that the law enforcement really blew it, then I would have to change my mind.  But I can't see it coming that far, not if the District Attorney's Office and the police department have done their jobs right.

MS. BYLUND:  Okay.  So you think he's guilty and does that mean you are not going to be able to take the oath to follow his Honor's instruction which is to absolutely indulge him in the presumption of innocence as though it was actual proof?

JUROR #9:  I will listen to all of the evidence.

MS. BYLUND:  Do you presume that he's absolutely innocent as

he sits here at this time.
JUROR #9:  Having looked in his eyes, you are going to have to do a hell of a job to convince me he's not guilty.
THE COURT:  Well, she's got no burden.  [¶]  Ms. Bylund, you go ahead and have a seat.  It's almost 12.
MS. BYLUND:  Okay.  Thank you.
THE COURT:  Sir, the only instruction I have read involved the burden of proof and presumption of guilty – presumption of innocence, excuse me.  And that the defendant as he sits here now is presumed innocent.  Now, you are telling me with 20 years in the military and your personal belief in the system, and that's fine, um, are you telling me that from a distance of about 30 feet you can look into this fellow's eyes and tell whether he did something or didn't do it, is that what you are saying?
JUROR #9:  What I'm saying to you, your Honor, I have a real strong feeling about this gentlemen right now.
THE COURT:  Okay.  Well, I appreciate your candid response, but I don't think that you can be a fair and impartial juror based on your mind set, so I will go ahead and excuse you.  Sir, I want you to head back to the jury assembly room, please.

(Id.)

Under these circumstances, it is easier to analyze whether Petitioner was prejudiced by trial counsel's failure to request a mistrial due to prospective Juror #9's comments during voir dire.  The Sixth Amendment's right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial 'indifferent' jurors."  Irwin v. Dowd, 366 U.S. 717, 722 (1961).  "Even if 'only one juror is unduly biased or prejudiced,'" the defendant is denied his constitutional right to an impartial jury."  United States v. Eubanks, 591 F.2d 513, 517 (9th Cir. 1979).  "Due process requires that the defendant be tried by a jury capable and willing to decide the case solely on the evidence before it."  Smith v. Phillips, 455 U.S. 209, 217 (1982).

Petitioner argues that prospective Juror #9's comments during voir dire infected the entire jury panel because not only were his comments biased, but they were spoken with an air of authority.  Petitioner relies on Mach v. Stewart, 137 F.3d 630 (9th Cir. 1997) to support this Claim.  In Mach, the petitioner was convicted of sexual conduct with a minor under the age of fourteen.  See id. at 631.  During voir dire, the trial court elicited from a prospective juror that:  (1) she had taken child psychology courses, worked with psychologists and worked with

49

children in her position as a social worker with the State of Arizona Child Protective Services; and (2) four separate statements that she had never been involved in a case in which a child accused an adult of sexual abuse where that child's statements had not been borne out.  See id. at 632-33.  The trial court also elicited another statement from this prospective juror that "she had never known a child to lie about sexual abuse."  Id. at 633.  The Ninth Circuit determined that when Mach's trial counsel asked for a mistrial, the trial court should have conducted further voir dire to determine whether the panel had in fact been infected by the prospective juror's "expert-like statements."  Id.  The Ninth Circuit found that, "[g]iven the nature of [the prospective juror's] statements, the certainty with which they were delivered, the years of experience that led to them, and the number of times they were repeated, we presume that at least one juror was tainted and entered into jury deliberations with the conviction that children simply never lie about being sexually abused.  This bias violated Mach's right to an impartial jury."  Id.

Mach is distinguishable from the instant case.  Prospective Juror #9 did not offer an expert opinion regarding the evidence.  Rather, he expressed his personal opinion that he would give law enforcement testimony more weight than the accused and his personal belief that upon looking into Petitioner's eyes, Petitioner's trial counsel was "going to have to do a hell of a job to convince [him] he's not guilty."  (Pet'r's Am. Pet. Ex. N.)  These responses during voir dire amounted to his personal beliefs and general impressions of the legal system and did not so taint the jury pool so as to amount to a juror being unduly biased or prejudiced.  Thus, under these circumstances, Petitioner has failed to show to a reasonable probability that the outcome of the proceedings would have been different had Petitioner's trial counsel made a motion for a mistrial due to Prospective Juror #9's comments during the voir dire proceedings.  Juror 9's comments were based on his own personal beliefs and the jury was not impermissibly tainted.  Therefore, Petitioner is not entitled to federal habeas relief on Claim XI.

   L.  Claim XII

   In Claim XII, Petitioner argues that trial counsel was ineffective by failing to advise

1    Petitioner that the ultimate decision on whether to testify was his to make thereby making his

2    wavier of his right to testify involuntary.  The last reasoned decision on this Claim was from the

3    California Court of Appeal which stated the following in analyzing this Claim:

> Defendant claims that his trial counsel was ineffective for not
> advising him of his constitutional right to testify and that the
> ultimate decision as to whether or not he would testify was
> defendant's to make, citing Brown v. Artuz (2d Cir. 1997) 124
> F.3d 73, 79-80 and United States v. Teague, supra 953 F.2d 1525,
> 1534.  Brown did indeed hold that the right to testify is personal to
> the defendant and agreed with the Teague court that "[d]efense
> counsel bears the primary responsibility for advising the defendant
> of his right to testify or not to testify . . . ."  (United States v.
> Teague, supra 953 F.2d at p. 1533.)  However, as Brown
> acknowledges, not all courts are in agreement on this issue, some
> holding the trial court responsible for informing the defendant of
> this right, some holding defense counsel responsible, and others
> placing the burden on defendant.  Indeed the Ninth Circuit
> analogized the right to testify to the right to confront witnesses,
> finding it to be "so well known that counsel is not obliged to
> inform the defendant of its existence."  (Brown v. Artuz, supra,
> 124 F.3d at p. 79, citing United States v. Martinez (9th Cir. 1989)
> 883 F.2d 750, 759-60, vacated on other grounds, 928 F.2d 1470
> (9th Cir. 1991) [discussion in context of ruling that trial court had
> no duty to advise defendant of right to testify or to take waiver];
> see also United States v. Nohara (9th Cir. 1993) 3 F.3d 1239,
> 1243-1244; United States v. Edwards (9th Cir. 1990) 897 F.2d 445,
> 446-447 [extending reasoning of Martinez and holding that even if
> defendant unaware of his right to testify, unfair to prosecution to
> permit postconviction challenge and finding waiver].)
>
> Even if the failure to advise defendant of his right to testify may
> constitute ineffective assistance of counsel, we do not find Ms.
> Bylund's performance to have been lacking on the record before
> us.  Reviewing courts must be "highly deferential" when
> scrutinizing an attorney's performance on a claim of ineffective
> assistance of counsel.  (Strickland v. Washington, (1984) 466 U.S.
> 668, 688-689)  A strong presumption must be indulged that
> counsel's conduct falls within the wide range of reasonable
> professional assistance, and we must not second-guess a trial
> attorney's actions solely with the benefit of hindsight.  (Ibid.;
> People v. Wrest (1992) 3 Cal.4th 1088, 1114-1115.)  Not only
> must a defendant show that his counsel's performance was
> deficient when measured against the standard of a reasonably
> competent attorney, but he must additionally demonstrate that his
> attorney's performance was prejudicial, in that it "'so undermined
> the proper functioning of the adversarial process that the trial
> cannot be relied on as having produced a just result.' [Citations.]"
> (People v. Mayfield (1997) 14 Cal.4th 668, 783-784.)  "If the

record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.'" (Id. at p. 784.)  If a defendant fails to show that the challenged actions of counsel were prejudicial under this standard, a reviewing court may reject the claim without determining whether counsel's performance was deficient.  (Id. at pp. 783-784.)

The issue of trial counsel's decision not to call defendant to testify was discussed at defendant's motion for a new trial.  In that context, his attorney, Ms. Bylund, testified that she had discussed with defendant the issue of what defense evidence, if any, should be put on, during the trial and even before the trial started.  Specifically, it "[w]as part of [her] understanding with him that in addition to no witnesses being called he would not testify."  That issue was discussed at length.  While it is true, as defendant now asserts on appeal, that Ms. Bylund never specifically stated that she advised defendant of his right to testify, she was never specifically asked if she had done so.  She was also never asked for an explanation of this alleged failure to advise.  Based on Ms. Bylund's testimony, which can reasonably be understood to mean that defendant agreed with counsel that he would not testify, defendant's claim of ineffective representation on this ground must fail.  Counsel was not asked for an explanation of the allegedly deficient conduct and this is not a case where "'there simply could be no satisfactory explanation.'"  (People v. Mayfield, supra, 14 Cal.4th at p. 784.)  Defendant's concurrence in counsel's advice on the subject could be a satisfactory explanation for counsel not explaining that the ultimate decision was defendant's to make.

Defendant has also failed to show that prejudice resulted from his attorney's alleged failure to advise him regarding his right to testify.  There was not a "reasonable probability that, but for counsel's failings, the result would have been more favorable . . ." to defendant.  (In re Wilson (1992) 3 Cal.4th 945, 950.)  There was no evidence presented at the motion for new trial regarding the issue of whether defendant would have testified, had he been so advised, [FN 21] or what that testimony would have been.  We cannot say that defense counsel's complained-of omission so undermined the adversary system that we cannot rely on the trial having produced a just result.  (People v. Mayfield, supra, 14 Cal.4th at pp. 783-784.)

[FN 21]  Defendant does state at an earlier Marsden hearing that "I wanted to testify" and that "if I would have known ahead, I would have inserted my right to testify . . . [if I had known] [t]hat my case was going to be rested."  From this latter statement, it might inferred that defendant was aware of his right to testify, independent of his attorney so advising him, in which case counsel would not be ineffective for failing to advise him of that right and he would be deemed to have waived that right by his failure to

52

1    assert it, even under <u>DeLuca</u>, <u>supra</u>, at page 1356.  However, the
     record is not clear on ths issue, as later in that <u>Marsden</u> hearing
2    defendant states that "I didn't know I could say anything."  At the
     subsequent motion for new trial, he testifies that he did not address
3    the court about his attorney's decision not to call any witnesses, as
     "I didn't know I could."
4

5    (Slip Op. at p. 27-29.)

6         "[A] defendant in a criminal case has the right to take the witness stand and to testify in

7    his or her own defense."  <u>Rock v. Arkansas</u>, 483 U.S. 44, 49 (1987).  Because the right it is

8    personal, it may be relinquished only by the defendant himself, and his relinquishment of the

9    right must be knowing and intentional.  See <u>United States v. Pino-Noriega</u>, 189 F.3d 1089, 1094

10   (9th Cir. 1999).  However, a defendant's waiver of the right to testify need not be explicit, and

11   may be inferred from his failure to testify or to notify the trial court of his desire to do so.  <u>See</u> <u>id.</u>

12   at 1094-95.  Additionally, "[a]lthough the ultimate decision whether to testify rests with the

13   defendant, he is presumed to assent to his attorney's tactical decision not to have him

14   testify."  <u>United States v. Joelson</u>, 7 F.3d 174, 177 (9th Cir. 1993).  "[I]f the defendant wants to

15   testify, he can reject his attorney's tactical decision by insisting on testifying, speaking to the

16   court, or discharging his lawyer."  <u>Id.</u>  Thus, "[w]hen a defendant remains 'silent in the face of

17   his attorney's decision not to call him as a witness,' he waives the right to testify."  <u>Pino-Noriega</u>,

18   189 F.3d at 1095 (quoting <u>United States v. Nohara</u>, 3 F.3d 1239, 1244 (9th Cir. 1993)); <u>see</u>

19   <u>also</u> <u>Horton v. Mayle</u>, 408 F.3d 570, 577 (9th Cir. 2005) ("Horton also challenges his trial

20   counsel's performance on the ground that counsel advised him not to testify based on the

21   mistaken belief that Horton's prior murder conviction could be used to impeach him even though

22   the trial judge had ruled that it was inadmissible.  We agree with the district court's bottom line,

23   that the <u>Strickland</u> standard has not been met.  Counsel's declaration does not indicate *when* he

24   told Horton that his prior conviction might be used to impeach him (it could have been before the

25   trial judge's ruling).  Nor is there any indication from Horton that he wanted to testify or would

26   have testified; he gave no such signal at trial, or in the district court.  Further, there is no

submission indicating what he might have testified to.  In these circumstances, and in light of

Horton's own inculpatory conduct and statements, it would be sheer speculation to say that the

outcome would have been different.") (internal citations and footnote omitted); Dows v. Wood,

211 F.3d 480, 487 (9th Cir. 2000) ("Dows argues that Egger denied him his right to testify at trial

by threatening to walk out on Dows in the middle of trial if he insisted on testifying.  Again, this

argument is without factual support.  In its order denying Dows a new trial, Judge Martinez noted

that at no time during the trial did Dows ever indicate that he wanted to testify or that he was

prevented from testifying from doing so by counsel."); Gutierrez v. Subia, Civ. No. 07-472, 2008

WL 1968357, at *15-16 (C.D. Cal. Apr. 30, 2008) (finding no ineffective assistance of counsel

because Petitioner waived claim because there was no indication in the record that he

contemporaneously made known any desire to testify during trial as well as due to a lack of

prejudice because Petitioner fails to show what testimony he would have given nor explain what

considerations he was told that led counsel to recommend that he not testify); McElvain v. Lewis,

283 F. Supp. 2d 1104, 1118 (C.D. Cal. 2003) (finding that where petitioner remained silent when

trial counsel rested without calling him as a witness that petitioner waived right to testify and

cannot claim ineffective assistance of counsel due to trial counsel's failure to call him as a

witness); Dewberry v. Cambra, Civ. No. 97-2408, 1998 WL 908923, at *11 (N.D. Cal. Dec. 22,

1998) (denying petitioner's claim that counsel was ineffective in advising him not to testify

because petitioner did not object at trial).

        Petitioner attached a personal declaration to his amended federal habeas petition in which

he stated the following:

> During the proceedings in the trial court, I had conversations with
> my trial attorney, Deputy Conflict Defender Diane Bylund, about
> my testifying at trial.  [¶]  I understood from those conversations
> that a criminal defendant may testify at trial.  Ms. Bylund,
> however, never informed me that the ultimate decision about
> whether to testify was for me to make.  I assumed from our
> discussions that the final decision was her's to make.  [¶]  Had I
> understood that the ultimate decision about whether I would testify
> was mine, I would have asserted and exercised my right to testify.

54

(Pet'r's Am. Pet. Ex. L.)

Under these circumstances, it is easier to analyze Petitioner's Claim under the prejudice prong of the <u>Strickland</u> standard. Petitioner fails to show to a reasonable probability that the outcome of the proceeding would have been different, even assuming *arguendo* that counsel was ineffective in light of the evidence of Petitioner's statements to police that implicated him as an aider and abettor to the carjacking. As previously stated, those statements established that Petitioner was guilty as an aider and abettor under a felony murder theory. Therefore, Petitioner is not entitled to federal habeas relief on this Claim.

M. Claim XIII

In Claim XIII, Petitioner argues that the cumulative effect of trial counsel's purported errors rendered his trial fundamentally unfair. Petitioner also raises a cumulative error argument in Claim XXVI that encompasses all of his claims, not just his ineffective assistance of counsel claims. Therefore, Petitioner's cumulative error argument will be analyzed in <u>infra</u> Part V.Z.

N. Claim XIV

In Claim XIV, Petitioner argues that the trial court erred in failing to hold a <u>Marsden</u>, 2 Cal.3d 118, 84 Cal. Rptr. 156, 465 P.2d 44 hearing. Respondent argues in his answer that this Claim is procedurally defaulted.

The California Court of Appeal stated the following in analyzing this Claim:

> Defendant claims that the trial court erred by not conducting an adequate inquiry after he expressed dissatisfaction with his court-appointed attorney, as required by <u>People v. Marsden</u>, <u>supra</u>, 2 Cal.3d at pp. 124-125. <u>Marsden</u> requires that the court permit the defendant to explain the basis of his contention when he seeks to discharge his appointed counsel on the ground of inadequate representation. (<u>People v. Marsden</u>, <u>supra</u>, 2 Cal.3d at pp. 124-125.) The trial court's duty to conduct a <u>Marsden</u> hearing arises when a defendant asserts directly or by implication that his attorney's conduct has been so inadequate so as to deprive him of his constitutional right to effective counsel. (<u>People v. Leonard</u> (2000) 78 Cal.App.4th 776, 778.) The court has no duty to conduct the hearing sua sponte. (<u>Id.</u> at p. 787.)

Counsel was appointed to represent defendant at his May 27, 1997

arraignment on the information, after he could no longer afford to pay for the private attorney who had represented him through the preliminary hearing. On May 30, 1997, at a hearing for further arraignment, defendant indicated that he was still trying to raise funds to pay for a private attorney and said that even if he was unable to do so, he did not want the current appointed counsel, Diane Bylund, as his attorney. His stated reason was that "She gave me the impression when I was in county jail that I would be tried and convicted without even reading my paperwork." This statement was made in the context of a discussion among Ms. Bylund, the defendant, and the court regarding defendant's desire to hire his own attorney. The court explained to defendant, "Well, if you want to get time to get an attorney, I'll give you time to get an attorney. We'll make a decision. If you can't afford an attorney, the Court has appointed one to represent you."

When defendant reiterated that he did not want Ms. Bylund to represent him in any event, the court attempted to explain that the choice of which court-appointed attorney would represent him was not his. "If you're going to have counsel, the Court determines, and the legislature determines, by the law, who you are entitled to receive. And you are entitled to receive that office that's going to be representing you." The court also explained that defendant could have a hearing regarding his representation, "[a]nd you're entitled to have a hearing as to whether or not that would be fair or not. I'm not going to have the hearing now. You have a right to have a hearing for me to make that decision." The court then put the matter over until June 6 in order to give defendant more time to retain his own attorney.

Given the context of the comments, it appears that the court was first trying to explain to defendant, appearing for continued arraignment just three days after Ms. Bylund was appointed to represent him, that he did not get to personally choose who his court-appointed attorney would be, unlike his choice of retained counsel. The court then mentioned that he could have a hearing "as to whether or not that would be fair . . . ." Presumably the trial court was referencing a Marsden hearing by that remark. The court reasonably indicated that such a hearing would not be conducted at that moment, as defendant was still trying to retain private counsel, which would have rendered the issue moot.

Assuming that defendant's comments were sufficient to put the trial court on notice that he was complaining about the adequacy of his attorney's representation, or alleging a conflict so severe that adequate representation would not be possible, it was incumbent upon defendant to raise the issue at the next hearing, when it was finally determined that he would not be hiring a private attorney. On that date, the court explained to defendant, "bottom line is apparently you and your friends or your family attempted to retain Mr. Beles but have been unable to do so. Ms. Bylund represents

1    you.  Should you be able to retain Mr. Beles or any other lawyer of
     your choice, that person can substitute in basically at any time."
2    Defendant made no mention of not wanting Ms. Bylund to
     represent him and acquiesced in the court's action.  By abandoning
3    his motion, or at least failing to renew it, he has waived the issue
     on appeal.  (People v. Skaggs (1996) 44 Cal.App.4th 1, 7-8 [failure
4    to renew Faretta [v. California (1975) 422 U.S. 806] motion
     constitutes abandonment of the motion]; People v. Kenner (1990
5    223 Cal.App.3d 56, 59-62 [defendant who fails to follow up on his
     request for Faretta motion deemed to have abandoned or
6    withdrawn the motion].)  As the court in Skaggs recognized, "[t]he
     world of the trial court is busy and hectic, and it is to be expected
7    that occasionally a court may omit to rule on a motion."  (People v.
     Skaggs, supra, 44 Cal.APp.4th at p. 8.)  To hold otherwise would
8    permit a defendant who realizes that his motion has not been ruled
     upon to engage in gamesmanship and save his "'ace to play
9    triumphantly on appeal.  [Citation.]'"  (Ibid.)

10   Defendant has waived the issue of the trial court's failure to
     conduct a Marsden hearing by failing to reassert his desire not to
11   have Ms. Bylund represent him.  [FN 11]
     [FN 11]  We do not find that the trial court's comments at the June
12   6 hearing effectively precluded defendant from reasserting his
     desire not to have Ms. Bylund represent him, as he now contends.
13   This is especially true in light of the fact that the court had
     previously informed defendant that he had the right to have a
14   hearing on that issue at a future date.

15   (Slip Op. at p. 13-16.)

16       A state court's refusal to hear the merits of a claim because of the petitioner's failure to

17   follow a state procedural rule is considered a denial of relief on an independent and adequate

18   state ground.  See Harris v. Reed, 489 U.S. 255, 260-61 (1989).  The state rule for these purposes

19   is only "adequate" if it is "firmly established and regularly followed."  Id. (citing Ford v.

20   Georgia, 498 U.S. 411, 424 (1991); see also Bennett v. Mueller, 322 F.3d 573, 583 (9th Cir.

21   2003) ("[t]o be deemed adequate, the state law ground for decision must be well-established and

22   consistently applied.").  The state rule must also be "independent" in that it is not "interwoven

23   with the federal law."  Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) (citing Michigan

24   v. Long, 463 U.S. 1032, 1040-41 (1983)).  Furthermore, procedural default can only block a

25   claim in federal court if the state court, "clearly and expressly states that its judgment rests on a

26   state procedural bar."  Harris, 489 U.S. at 263.  This means that the state court must have

1  specifically stated that it was denying relief on a procedural ground.  See Ylst v. Nunnemaker,

2  501 U.S. 797, 803 (1991); Acosta-Huerta v. Estelle, 7 F.3d 139, 142 (9th Cir. 1993).

3  Nevertheless, even if the state rule is independent and adequate, the claim may be reviewed by

4  the federal court if the petitioner can show:  (1) cause for the default and actual prejudice as a

5  result of the alleged violation of federal law; or (2) that failure to consider the claims will result

6  in a fundamental miscarriage of justice.  See Coleman v. Thompson, 501 U.S. 722, 752 (1991).

7       As noted above, the California Court of Appeal denied this Claim after determining that

8  Petitioner had waived this issue by failing to reassert it at subsequent court proceedings.  The rule

9  applied by the Court of Appeal, was, in essence, a version of the well-established

10 contemporaneous objection rule, which requires a proper objection at the time of trial to preserve

11 an issue for appeal.  See Davis v. Woodford, 384 F.3d 628, 653-54 (9th Cir. 2004).  The

12 contemporaneous objection rule is a sufficient independent and adequately procedural rule to

13 support the denial of a federal habeas petition on the ground of procedural default.  See Paulino

14 v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004).  In this case, Petitioner fails to show cause

15 and prejudice to overcome the procedural default and does not show that there would be a

16 fundamental miscarriage of justice.  See Gandarela v. Johnson, 275 F.3d 744, 749-50 (9th Cir.

17 2002) (stating that a petitioner must establish factual innocence to show that a fundamental

18 miscarriage of justice would result from the application of procedural default); see also Cook v.

19 Schriro, 538 F.3d 1000, 1028 (9th Cir. 2008) ("To qualify for the 'fundamental miscarriage of

20 justice' exception to the procedural default rule, however, Cook must show that a constitutional

21 violation has 'probably resulted' in the conviction when he was 'actually innocent' of the

22 offense.") (citation omitted).  Therefore, Claim XIV is procedurally barred.

23       O.  Claim XV

24       In Claim XV, Petitioner argues that the trial court erred in excluding Ericc Pickett's out

25 of court statements.  In his amended federal habeas petition, Petitioner argues that, "[i]n

26 particular, the defense sought to admit Pickett's statements to inmate Terrance Mullins that

1   Pickett shot the victim, that Shannon did not know anything about it, that Shannon was not the

2   aider and abettor, and that Pickett destroyed the gun." (Pet'r's Points & Authorities Supp. Am.

3   Pet. at p. 86.) The trial court ruled that Pickett's statement to Mullins that he shot the victim

4   would be admissible as a statement against penal interest. (Resp't's Answer Ex. B pt. 5, at p.

5   29.) However, the trial court ruled that Pickett's statements that exonerated Petitioner were not

6   against Pickett's penal interest and were therefore inadmissible. (See id.) Finally, with respect to

7   Pickett's statement to Mullins regarding the destruction of the gun, the trial court stated that it

8   was inclined to overrule the prosecution's objection but stated that was "assuming [Petitioner]

9   could sort it up here in a 402 hearing with Mullins." (Id. at p. 33.) The California Court of

10   Appeal stated the following in resolving this Claim:

11          Defendant sought to introduce out-of-court statements of Ericc
            Pickett to a fellow prisoner, Terrance Mullins, months before
12          Pickett entered his plea of no contest to murder. According to
            Mullins, Pickett said that he shot the victim and that defendant
13          knew nothing about the shooting until it happened. The District
            Attorney stipulated that Pickett was unavailable as a witness, but
14          argued that only those portions of the statements that were
            specifically disserving to Pickett's interest, that is, the portion of
15          the statements where Pickett said he was the shooter, could be
            admitted as declarations against his penal interest. Defendant
16          sought to introduce not only those portions of the statements, but
            also the portions that tended to specifically exonerate defendant by
17          indicating that he knew nothing about the shooting until it
            happened. The trial court ruled that only those portions of the
18          statements which indicated that Pickett was the shooter would be
            admitted as declarations against his interest. [FN 12] Defendant
19          claims this ruling was reversible error.

            [FN 12] Defendant also wished to introduce Pickett's statements
20          about the ownership of the gun and those admitting that he
            destroyed it. The trial court delayed ruling on that issue, pending
21          an Evidence Code section 402 hearing with Mullins, but indicated
            an inclination to overrule the prosecutor's objection. The issue of
22          the admissibility of these portions of Pickett's statements is not
            before us.

23
            The trial court's ruling on the admissibility of hearsay is reviewed
24          under the deferential abuse of discretion standard. (People v.
            Gatson (1998) 60 Cal.App.4th 1020, 1024.) The determination of
25          whether a statement is sufficiently against the declarant's interest
            so as to be admissible as a declaration against interest under
26          Evidence Code section 1230 [FN 13] is also reviewed under the

59

abuse of discretion standard.  (People v. Cudjo (1993) 6 Cal.4th 585, 607.)  Only if the statement would subject the declarant to criminal liability such that a reasonable person would not have made it unless he believed it to be true is it admissible; the test is "whether the declarant should have realized or did realize *that the statement when made was distinctly against his penal interest*." (People v. Johnson (1974) 39 Cal.App.3d 749, 761, italics in original.)  The proponent of the statement must not only show that the declarant is unavailable and that the statement is against his interest, but must also show that the declaration was sufficiently reliable to warrant its admission despite the hearsay character of the statement.  In determining the threshold issue of trustworthiness, the court may consider the words themselves and the circumstances under which they were spoken, the possible motivation of the declarant and the declarant's relationship to the defendant.  (People v. Cujjo, supra, 6 Cal.4th at p. 607.) [FN 13]  Evidence Code section 1230 provides that evidence of a statement by a declarant is not made inadmissible by the hearsay rule "if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."

Because the trustworthiness of such statements comes from the fact that they are against the declarant's interest, the hearsay exception does not apply to collateral assertions contained within them that are not against such interest.  "In light of the high probability of unreliability which characterizes such 'collateral assertions' [citations], we have construed the hearsay exception 'to be inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant.'" [Citation.]"  (People v. Campa (1984) 36 Cal.3d 870, 882-883; see also People v. Duarte (2000) 24 Cal.4th 603, 611-612; People v. Leach (1975) 15 Cal.3d 419, 441.)  Based on the limited amount the record reveals regarding the content of these statements, the first portion of Pickett's statement to Mullin [sic], that he shot the victim, would clearly be admissible as against his interest.  The second portion, which exculpates defendant, is not distinctly against Pickett's interest.  (People v. Chapman (1975) 50 Cal.App.3d 872, 880; see also People v. Gatlin (1989) 209 Cal.App.3d 31, 43-44 [portion of statement by codefendants that defendant had nothing to do with burglarly not against their penal interest where they also denied their culpability]; People v. Perry (1979) 100 Cal.App.3d 251, 264 [in dicta, portions of declarant's statement which exculpate defendant not admissible as declaration against interest, as not disserving to declarant, where remainder of statement is disserving to declarant's interest].)  Certainly the trial court's determination that the portion of the statements which exculpated defendant was not against the declarant's penal interest did not exceed its discretion.  Pickett had already admitted that he

shot the victim, subjecting himself to liability for the murder; his statement that defendant did not know the shooting was going to occur added nothing to enhance that liability.  [FN 14]

[FN 14]  Defendant also argues, for the first time on appeal, that this portion of the statement was against Pickett's interest as it "exposed Pickett to sole responsibility for the offense . . . . Pickett stood to lose any defense or claim for leniency based on a claim that [defendant] was the shooter."  We fail to see how the portion of the statement indicating that defendant knew nothing about the shooting until it occurred caused Pickett to lose any defense or claim of leniency, since the admitted portion already stated that Pickett shot the victim.

Defendant claims that the portion of the statements of Pickett which exculpated defendant was against Pickett's penal interest as Pickett had previously told a different story to police.  Having just admitted to a crime which would potentially subject him to life imprisonment, a reasonable person in Pickett's situation would not believe that making a statement that might at most subject him to potential liability for the misdemeanor of filing a false police report, would subject him to sufficient additional penalties so as to render those portions of the statements trustworthy and reliable based on them being disserving to his interest.  We doubt that most lay persons would even be cognizant of this potential liability, given the circumstances here.  The <u>Johnson</u> court stated, "As Wigmore puts it, the basis of this exception . . . is the experience that a statement asserting a fact *distinctly* against one's interest is unlikely to be deliberately false or heedlessly incorrect, and is thus sufficiently sanctioned, though oath and cross-examination are wanting.  [Citation.]"  (<u>People v. Johnson</u>, <u>supra</u>, 39 Cal.App.3d at p. 761.)  That portion of Pickett's statement which exculpated defendant is not *distinctly* against the declarant's interest and therefore is not admissible under the declaration against interest exception to the hearsay rule.  This is precisely what the trial court determined when the same argument was raised below; we find no abuse of discretion in the trial court's ruling.  [FN 15]

[FN 15]  Defendant cites a number of federal cases which hold that portions of inculpatory statements by third parties which exculpate a defendant are admissible.  We are not bound to follow these cases as precedent.  (<u>People Williams</u> (1997) 16 Cal.4th 153, 190; <u>People v. Zapien</u> (1993) 4 Cal.4th 929, 989.)  Additionally, defendant's arguments to the contrary aside, the requirement of the Federal Rules of Evidence for independent corroboration of declarations against interest *does* distinguish these cases, since the reliability and trustworthiness of such declarations in the federal system are not *wholly* dependent upon the statement being specifically disserving to the declarant, as they are under California law.  Finally, we do not find the portion of the statements which exculpated defendant to be so "integral" to the portion of the statement that is disserving to the declarant's interests, so as to render it admissible.

Finally, defendant argues that exclusion of those portions of Pickett's statements which exculpated defendant violated due process and his federal constitutional right to present a defense. [FN 16]  However, as pointed out by the respondent, "As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' [Citations.]  Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation.]  If the trial court missteped, '[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense. [Citation.]  Accordingly, the proper standard of review is that announced in <u>People v. Watson</u> (1956) 46 Cal.2d 818, 836 . . . and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension. (<u>Chapman v. California</u> (1967) 386 U.S. 18, 24 . . .)" (<u>People v. Fudge</u> (1994) 7 Cal.4th 1075, 1102-1103.)
[FN 16]  Respondent argues that this issue was not raised below and cannot be raised for the first time on appeal.  The issue was raised below, however.

In <u>Fudge</u>, the defendant contended that the trial court violated his constitutional right to present a defense by sustaining hearsay objections to questions asked by his attorney in an attempt to show that the inmate witnesses who testified against him had falsified their accounts after obtaining information about his case.  Although the evidence excluded on hearsay grounds in the present case was, as defendant contends, a direct statement by the person then claiming responsibility as the principal in the murder, that defendant knew nothing about the shooting until it occurred and therefore might not be considered a minor or subsidiary point, the trial court's ruling still did not prevent defendant from presenting a defense.  The ruling was merely "a rejection of *some evidence* concerning the defense" that defendant was not an aider and abettor, as he did not have the intent to commit the crime nor facilitate or encourage it.  (<u>People v. Fudge</u>, <u>supra</u>, 7 Cal.4th at p. 1103, italics added).  Not knowing the shooting was going to occur does not necessarily negate defendant's liability for aiding and abetting the carjacking, as previously explained.  Further, it must be noted that defendant elected to present *no* defense evidence at trial, including that portion of Pickett's statement which the trial court ruled admissible.

Given the evidence presented, including the testimony of two witnesses that defendant admitted being the shooter, and his actions facilitating and encouraging the commission of the carjacking and the circumstantial evidence of his intent to do so, as detailed above, there is no reasonable probability that a result more favorable to him would have resulted absent the exclusion of the

1           disputed portion of Pickett's statements.  (<u>People v. Watson</u>, <u>supra</u>,

2           46 Cal.2d 8181 at p. 836.)

3  (Slip Op. at p. 16-20.)

4       First, to the extent that Petitioner argues that Pickett's statement regarding destroying the

5  gun was impermissibly excluded, the trial court made no such finding.  Thus, Petitioner's

6  argument that the trial court erred in excluding this statement is plainly without merit.  The

7  remaining statements that are at issue are that Petitioner had no prior knowledge of the shooting

8  and carjacking before they occurred.

9       Criminal defendants have a constitutional right to present relevant evidence in their own

10  defense.  <u>See</u> <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986).  This right comes from both the right

11  to due process under the Fourteenth Amendment, <u>see</u> <u>Chambers v. Mississippi</u>, 410 U.S.284, 294

12  (1973), and the right "to have compulsory process for obtaining witnesses in his favor" provided

13  by the Sixth Amendment.  <u>See</u> <u>Washington v. Texas</u>, 388 U.S. 14, 23 (1967).  Nevertheless, "[a]

14  defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable

15  restrictions," such as evidentiary and procedural rules.  <u>See</u> <u>United States v. Scheffer</u>, 523 U.S.

16  303, 308 (1998).  "[S]tate and federal rulemakers have broad latitude under the Constitution to

17  establish rules excluding evidence from criminal trials."  <u>Id.</u>  The Supreme Court approves of

18  "well-established rules of evidence [that] permit trial judges to exclude evidence if its probative

19  value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or

20  potential to mislead the jury."  <u>Holmes v. South Carolina</u>, 547 U.S. 319, 326 (2006).  Evidentiary

21  rules do not violate a defendant's constitutional rights unless they "infring[e] upon a weighty

22  interest of the accused and are arbitrary or disproportionate to the purposes they are designed to

23  serve."  <u>Id.</u> at 324 (internal quotation marks and citation omitted); <u>see also</u> <u>Scheffer</u>, 523 U.S. at

24  315 (determining that the exclusion of evidence pursuant to a state evidentiary rule is

25  unconstitutional only where it "significantly undermined fundamental elements of the accused

26  defense").  Generally, it takes "unusually compelling circumstances . . . to outweigh the strong

1  state interest in administration of its trials." <u>Perry v. Rushen</u>, 713 F.2d 1447, 1452 (9th Cir.

2  1983).  The Supreme Court has expressed its:

> traditional reluctance to impose constitutional constraints on
> ordinary evidentiary rulings by state trial courts.  In any given
> criminal case the trial judge is called upon to make dozens,
> sometimes hundreds of decisions concerning the admissibility of
> evidence . . . . [T]he Constitution leaves to the judges who must
> make these decisions wide latitude to exclude evidence that is
> repetitive . . . only marginally relevant or poses an undue risk of
> harassment, prejudice, [or] confusion of the issues.

8  <u>Crane</u>, 476 U.S. at 689-90 (internal quotation marks omitted).  Furthermore, even if the exclusion

9  of evidence amounts to constitutional error, the erroneous exclusion of evidence must have had a

10 "substantial and injurious effect" on the verdict in order to justify federal habeas relief."[6]  <u>Brecht</u>

11 <u>v. Abrahamson</u>, 507 U.S. 619, 623 (1993).  Thus, even if there was constitutional error,

12 Petitioner must show that the error resulted in actual prejudice.  <u>See id.</u>

13        In support of this Claim, Petitioner relies on several federal circuit cases which analyzed

14 whether the district court improperly excluded testimony by misapplying the statement against

15 interest hearsay exception under the Federal Rules of Evidence.   Federal Rule of Evidence

16 804(b)(3) provides an exception to the hearsay rule so long as the declarant is unavailable and is

17 "[a] statement that:  (A) a reasonable person in the declarant's position would have made only if

18 the person believed it to be true because, when made, it was so contrary to the declarant's

19 proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim

20 against someone else or to expose the declarant to civil or criminal libability; and (B) is

21 supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered

22 in a criminal case as one that tends to expose the declarant to criminal liability."  Petitioner

23

24        [6] In his petition, Petitioner cites to <u>Chapman v. California</u> 386 U.S. 18 (1967) in arguing
that its standard of harmless applies, i.e. the error was harmless beyond a reasonable doubt.

25 However, Petitioner appears to correct this error in his traverse by stating that <u>Brecht</u>'s harmless
error standard applies in federal habeas review of trial-type errors.  <u>See</u> <u>Fry v. Pliler</u>, 551 U.S.

26 112, 121-22 (2007).

1   argues that these cases are applicable because the only difference between the Federal rule and

2   California's rule is that the Federal rule requires corroboration.  (See Pet'r's Points & Authorities

3   Supp. Am. Pet. at p. 89 n. 21.)  For example, Petitioner cites to United States v. Paguio, 114 F.3d

4   928 (9th Cir. 1997) to support this Claim.  In Paguio, the appellants were convicted of making

5   false statements to a bank to influence a loan application.  See id. at 929.  The appellant's

6   attorney obtained a statement from the appellant's father (who had initiated the loan process and

7   had returned with the handwritten loan application), that "his son had 'nothing to do with it.'"  Id.

8   at 931.  During the trial, the father was unavailable as he was a fugitive and defense counsel

9   sought to admit the father's statements under Federal Rule of Evidence 804(b)(3) as a statement

10  against interest.  See id.  The court noted that:

> Paguio's Jr.'s lawyer and paralegal assistant interviewed Paguio Sr.
> Defense counsel advised Paguio, Sr. that she was not his attorney,
> she represented his son, and what he told her was not privileged.
> He told her that the whole scheme was his, and his son (and by
> implication, his son's fiancé) had nothing to do with it.  The father
> had refused to testify about this, claiming his Fifth Amendment
> privilege at the first trial, and he became a fugitive prior to the
> retrial.  The district court ruled that portions of the evidence in
> which the father admitted his own criminal responsibility, but not
> those exonerating the son, could come into evidence.

17  Id. at 931-32.  The Ninth Circuit determined that Paguio Sr.'s statement was like Justice

18  Kennedy's hypothetical in his concurrence in Williamson v. United States, 512 U.S. 594, 617

19  (1994) (Kennedy, J. concurring):

> where the unavailable declarant said "I robbed the store alone, and
> defendant charged with robbery is only allowed to put in "I robbed
> the store," and not "alone." [Williamson, 512 U.S.] at 617, 114
> S.Ct. at 2443.  Wigmore, citing Holmes, characterized as
> "barbarous" exclusion of an unavailable declarant's confession,
> because exclusion increases the risk of convicting the innocent.  5
> Wigmore on Evidence § 1477 at 360 (Chardbourn rev. 1974).
> When the prosecution attempts to take advantage of the rule, as in
> Williamson, the statement is typically in the form, "I did it, but X
> is guiltier than I am."  As a matter of common sense, that is less
> likely to be true of X than "I did it alone, not with X."  That is
> because the part of the statement touching on X's participation is
> an attempt to avoid responsibility or curry favor in the former, but

1       to accept undiluted responsibility in the latter.

2   Paguio, 114 F.3d at 934.  Ultimately, the Ninth Circuit concluded that, "the unavailable witness

3   exception for statements against penal interest, Federal Rule of Evidence 804(b)(3) applied, so

4   the parts of Paguio's Sr.'s statement exonerating his son should have been admitted.  We cannot

5   characterize the error as harmless, because the hung jury at the first trial persuades us that the

6   case was close and might have turned on this evidence."  Id. at 935.

7       Assuming *arguendo* that the trial court's exclusion of Pickett's full statement to Mullins

8   was improper, any error was clearly harmless under the Brecht standard.  Unlike the cases that

9   Petitioner relies on in his petition, Petitioner admitted to police his involvement in the crime

10  which established Petitioner as an aider and abettor under a felony-murder theory.  As previously

11  stated, Petitioner admitted to police that he knew Pickett intended to steal the truck, yet Petitioner

12  agreed to drive Pickett to Vallejo anyway and eventually even accompanied him on the test drive

13  of the truck.  Petitioner was under the belief that Pickett was carrying a firearm and Pickett had

14  told Petitioner that he would "whip [the car owner's] ass" if he got in the way.  Thus, in light of

15  Petitioner's own admissions regarding what he knew as well as his own actions as stated to the

16  police, Petitioner failed to show that there would have been a substantial and injurious effect

17  such that the jury would have arrived at a different verdict even if there was trial court error..

18  Accordingly, Petitioner is not entitled to federal habeas relief on this Claim.

19      P.  Claim XVI

20      In Claim XVI, Petitioner argues that the trial court erred in excluding evidence regarding

21  Ericc Pickett which showed that Petitioner had reason to fear Pickett.  Petitioner argues that these

22  rulings violated his due process rights and denied Petitioner the ability to put on a defense.  The

23  last reasoned decision on analyzing Petitioner's arguments within this Claim was from the

24  California Court of Appeal which stated the following:

25          Under the rubric of "evidence about Ericc Pickett which showed
            that Shannon Secrease had reason to fear Pickett," defendant
26          additionally challenges several other evidentiary rulings made by

the trial court.  We find that any errors in the court's rulings were harmless.

*1.  Pickett's Statement About Ownership of the Gun*

The trial court sustained a hearsay objection to defendant's proffered evidence that Pickett admitted to the police and Vivian Patton that the gun used in the homicide was his.  Defendant contends that both statements were declarations against Pickett's interest.  Respondent argues that because Pickett simultaneously denied any responsibility for the crime, blaming the defendant instead, these statements were not against his penal interest.  Given the circumstances under which these statements were made, where Pickett had accompanied defendant to Vallejo, made statements of his intent to take the victim's truck by force if necessary, taken a test drive with him and the victim, and been present when the victim was shot, the statement that the murder weapon was his was sufficiently incriminating that a reasonable person should have realized that the statement, when made, was distinctly against his penal interest.  (People v. Johnson, supra, 39 Cal.App.3d at p. 761.)  The statement, given the surrounding circumstances, would have potentially subjected Pickett to criminal liability as an aider and abettor such that a reasonable person would not have made it unless he believed it to be true.  The trial court erred in excluding these statements on hearsay grounds.

*2.  King's tesitmony*

Defendant next contends that the trial court erred in excluding testimony from Jamilla [sic] King that Pickett had threatened her after she talked to police and implicated him.  This testimony should have been admitted, defendant argues, to bolster his defense theory that he assisted Pickett after the shooting, and failed to report the offense, because he feared Pickett.

The trial court found this evidence was not relevant.  The relevancy of evidence is left to the sound discretion of the trial court and is reviewed under an abuse of discretion standard.  (People v. DeJesus (1995) 38 Cal.App.4th 1, 32.)  Defendant does not contend that he ever argued the now proffered theory of relevancy at the trial court level.  As this ground of admissibility was not raised at trial, it cannot be raised for the first time on appeal.  (People v. Fauber (1992) 2 Cal.4th 792, 831.)  Even if this theory of admissibility had been raised below, the trial court did not err by excluding the evidence.  The trial court ruled it was not relevant as it had little bearing on defendant's third party culpability argument, since there could be many reasons for the threat.  Even under the theory promulgated on appeal, there was no evidence that defendant was aware of the threat against King.  The trial court was within its discretion to exclude this evidence on relevancy grounds.

*3.  Pickett's Statement to Police that "People are telling you stories that I told them to tell."*

Defendant sought to introduce Pickett's statement to police officers that "People are telling you stories that I told them to tell."  The court sustained the relevancy objection to the proffered evidence, indicating the statement was too vague and "would lead to endless speculation as to what he was talking about."  Without more information about what people and what stories Pickett was referring to, the trial court acted within its discretion in excluding this evidence.

*4.  Pickett's Statements to King and the Police re:  the Truck*

Defendant sought to introduce a statement by Pickett to witness King that Pickett had already looked at the truck and that he intended to steal it and kill the owner if necessary, arguing that the statement was a declaration against interest.  The prosecution's hearsay objection was sustained.  Defendant makes no cogent argument as to how this statement was disserving to Pickett's penal interest *at the time it was made*, and none appears from the record.  Stating an intent to steal or kill in the future, under these circumstances, would not reasonably be understood by Pickett to subject him to criminal liability, such that he would not have made the statement unless it was true.

Defendant also challenges the trial court's exclusion of Pickett's statement to the police that Pickett had spoken to the victim four or five months earlier about the truck.  [FN 17]  Defendant argues that this statement supports the defense theory that "it was Pickett's show."  The trial court acted within its discretion in determining that this statement had no relevance to the issues before the court, given that it merely indicated that Pickett and someone talked to the victim five months before the offense.  Further, since it was clear from the evidence that was admitted at trial that it was Pickett's idea to obtain the truck, any error in excluding this statement would have been harmless.  (People v. Watson, supra, 46 Cal.2d 818 at p. 836.)

[FN 17]  The offer of proof made by defense counsel at trial was actually that Pickett told police "that *they* had spoken to the victim about the sale of the truck four of five months earlier."

*5.  Pickett's No Contest Plea*

The trial court excluded evidence of Pickett's no contest plea on the ground that it was irrelevant.  Defendant argues that evidence of this plea would support the defense theory that Pickett was responsible for the crime and that defendant had no knowledge that Pickett intended to kill the victim.  Pickett's plea, however, was not probative on this theory, as the plea was consistent with either a scenario where Pickett was the shooter or where he was an aider

and abettor.  The plea would do nothing to prove whether defendant was the actual shooter, or an aider and abettor, or whether he had no culpability at all, as he argues.  The trial court thus did not abuse its discretion by excluding this evidence on relevancy grounds.

### 6.  Due Process Claim and Harmless Error

Defendant claims that "in combination with the exclusion of Pickett's admissions described . . . above the trial court's evidentiary ruling[s] worked to deny [defendant] a defense."  [FN 18]  The only error noted in any of these evidentiary rulings, regarding the exclusion of Pickett's statement that the murder weapon was his, falls into that category of "defense evidence on a minor or subsidiary point" which does not impair a defendant's due process right to present a defense.  (People v. Fudge, supra, 7 Cal.4th at pp. 1102-1103.)  The trial court's error in excluding that evidence was clearly harmless, as it was not reasonably probable that defendant would have gained a more favorable result had that evidence been admitted.  (People v. Watson, supra 46 Cal.2d 818, 836.)

[FN 18]  Respondent argues that this issue was not raised below and cannot be raised for the first time on appeal.  While not a model of clarity, defendant's written motion in limine filed in the trial court does appear to raise this constitutional issue under the rubric of third party culpability evidence.  We find the argument was raised sufficiently to preserve the issue for appeal.

(Slip Op. at p. 21-24.)

The standard to analyze this Claim of the trial court's error in excluding certain pieces of evidence was stated in supra Part V.O.  Federal habeas relief does not lie for state law errors; instead, a state court's evidentiary ruling is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process.  See Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000).  To raise such a claim in a federal habeas petition, the "error alleged must have resulted in a complete miscarriage of justice."  Hill v. United States, 368 U.S. 424, 428 (1962).  Furthermore, an evidentiary error is considered harmless if it did not have a substantial and injurious effect in determining the jury's verdict.  See Padilla v. Terhune, 309 F.3d 614, 621 (9th Cir. 2002).

Any purported error in excluding this evidence would be considered harmless under the Brecht standard.  Petitioner admitted to police to several facts which clearly established that

69

1  Petitioner was an aider and abettor under a felony-murder theory.  The fact that the trial court

2  excluded the evidence noted by the California Court of Appeal cited above did not have a

3  substantial or injurious effect on the jury's verdict.  For example, the fact that the trial court

4  excluded Pickett's statement that the gun was his was harmless.  The admission of this evidence

5  was harmless in light of the strong evidence in the form of Petitioner's own statements to police

6  regarding his knowledge and actions which established Petitioner as an aider and abettor under a

7  felony-murder theory.[7]  Pickett's statements that he threatened King and told police that "people

8  are telling you stories that I told them to tell," even if not excluded by the trial court would also

9  not have had a substantial effect on the jury's verdict in light of Petitioner's statements and

10  admissions to police upon his arrest.  Finally, the exclusion of Pickett's statement that he

11  intended to steal the truck and kill the owner if necessary as well as his plea of no contest to first-

12  degree murder was harmless in light of Petitioner's admissions of his involvement and

13  knowledge before the crime was committed as he stated to police upon his arrest.  Therefore,

14  Petitioner is not entitled to federal habeas relief on Claim XVI.

15      Q.  Claim XVII

16      In Claim XVII, Petitioner argues that the trial court erred in failing to instruct the jury on

17  the elements of the lesser included offense of taking a vehicle under California Vehicle Code §

18  10851.  California Vehicle Code § 10851(a) states that:

> Any person who drives or takes a vehicle not his or her own,
> without the consent of the owner thereof, and with intent either to
> permanently or temporarily deprive the owner thereof of his or her
> title to or possession of the vehicle, whether with or without intent
> to steal the vehicle, or any person who is a party or an accessory to
> or an accomplice in the driving or unauthorized taking or stealing,
> is guilty of a public offense and, upon conviction thereof, shall be
> punished by imprisonment in a county jail of not more than one
> year or in the state prison or by a fine of not more than five

---

[7] The fact that Pickett admitted that the gun was his might have had an impact had Petitioner been convicted as the shooter, but as the jury specifically found the firearm special finding to be not true, at least some jurors were only willing to convict Petitioner as an aider and abettor.

1    thousand dollars ($5,000), or by both the fine and imprisonment.

2    Petitioner argues that the evidence supported instructing the jury on this offense.  The California

3    Court of Appeal analyzed this issue and stated the following:

4    The defendant contends that the trial court erred by not instructing
     sua sponte on Vehicle Code section 10851 as a lesser included
5    offense to the crime of carjacking.  Penal Code section 1159
     provides that the jury may find a defendant guilty of any offense,
6    the commission of which is necessarily included in the charged
     offense, or of an attempt to commit the offense.  A trial court must
7    instruct sua sponte on necessarily included offenses which are
     supported by the evidence.  (People v. Breverman (1998) 19
8    Cal.4th 142, 161.)  Thus instructions on a necessarily included
     offense are required "'when the evidence raises a question as to
9    whether all of the elements of the charged offense were present
     [citation], but not when there is no evidence that the offense was
10   less than charged.' [Citation.]" (People v. Barton (1995) 12
     Cal.4th 186, 194-195; see People v. Earp (1999) 20 Cal.4th 826,
11   885.)  Instruction on a necessarily included offense is not required
     when there is any evidence to support it, but only when "evidence
12   that the defendant is guilty only of the lesser offense is 'substantial
     enough to merit consideration' by the jury." (People v. Breverman,
13   supra, 19 Cal.4th at p. 162.)  The Attorney General does not
     contest that a violation of Vehicle Code section 10851 is a
14   necessarily included offense of carjacking, [FN 26] but argues that
     the evidence did not require the trial court to instruct upon it.  We
15   agree.
     [FN 26]  Neither side cites any case authority on the issue of
16   whether a violation of vehicle Code section 10851 is a necessarily
     included offense to the crime of carjacking, nor have we located
17   any.  We would note, however, that the CJER Mandatory Criminal
     Jury Instructions Handbook (CJER 2000) Carjacking, section 2.24
18   does indicate that it is a necessarily included offense.

19   There was ample evidence to support the jury's finding that
     defendant committed a carjacking, as detailed earlier in this
20   opinion.  The only evidence cited by defendant as supporting the
     lesser crime of the taking of a vehicle in violation of Vehicle Code
21   section 10851 is the statement by Pickett indicating that he was
     going to return later to steal the truck, by force if necessary.  While
22   that evidence might support an inference that defendant did not
     intend to aid and abet a carjacking on that very day, it leads to the
23   inference that defendant did intend to aid and abet a carjacking that
     might occur at a subsequent time, given the fact that defendant was
24   driving Pickett to look at the truck and knew of his intent to take it
     by force.  In order to reach the conclusion argued by defendant, that
25   he only intended to aid and abet a violation of Vehicle Code
     section 10851, the jury would have to find that defendant thought
26   Pickett's stated intent to use force was "puffery" as defendant puts

71

1    in his brief.  There was no evidence presented to support such a
     theory; indeed the evidence would indicate to the contrary, as
2    defendant said he believed Pickett had a gun on the day he drove
     him to Vallejo.  Under these facts there was not sufficient evidence
3    to require the trial court to give the instruction sua sponte.

4    If the trial court erred in not giving the instruction, however, such
     error was harmless.  As defendant concedes, the California
5    Supreme Court has held that "the failure to instruct sua sponte on a
     lesser included offense in a noncapital case is, at most, an error of
6    California law alone, and is thus subject only to state standards of
     reversibility . . . . such misdirection of the jury is not subject to
7    reversal unless an examination of the entire record establishes a
     reasonable probability that the error affected the outcome."
8    (People v. Breverman, supra, 19 Cal.4th at p. 165.)  Thus any error
     would be subject to the standard of review in People v. Watson,
9    supra, 46 Cal.2d 818 at p. 836.  (People v. Stewart (2000) 77
     Cal.App.4th 785, 796.)  Given the evidence detailed previously,
10   and given the fact that the jury convicted defendant of murder in
     the first degree and found the carjacking special circumstance to be
11   true, it is not reasonably probable that a result more favorable to
     defendant would have attached absent the alleged error in not
12   instructing on the lesser included offense.

13   (Slip Op. at p. 34-36.)

14          In this case, Petitioner does not have a federal constitutional right to an instruction on a

15   lesser included offense.  See Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) (habeas relief for

16   failure to instruct on lesser included offense in non-capital case barred by Teague v. Lane, 489

17   U.S. 288 (1989), because it would require the application of a new constitutional rule); Windham

18   v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) ("[T]he failure of a state trial court to instruct on

19   a lesser included offense in a non-capital case does not present a federal constitutional

20   question").  However, the Ninth Circuit in Solis noted that there might exist an exception to this

21   general rule for adequate jury instructions on a defendant's theory of defense.  See 219 F.3d at

22   929.  Nevertheless, even assuming that Petitioner does have a constitutional right to receive

23   adequate instructions on his theory of the case, Petitioner still is not entitled to federal habeas

24   relief in light of Petitioner's damaging admissions to police upon his arrest which supported the

25   theory of Petitioner as an aider and abettor of the carjacking, and hence, guilty of felony-murder.

26   Thus, Petitioner failed to show to a reasonable probability that the jury would have arrived at a

different verdict had this instruction been given in light of the strong evidence implicating him in

the carjacking.  Therefore, Petitioner is not entitled to federal habeas relief on this Claim.

R.  Claim XVIII

In Claim XVIII, Petitioner argues that the trial court's third-party culpability instruction

impermissibly shifted the burden of proof to the Petitioner, thereby violating Petitioner's due

process rights.  The California Court of Appeal stated the following in analyzing this Claim:

> The trial court instructed the jury that "In order to establish the
> defense of third party culpability the defendant need only raise a
> reasonable doubt as to whether he was the person who committed
> the offense.  ¶  If you find there is direct or circumstantial evidence
> that Eric Pickett is the sole perpetrator of the crime, and that such
> evidence creates a reasonable doubt as to the defendant's guilt, you
> must give the defendant the benefit of that doubt and find him not
> guilty of the charges alleged in Counts 1 and 3."  While it is
> unclear from the record who requested or drafted this instruction, it
> is entitled "Court's."  It does not appear, however, that defendant
> objected to the giving of the instruction and indeed his attorney
> argued that the instruction was critical and she read it to the jury in
> its entirety during her argument.  Defendant now contends that the
> giving of this instruction was in error, as it impermissibly shifted
> the burden of proof to the defendant, thus violating his right to due
> process.
>
> While the first sentence of the challenged instruction might appear
> to place the burden on defendant to raise a reasonable doubt as to
> his guilt, when read in its entirety, this instruction does not shift the
> burden of proof.  As the instruction goes onto explain, if there was
> direct or circumstantial evidence that Pickett was the sole
> perpetrator and that evidence gave the jury a reasonable doubt as to
> defendant's guilt, the jury was required to give defendant the
> benefit of that doubt and vote not guilty.  Also when this
> instruction is considered in light of all the other instructions, as we
> are required to do (People v. Crandell (1988) 46 Cal.3d 833, 874),
> the jury was clearly and adequately instructed that the burden of
> proving the defendant guilty rested with the prosecution.  Here the
> jury was additionally instructed with CALJIC No. 2.90, providing
> that the People had the burden of proving defendant guilty beyond
> a reasonable doubt, as well as specific instructions reiterating that
> burden for the special circumstance allegation and the firearm
> enhancement (which the jury found not true).
>
> Considering the challenged instruction in the context of the
> instructions as a whole, we cannot say that "'the [allegedly] ailing
> instruction by itself so infected the entire trial that the resulting
> conviction violates due process.'"  (Estelle v. McGuire (1991) 502

1    U.S. 62, 72.)

2  (Slip Op. at p. 36-37.)

3    A challenge to a jury instruction solely as an error of state law does not state a claim

4  cognizable in a federal habeas corpus action.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).

5  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the

6  ailing instruction by itself so infected the entire trial that the resulting conviction violates due

7  process.  See id. at 72.  Additionally, the instruction may not be judged in artificial isolation, but

8  must be considered in the context of the instructions as a whole and the trial record.  See id.  The

9  court must evaluate jury instructions in the context of the overall charge to the jury as a

10  component of the entire trial process.  See United States v. Frady, 456 U.S 152, 169 (1982).  As

11  the Ninth Circuit stated in Mendez v. Knowles, 556 F.3d 757, 768 (9th Cir. 2009):

12         "Any jury instruction that 'reduce[s] the level of proof necessary
          for the Government to carry its burden . . . is plainly inconsistent
13         with the constitutionally rooted presumption of innocence.'"
          [Gibson v. Ortiz, 387 F.3d 812, 820 (9th Cir. 2004)] (quoting Cool
14         v. United States, 409 U.S. 100, 104 (1972)).  When a jury
          instruction is erroneous because it misdescribes the burden of
15         proof, it "vitiates all the jury's findings," and no verdict within the
          meaning of the Sixth Amendment is rendered.  Sullivan v.
16         Louisiana, 508 U.S. 275, 281 (1993).  "Where such an error exists,
          it is considered structural and thus is not subject to harmless error
17         review."  Gibson, 387 F.3d at 820 (citing Sullivan, 508 U.S. at
          280-82).  [¶]  Conversely, if the instructions in question are
18         considered "ambiguous," then they will only violate due process if
          "a reasonable likelihood exists that the jury has applied the
19         challenged instruction[s] in a manner that violates the
          Constitution."  Id. at 820-21 (citing Estelle v. McGuire, 502 U.S.
20         62, 72 (1992); see also Mejia v. Garcia, 534 F.3d 1036, 1041-42
          (9th Cir. 2008).  Unless there is a likelihood that the jury applied
21         the instructions in a way that lessens the prosecution's burden of
          proof, we review instructional error under the harmless error
22         standard.  See Hedgpeth v. Pulido, – U.S. –, 129 S.Ct. 530, 532
          (2008).

23

24    Under these circumstances, the California Court of Appeal's decision was not an

25  unreasonable application of clearly established federal law nor did it result in a decision that was

26  based on an unreasonable determination of the facts.  The challenged instruction must be viewed

1   in the light of all of the jury instructions and it will only violate due process if there is a

2   reasonable likelihood that the jury applied the instructions in a way that lessened the

3   prosecution's burden of proof.  In this case, the jury was specifically instructed that, "[a]

4   defendant in a criminal action is presumed to be innocent until the contrary is proved, and in a

5   case of reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not

6   guilty.  *This presumption places upon the People the burden of proving him guilty beyond a*

7   *reasonable doubt*."  (Resp't's Answer Ex. B pt. 5 at p. 186 (emphasis added).)  Furthermore, the

8   jury was instructed that, "*The People have the burden of proving the truth of a special*

9   *circumstance.*  And if you have a reasonable doubt as to whether a special circumstance is true,

10  you must find it to be not true." (Id. (emphasis added).)  Reviewing the jury instructions as a

11  whole, Petitioner fails to show that his due process rights were violated.  See Francis v. Franklin,

12  471 U.S. 307, 315 (1985) (stating that potentially offending words of a jury instruction must be

13  considered in the context of the whole and other instructions might explain the particular infirm

14  language to the extent that a reasonable juror could not have considered the charge to have

15  created an unconstitutional presumption) (citation omitted).  There is no reasonable likelihood

16  that the jury applied the challenged instruction in a manner that violated the Constitution.

17  Therefore, Petitioner is not entitled to federal habeas relief on Claim XVIII.

18      S.  Claim XIX

19      In Claim XIX, Petitioner argues that the trial court erred in failing to *sua sponte* instruct

20  the jury on a duress defense.  Petitioner raised this Claim in his December 2007 state habeas

21  petition to the California Supreme Court which was denied pursuant to  In re Clark, 5 Cal. 4th

22  750, 21 Cal. Rptr. 2d 509, 855 P.2d 729 and In re Robbins, 18 Cal. 4th 770, 780, 77 Cal. Rptr. 2d

23  153, 959 P.2d 311.  Thus, there does not appear to be a state court decision that decided this

24  Claim on the merits.  Respondent does not argue that this Claim is procedurally defaulted, but

25  instead argues that the Claim should be denied on the merits.  Because there is no state court

26  decision on the merits, the Claim will be reviewed *de novo*.

75

1    "Failure to instruct on the defense theory of the case is reversible error if the theory is

2    legally sound and the evidence in the case makes it applicable."  See Byrd v. Lewis, 566 F.3d

3    855, 860 (9th Cir. 2009), cert. denied, 130 S.Ct. 2103 (2010).  In order to obtain relief, Petitioner

4    "must show that the alleged instructional error had substantial and injurious effect or influence in

5    determining the jury's verdict."  Id. (internal quotation marks and citations omitted).  "A

6    'substantial and injurious effect' means a 'reasonable probability' that the jury would have

7    arrived at a different verdict had the instruction been given."  Id. (citing Clark, 450 F.3d at 916).

8    In deciding whether Petitioner was prejudiced, two issues are considered:  (1) the weight of the

9    evidence that contradicts the defense; and (2) whether the defense could have completely

10   absolved the defendant of the charge.  See id. (citing Beardslee v. Woodford, 358 F.3d 560, 578

11   (9th Cir. 2004).  "The burden on [Petitioner] is especially heavy where . . . the alleged error

12   involves the failure to give an instruction."  Id. (internal quotation marks and citation omitted).

13   As noted in supra Part V.F, Petitioner could not use his duress argument to negate the

14   murder, but only the underlying felony in this case, i.e., the carjacking.  As outlined in supra Part

15   V.C, Petitioner drove Pickett to Vallejo knowing that he wanted to eventually steal the truck.  He

16   believed that Pickett was carrying a gun and that Pickett had told him he was going to "whip [the

17   truck owner's] ass" if he got in the way.  Knowing all these facts, Petitioner still aided and

18   abetted Pickett.  He does not assert that Pickett threatened him to drive him down to Vallejo.  It

19   was not until after the murder occurred that the facts Petitioner relies to support his duress

20   argument took place (i.e., Pickett's statement that Petitioner will "get yours" when he demanded

21   that Petitioner get back in the car).  Thus, the weight of the evidence contradicted the duress

22   defense such that Petitioner is not entitled to federal habeas relief on his argument that the trial

23   court erred in failing to *sua sponte* give a duress defense instruction.

24   T.  Claim XX

25   In Claim XX, Petitioner argues that he was denied his Constitutional right to testify.  The

26   last reasoned decision on this Claim was from the California Court of Appeal which stated the

76

1  following:

2      Defendant argues that he was denied his right to testify in his own
       behalf, in violation of the federal constitution.  The right to testify
3      in one's own behalf has been found to be of such fundamental
       importance that a defendant who demands to do so, even over the
4      advice of his attorney, has the right to testify.  "The defendant's
       insistence upon testifying may in the final analysis be harmful to
5      his case, but the right is of such importance that every defendant
       should have it in a criminal case.  Although normally the decision
6      whether a defendant should testify is within the competence of the
       trial attorney [citation], where . . . a defendant insists that he wants
7      to testify, he cannot be deprived of that opportunity."  (<u>People v.
       Robles</u> (1970) 2 Cal.3d 205, 215.)

8

9      While a defendant has the right to testify over his attorney's
       objection, that right must be asserted in a timely manner.  (<u>People
10     v. Hayes</u> (1991) 229 Cal.App.3d 1226, 1231.)  If such an assertion
       is not made, "'a trial judge may safely assume that a defendant,
11     who is ably represented and who does not testify is merely
       exercising his Fifth Amendment privilege against self-
12     incrimination and is abiding by counsel's trial strategy . . . .'
       [Citation.]"  (<u>People v. Bradford</u> (1997) 14 Cal.4th 1005, 1053.)
13     Thus, our Supreme Court has repeatedly held that a trial court is
       under no duty to advise a defendant of his right to testify;
14     "'"otherwise, the judge would have to conduct a law seminar prior
       to every criminal trial.  [Citation.]"'"  (<u>People v. Alcala</u> (1992) 4
15     Cal.4th 742, 805.)  When the record fails to disclose such a timely
       and adequate demand to testify, as it does in this case, "'a
16     defendant may not await the outcome of the trial and then seek
       reversal based on his claim that despite expressing to counsel his
17     desire to testify, he was deprived of that opportunity.'  [Citations.]"
       (<u>Id.</u> at pp. 805-806.)

18     There was a motion for a new trial encompassing these issues.  [FN
       19]  Defendant testified that after the prosecution rested, his
19     attorney said she was going to ascertain whether the trial judge
       would permit certain defense witnesses to testify, and then she and
20     defendant would discuss whether he would testify.  According to
       defendant, his attorney returned after speaking with the judge and
21     rested without further discussion of the issue.  His attorney, by
       defendant's account, never advised him of his constitutional right
22     to testify.  Defendant never made any request of the trial court that
       he be permitted to testify, according to his own testimony at this
23     hearing.  Defendant's trial counsel testified to a very different set
       of facts.  She indicated that she determined it was not in her
24     client's best interest to testify.  The decision as to what defense
       evidence to present was made before the prosecution rested and it
25     was discussed with defendant.  He agreed with the decision.  The
       fact that defendant would not testify was "discussed [with him] at
26     length."

[FN 19]  New counsel was appointed to represent defendant for purposes of this motion.

Absent defendant's timely assertion of his desire to testify, he is bound by his attorney's decision not to put him on the stand and he "must seek relief, if any is due, by showing ineffective assistance of counsel."  (People v. Mosqueda (1970 5 Cal.App.3d 540, 545-546, cited with approval in People v. Hayes, supra, 229 Cal.App.3d at p. 1232.)  In People v. Guillen (1974) 37 Cal.App.3d 976, as in this case, the defendant did not mention his desire to take the stand until after his conviction.  Finding that counsel's decision not to let his client testify was a tactical one normally within the competence of the trial attorney, the court recognized that a defendant who wants to testify cannot be denied that opportunity.  However, the court further found that the defendant failed to timely assert his desire to testify.  "Defendant did not apprise the court he desired to testify at any time during the trial proceeding when the right could have been accorded him, instead he waited until an adverse verdict was rendered against him before advising the court he had really wanted to take the stand after all, then demanded a new trial – another chance before a new jury – on the ground his counsel had 'deprived' him of his right."  (Id. at pp. 984-985.)  The Guillen court held that denial of defendant's motion for new trial was not an abuse of discretion under those circumstances.

The Supreme Court has reached a similar conclusion, in the context of finding that a trial court is not required to obtain a personal waiver of defendant's right to testify.  The court held that if a trial court's assumption that a defendant who does not assert his right to testify fails to do so because he is exercising his Fifth Amendment privilege is incorrect, "*defendant's remedy is* not a personal waiver in open court, but *a claim of ineffective assistance of counsel.* ([Mosqueda, supra, 5 Cal.App.3d.] at pp. 545-546.)"  (People v. Bradford, supra, 14 Cal.4th at p. 1053, italics added.)

Defendant argues that these authorities are inapposite, because his failure to assert his right to testify was due to his attorney's failure to advise him of his constitutional right to do so.  We disagree.  Defendant cites DeLuca v. Lord (S.D.N.Y. 1994) 858 F. Supp. 1330, 1356 as authority for the conclusion that an attorney failing to advise his client of his right to testify has the effect of negating defendant's waiver of the issue for appeal.  DeLuca held that the right to testify is a fundamental right and its waiver must be knowing and voluntary.  (Id. at p. 1353.)  Thus, the court reasoned, trial counsel has a duty to inform his client that the ultimate right to decide whether or not to testify belongs to the defendant, and if the preponderance of credible evidence indicates the defendant was not independently aware of that right, counsel is ineffective if he fails to so advise his client.  (Id. at p. 1360.)  A defendant "who is unaware that [he] has a right to assert [his] desire to testify over

78

[his] attorney's wishes cannot be deemed to have waived [his] right knowingly and voluntarily." (Id. at p. 1355.)  DeLuca, however, acknowledges that there is a split of authority on this issue, with one approach "ultimately rest[ing] the burden of protecting the fundamental right to testify on the defendant . . . . Under this theory, the right to testify, merely a subordinate right of the right to remain silent, does not attach until the defendant affirmatively asserts it in court.  Any failure on the part of the defendant to affirmatively act to protect that right constitutes a valid waiver." (Id. at p. 1356.)  This is basically the approach taken in Hayes, supra 229 Cal.App.3d and we elect to follow it.  (See, e.g. separate concurring opinion of Justice Birch in United States v. Teague (11th Cir. 1992) 953 F.2d 1525, 1537 (en banc).)  We find that defendant waived his right to testify by failing to timely assert it and that the issue is therefore properly raised under claim of ineffective assistance of counsel.

(Slip Op. at p. 24-27 (footnote omitted).)

It appears as if Petitioner simply is realleging his arguments that he made in Claim XII within this Claim.  For example, in his amended federal habeas petition, Petitioner stats that, "[d]efense counsel's responsibilities with respect to the defendant's right to testify are multifaceted." (Pet'r's Points & Authorities Supp. Am. Pet. p. 111.)  Furthermore, in support of Claim XX, Petitioner states that:

Shannon testified that he was never informed that he had a constitutional right to testify.  During her new trial motion testimony, Bylund did not contradict Shannon's statements that she did not advise him that the decision was his.  Bylund never told Shannon that the ultimate decision of whether to testify was his. Accordingly, any waiver of the right to testify was not made knowingly and voluntarily and Shannon's silence cannot be deemed a waiver . . . Accordingly, Shannon was denied the right to testify.  Because he was never advised that the decision was ultimately his own, his failure to assert the right after Bylund rested does not waive the claim.

(Id. at p. 111-12.)

Respondent argues that this Claim is procedurally barred based on the reasoning of the California Court of Appeal on direct appeal.  However, in the interests of judicial economy, and because this Claim is without merit for the reason described infra, the procedural default argument will not be addressed.  See Lambrix v. Singletary, 520 U.S. 518, 525 (1997); Franklin

1    v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently

2    more complex than the merits issues presented by the appeal, so it may well make sense in some

3    instances to proceed to the merits if the result will be the same.").

4           As previously noted in supra Part V.L, the right to testify in one's own defense is well

5    established and is a "constitutional right of fundamental dimension."  United States v. Joelsen, 7

6    F.3d 174, 177 (9th Cir. 1993); see also Rock v. Arkansas, 483 U.S. 44, 51 (1987).  The right is

7    personal, and "may only be relinquished by the defendant, and the defendant's relinquishment of

8    the right must be knowing and intentional."  Joelson, 7 F.3d at 177.

9           As stated in supra Part V.L, to the extent that Petitioner bases Claim XX on counsel's

10   purported failure to inform him of his right to, that argument does not warrant federal habeas

11   relief.  Furthermore, it should be noted that the court has no duty to affirmatively inform

12   defendants of their right to testify, or to inquire whether they wish to exercise that right.  See

13   United States v. Edwards, 897 F.3d F.3d 445, 447 (9th Cir. 1990).  Thus, to the extent that

14   Petitioner also alleges any trial court error within Claim XX, that also does not warrant federal

15   habeas relief.

16       U.  Claim XXI

17          In Claim XXI, Petitioner argues that there was insufficient evidence to convict him of

18   carjacking and first-degree murder.  The last reasoned decision on this Claim was from the

19   California Court of Appeal which stated the following:

20               Defendant first contends that the evidence was insufficient to
                 convict him of carjacking and first degree murder.  He argues that
21               the evidence was insufficient to prove that he was either the
                 shooter, or that he aided and abetted in the carjacking, which he
22               concedes would make him liable not only for the carjacking, but
                 also for murder under the felony murder doctrine.  There is no
23               merit to this contention.

24               When assessing a claim of insufficiency of evidence, we do not
                 determine if the evidence proves guilt beyond a reasonable doubt,
25               but rather we determine whether substantial evidence supports the
                 conclusion reached by the trier of fact.  (People v. Johnson (1980)
26               26 Cal.3d 557, 576.)  We review the whole record in the light most

                                              80

favorable to the judgment to determine whether there is substantial evidence, "that is, evidence that is reasonable, credible and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (People v. Rodriguez (1999) 20 Cal.4th 1, 11.)  The existence of every fact the jury could reasonably deduce from the evidence in support of the judgment must be presumed.  (People v. Pensinger (1991) 52 Cal.3d 1210, 1237.)  The testimony of just one witness, if believed by the jury, is sufficient to sustain a verdict.  (People v. Watts (1999) 76 Cal.App.4th 1250, 1259.)

The reviewing court does not determine the credibility of witnesses or reweigh the evidence; all reasonable inferences must be drawn, and all conflicts resolved, in favor of the judgment.  (People v. Poe (1999) 74 Cal.App.4th 826, 830.)  The standard of review is the same in cases based mainly on circumstantial evidence.  "'"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of judgment."'"  (People v. Stanley (1995) 10 Cal.4th 764, 793.)

Defendant first argues that there was insufficient evidence presented that he was the actual shooter in this case.  He states that "The jury unanimously found, beyond a reasonable doubt, that Shannon did not shoot Iano."  Thus he asserts that the jury's not true finding on the use of a firearm enhancement precludes affirming his conviction of first degree murder on the theory that he was the actual shooter.  Yet he concedes in the next breath that such a finding on a weapon use enhancement, coupled with a first degree murder conviction, does not necessarily mean that the jury convicted defendant on an aider and abettor theory, indicating that he makes the argument to preserve the issue for possible review by the United States Supreme Court.  (Santamaria v. Horsley (9th Cir. 1998) 133 F.3d 1242 (en banc), cert. denied (1998) 119 S.Ct. 68; People v. Santamaria (1994) 8 Cal.4th 903, 919.

Santamaria holds that a verdict of guilty on a first degree murder charge, coupled with a finding that the defendant did not personally use a weapon, "shows only that there was a reasonable doubt in the minds of the jurors that defendant specifically used a knife.  *It does not show the reverse, that the jury specifically found defendant was an aider and abettor* . . . .  The jury may merely have believed, and most likely did believe, that defendant was guilty of murder as either a personal knife user or an aider and abettor but *it may have been uncertain exactly which role defendant played.*"  (People v. Santamaria, supra, 8 Cal.4th at p. 919, italics in original.)

This is true because there is no requirement under California law that the jury unanimously agree as to the theory of murder, so long as they unanimously agree that a defendant is guilty of murder.  As

the court explained, "More specifically, the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator." (People v. Santamaria, supra, 8 Cal.4th at p. 918.)  Not only is there not a unanimity requirement as to theory upon which a defendant is convicted of murder, but the individual jurors need not choose among the theories, so long as each is convince beyond a reasonable doubt that defendant committed murder.  "Sometimes, as probably occurred here, the jury simply cannot decide beyond a reasonable doubt exactly who did what.  There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other." (Id. at p. 919.)

The evidence here was sufficient to support defendant's conviction of first degree murder, either under the theory that he was the shooter or under an aider and abettor theory.  He, of course, admitted accompanying Pickett to Vallejo to look at the pickup truck and admitted going on a test drive with Pickett and the victim.  He admitted to the police that he knew that Pickett planned on stealing the truck, although he said that Pickett indicated he was going to return later to do so.  He admitted that Pickett said he would "whip the victim's ass" if he got in Pickett's way.  He believed, from Pickett's comments on the way to Vallejo, that Pickett was carrying a gun.  In addition, defendant told not one, but two, civilian witnesses (Patton and Webb) that it was he who actually shot the victim.  He lied to the police.  He tried to fabricate an alibi.  He destroyed evidence by cleaning up the blood in the truck.  He told a witness that he buried the murder weapon.  Viewing this evidence in the light most favorable to the prosecution, it is clearly sufficient to support defendant's conviction of first degree murder under either theory relied upon by the prosecution.

Defendant argues that the testimony of witnesses Patton and Webb cannot support defendant's conviction under the theory that he was the shooter, as they were "utterly unreliable," having "[b]oth admitted lying to the police and both had motives to lie." However, the determination of the credibility of witnesses, and the weight to be accorded their testimony, lies with the trier of fact. Unless there exists a physical impossibility that their statements are true or the statements shock the moral sense of the court, the statements must not be rejected by a reviewing court.  Only if they are inherently improbable and only if that inherent improbability plainly appears, are they insufficient to sustain a verdict. Otherwise uncertainties or discrepancies in the testimony of witnesses are matters for the trier of fact to resolve.  (People v. Watts, supra, 76 Cal.App.4th 1250 at pp. 1258-1259.)  We find none of these exceptions attaches in the present case.

Defendant also argues that the evidence was insufficient to convict

him of carjacking or murder under a felony-murder theory, based on carjacking as the underlying felony.  Defendant concedes that he could, of course, have been convicted of carjacking [FN 7] if the jury found he was an aider and abettor in the commission of that offense.  He further concedes that he could have been convicted of first degree murder, under the felony-murder rule, if he was found to have been an accomplice in the carjacking.  This is true even if the killing was accidental or unforeseeable.  (People v. Escobar (1996) 48 Cal.App.4th 999, 1018-1019.)  There was sufficient evidence of defendant's participation in the crime of carjacking, as an aider and abettor, to support both of these convictions.

[FN 7]  Carjacking is defined in section 215 as "the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence . . . against his or her will and with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear."

One who acts with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating the commission of the offense, and who by act or advice, aids, promotes, encourages, or instigates the commission of the crime, is an aider and abettor.  (CALJIC No. 3.01.)  The aider and abettor need not share the intent of the principal; it is sufficient if he either shares that intent or if he intends to commit, encourage, or facilitate the commission of the crime.  (People v. Nguyen (1993) 21 Cal.App.4th 518, 534.)  This intent may be formed either before, or during the commission of, the offense.  (People v. Montoya (1994) 7 Cal.4th 1027, 1039; People v. Haynes (1998) 61 Cal.App.4th 1282, 1294.)

Here there was no dispute that defendant was present when the carjacking and shooting occurred; there was no dispute that he facilitated the homicide by driving Pickett to Vallejo.  What defendant does contest is whether or not he had the requisite intent:  to either commit the carjacking or to facilitate its commission.  He relies primarily on his statement to the police, that Pickett indicated he was going to come back and steal the truck *later*, as support for his contention that he had no intent to facilitate a carjacking.  At most, he argues, he intended to facilitate a car theft that was to occur at a later date.  However, even apart from the evidence that defendant was the actual shooter (which would clearly show his intent to carjack the vehicle right then and there), an aider and abettor need not intend to encourage or facilitate the particular offense that was ultimately committed by the principal.  "His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator."  (People v. Croy (1985) 41 Cal.3d 1, 12, fn.5; People v. Escobar, supra, 48 Cal.App.4th at pp. 1018-1019.)

Defendant believed that Pickett had a gun with him when he drove Pickett to Vallejo to look at the pickup truck. He knew that Pickett intended to steal the truck at some point in time. He knew that Pickett would use force if the victim resisted. [FN 8] A jury could reasonably infer that by driving Pickett to Vallejo to see the truck, defendant intended to facilitate carjacking, on that or a later date, by assisting Pickett in going to see the truck, ascertaining its location, and obtaining other information needed to commit the crime. Certainly defendant's knowledge of Pickett's intent to use violence if necessary would render him liable for a subsequent carjacking as a "reasonably foreseeable" offense committed as a consequence of Pickett's criminal act, even if the crime had occurred on a subsequent date. The fact that Pickett elected to commit this reasonably foreseeable crime sooner, rather than later, does not negate defendant's liability as an aider and abettor.

[FN 8] The prosecution relied as well on defendant's singing along with a rap song on the way to Vallejo, a song whose lyrics apparently described killing someone and taking their property, to show his intent. Defendant contends this evidence should be discounted because the witness Patton indicated that she only heard after the fact what the lyrics meant, because she was unqualified to testify as to their meaning, and because she was unsure even at trial whether they referred only to property being taken with violence. All of these points go to the weight to be given to this evidence, however, and not to its admissibility. Any objection to its admissibility on the ground of lack of foundation was waived as it was not raised in the trial court. (Evid. Code, § 353.) Although defense counsel initially objected on the ground of lack of foundation, the objection was not renewed after Patton testified regarding her familiarity with the expression.

Viewing the facts in the light most favorable to the prosecution, a reasonable jury could have held defendant liable as an aider and abettor to the carjacking, and found him guilty of felony-murder, based on this interpretation of the evidence. Whether or not the evidence might be reconciled with a different finding, there was sufficient evidence to sustain the verdict of the jury. (People v. Stanley, supra, 10 Cal.4th at pp. 792-793.)

(Slip Op. at p. 6-11.)

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction, if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of

84

1   the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "[T]he

2   dispositive question under Jackson is 'whether the record evidence could reasonably support a

3   finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir.

4   2004) (quoting Jackson, 443 U.S. at 318). A petitioner for writ of habeas corpus "faces a heavy

5   burden when challenging the sufficiency of the evidence used to obtain a state conviction on

6   federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).

7          A federal habeas court determines the sufficiency of the evidence in reference to the

8   substantive elements of the criminal offense as defined by state law. See Jackson, 443 U.S. at

9   324 n. 16. Under California law: "[c]arjacking is the felonious taking of a motor vehicle in the

10  possession of another, from his or her person or immediate presence of a passenger of the motor

11  vehicle, against his or her will and with the intent to deprive the person in possession of the

12  motor vehicle of his or her possession, accomplished by means of force or fear." Cal. Penal

13  Code § 215(a). Additionally, as previously stated, a defendant may be found guilty of under an

14  aiding and abetting theory if the following elements are established beyond a reasonable doubt:

15  (1) the defendant acting with knowledge of the unlawful purpose of the perpetrator; (2) the

16  defendant acted with the intent or purpose of committing, encouraging, or facilitating the

17  commission of the offense; and (3) the defendant, by act or advice, aided, promoted, encouraged

18  or instigated, the commission of the crime. See People v. Prettyman, 14 Cal. 4th 248, 259, 58

19  Cal. Rptr. 2d 827, 926 P.2d 1013 (1996). California law provides that one who aids and abets a

20  crime is considered a principal in the crime and is guilty to the same extent as any other

21  principal, including the actual perpetrator. See Cal. Penal Code § 31; People v. McCoy, 25 Cal.

22  4th 1111, 1116-17, 108 Cal. Rptr. 2d 188, 24 P.3d 1210 (2001). A defendant is guilty of first

23  degree murder under California law if it is committed in the perpetration of, or attempt to

24  perpetrate a carjacking. See Cal. Penal Code § 189. As Petitioner admits in his petition and as

25  stated by the California Court of Appeal, under California law, an aider and abettor to the

26  underlying felony is guilty of felony-murder even if the killing was not a natural and probable

1  consequence.  See People v. Escobar, 48 Cal. App. 4th 999, 1019, 55 Cal. Rptr. 883 (1996).

2     Viewing the evidence in the light most favorable to the prosecution, there was sufficient

3  evidence to convict Petitioner of carjacking and first-degree murder.  Petitioner's reliance on

4  Mitchell v. Prunty, 107 F.3d 1337 (9th Cir. 1997), overruled on other grounds, Santamaria v.

5  Horsley, 133 F.3d 1242 (9th Cir. 1998) is misplaced under these circumstances.  In Mitchell,

6  after a shootout between rival gang members earlier in the day whereby Judabean was shot in the

7  ankle and the arm, Judabean returned to Mitchell's apartment building (the place where the

8  shootout had occurred).  Men were standing on the second-floor landing of Mitchell's apartment.

9  Judabean then taunted the men on the landing yelling, "I wish you would shoot me."  Id. at 1338.

10  The men then fired on Judabean.  See id.  Subsequently, the men on the landing fled and one car

11  drove over Judabean which turned out to be fatal (a doctor testified at trial that the gunshots

12  would have been treatable.)  See id. at 1339.  In his federal habeas petition, Mitchell argued that

13  there was insufficient evidence to sustain his murder conviction.  The Ninth Cirucit noted that

14  "[b]ecause the jury found Mitchell neither fired any of the bullets that struck Judabean nor drove

15  the vehicle that crushed Judabean's chest, he could be guilty of Judabean's murder - if at all -

16  only as an aider and abettor."  Id.  Ultimately, the Ninth Circuit stated that:

> [b]ecause Mitchell could not have known that Judabean would
> appear outside his apartment – deferring medical care in order to
> taunt his adversaries – there is no way Mitchell could have
> admitted fellow gang members into his apartment with the intent to
> commit murder.  Thus, even if Mitchell facilitated Judabean's
> murder by making the landing of his apartment building available
> to the assailants, this actus reus was not coupled with the necessary
> *simultanous* mens rea.  Evidence that Mitchell may have wanted
> Judabean dead – that is to say, that he had a motive for murder – is
> not proof of intent.

23  Id. at 1341.

24     This case is different than Mitchell in several respects.  Unlike Mitchell, there was

25  sufficient evidence that Petitioner aided and abetted Pickett in the carjacking.  As noted by the

26  California Court of Appeal, Petitioner believed that Pickett had a gun with him when he drove

1    Pickett to Vallejo to look at the pickup truck.  He knew that Pickett intended to steal the truck at

2    some point in time.  He knew that Pickett would use force if the victim resisted.  A jury could

3    reasonably infer that by driving Pickett to Vallejo to see the truck, defendant intended to facilitate

4    the carjacking by aiding Pickett in going to see the truck, ascertaining its location, and helping

5    him to obtain other information he needed to commit the carjacking.  This is far different than the

6    situation in <u>Mitchell</u> where Mitchell simply allowed gang members onto his apartment landing

7    and Judabean randomly showed up outside of his apartment.  Since Petitioner aided and abetted

8    Pickett in the commission of the carjacking, there was sufficient evidence to support the

9    conviction of first-degree murder in light of the felony-murder rule.  Thus, Petitioner is not

10   entitled to federal habeas relief on Claim XXI.

11        V.  Claim XXII

12        In Claim XXII, Petitioner argues that there was insufficient evidence to support the jury's

13   finding of a carjacking special circumstance.  The California Court of Appeal provided the last

14   reasoned decision on this Claim and it stated the following:

15            Defendant also contends that the finding of true on the special
             circumstance allegation must be reversed as there was insufficient
16           evidence that he acted as a major participant with reckless
             indifference to human life.  (§ 190.2, subd. (d).)

17
             Section 190.2, subdivision (d) provides that "every person, not the
18           actual killer, who, with reckless indifference to human life and as a
             major participant, aids, abets, counsels, commands, induces,
19           solicits, requests, or assists in the commission of [carjacking]
             which results in the death of some person . . . and who is found
20           guilty of murder in the first degree therefor, shall be punished by
             death or life imprisonment in the state prison for life without the
21           possibility of parole . . . ."  [FN 9]  Reckless indifference to human
             life is defined as that mental state "'in which the defendant
22           "knowingly engag[es] in criminal activities known to carry a grave
             risk of death." [Citation.] . . . .'"  (<u>People v. Estrada</u> (1995) 11
23           Cal.4th 568, 577.)
             [FN 9]  Section 190.2, subdivision (d) codified the decision of the
24           United States Supreme Court in <u>Tison v. Arizona</u> (1987) 481 U.S.
             137, 158.
25
             The code also provides, however, for the application of a special
26           circumstance allegation to an aider and abettor who harbors an

                                        87

intent to kill.  "Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole . . . ."  (§ 190.2, subd. (c).)

Section 190.2 also addresses the culpability of the actual killer, providing that "[u]nless an intent to kill is specifically required under subdivision (a) for a special circumstance enumerated therein, an actual killer, as to whom the special circumstance has been found to be true . . . need not have any intent to kill . . . ."  (§ 190.2, subd. (b).)  The jury was instructed on all three of these possible scenarios, under CALJIC No. 8.80.1.

Viewing the evidence in the light most favorable to the prosecution, any of these three possible bases of culpability could have been found by a reasonable trier of fact.  As detailed above, there was sufficient evidence from which the jury could determine that defendant was the actual killer, including his admission to two civilian witnesses that he shot the victim.  [FN 10]  If the jury believed that he was only an aider and abettor to the crime, there was substantial evidence from which they could conclude that he did so with the intent to kill.  Defendant drove Pickett to Vallejo knowing that Pickett intended to steal the truck and was prepared to use force to do so.  He believed Pickett to have a gun with him.  He sang along with a rap song whose lyrics spoke of killing someone and taking their property.  He accompanied Pickett on the test drive with knowledge of Pickett's intent.
[FN 10]  Defendant's protestations to the contrary aside, the jury's negative finding on the use of a firearm enhancement does not negate this possibility.  (People v. Santamaria, supra, 8 Cal.4th at p. 919.)

At the very least this evidence would support a finding that defendant aided and abetted the crime as a major participant with reckless indifference to human life.  He provided the means of getting to the victim's residence.  He accompanied Pickett on the test drive.  He did this knowing that Pickett intended to steal the truck and use whatever force was necessary to do so.  He believed Pickett had a gun with him that day.

Drawing all reasonable inferences and resolving all conflicts in favor of the judgment, there is substantial evidence to support the special circumstance finding.  (People v. Poe, supra, 74 Cal.App.4th at p. 830.)  A rational trier of fact "could have found the essential elements of the [special circumstance allegation] beyond a reasonable doubt.  [Citation.]"  (People v. Davis (1995) 10 Cal.4th 463, 509.)

(Slip Op. at p. 11-13.)

The standard for a sufficiency of the evidence claim was outlined in supra Part V.U.  As Petitioner notes in his traverse, "[t]he claim that there is insufficient evidence to support a finding that Mr. Secrease participated with either intent to kill or reckless indifference to human life is similar to the previous claim that there is insufficient evidence to support that Mr. Secrease knowingly or intentionally aided and abetted Mr. Pickett's crime."  (Pet'r's Traverse at p. 49.) As explained in supra Part V.U, there was sufficient evidence to support a finding that Petitioner aided and abetted the carjacking.  However, Petitioner also argues that there was insufficient evidence on the issue of reckless indifference.  As noted by the California Court of Appeal, California Penal Code § 190.2(d) states that:

> every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony [like carjacking], which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance [of carjacking] has been found to be true.

In this case, there was sufficient evidence that Petitioner was a major participant in the carjacking and acted with reckless disregard to human life.  Petitioner knew that Pickett intended to steal the truck.  He knew that Pickett would use force if the victim resisted.  He was under the belief that Pickett was carrying a firearm.  Petitioner nevertheless drove Pickett to Vallejo and subsequently went on the test drive with Pickett.  Under these circumstances, and viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence to support a finding that Petitioner was a major participant in the commission of the carjacking and acted with reckless disregard for human life.  Based on the foregoing, the state court's determination of this issue was not contrary to, or an unreasonable application of clearly established federal law.[8]

---

[8] In light of this finding, it is unnecessary to analyze the state court's additional findings that there was sufficient evidence to allow the jury to determine that Petitioner was the actual killer and/or that he aided and abetted Pickett with his intent to kill the victim.

1   Petitioner is not entitled to federal habeas relief on this Claim.

2       W.  Claim XXIII

3       In Claim XXIII, Petitioner argues that his sentence must be vacated because the jury

4   verdict does not reflect a special circumstance finding.  The California Court of Appeal provided

5   the last reasoned decision on this Claim and stated the following:

> Defendant argues that his sentence for life imprisonment without
> the possibility of parole must be vacated as the jury verdict does
> not reflect a special circumstance finding.  This contention is
> without merit.
>
> The verdict form for count 1 consists of two pages.  The first page
> calls for a finding of guilty or not guilty of the crime of first degree
> murder.  The second page calls for special findings of true or not
> true on two allegations, the first that defendant "was engaged in the
> commission of the crime of carjacking within the meaning of
> section 190.2(a)(17)" and the second that defendant personally
> used the firearm.  Defendant contends that because the form did
> not use the term "special circumstance," did "not even state that the
> murder was committed during the carjacking," and did not call for
> the findings as to whether defendant was the actual killer, an aider
> and abettor with the intent to kill, or an aider and abettor who acted
> as a major participant with reckless indifference to human life, it
> was inadequate.
>
> First we note that the verdict form was gone over with counsel on
> the record and defense counsel did not object to the challenged
> language.  [FN 28]  When considered in conjunction with the
> instructions given to the jury, it is clear that this verdict form is not
> lacking.  The jury was specifically instructed that they must
> determine "if the following special circumstance:  [*sic*] is true or
> not true: the murder was committed in the commission of a
> carjacking."  This language matches almost exactly the language
> used in the verdict form.  The jury was further instructed that "[t]o
> find that the special circumstance, referred to in these instructions
> as murder in the commission of carjacking, is true, it must be
> proved:  ¶ 1.  The murder was committed while the defendant was
> engaged in or was an accomplice in the commission of a carjacking
> . . . ."  The jury was further instructed that they would be required
> to "state [a] special finding as to whether this special circumstance
> is or is not true on the form that will be supplied."  We fail to see
> how the jury could have been misled or confused by the verdict
> form when it is considered in conjunction with the instructions
> provided to them.
> [FN 28]  We elect to reach the merits of this issue, despite
> defendant either waiving the issue or inviting any error by the trial
> court, in order to forestall yet another claim of ineffective

1    assistance of counsel.

    [FN 29]  Defendant cites no authority for his argument that the
2    verdict form was lacking because it did not require the jury to
    make a special finding regarding whether the defendant was the
3    actual killer, an aider or abettor with the intent to kill, or an aider
    and abettor who acted as a major participant with reckless
4    indifference to human life.  We know of no requirement that it do
    so.

5

6    (Slip Op. at p. 38-39.)

7    Respondent first argues that this Claim is procedurally defaulted.  Respondent asserts that

8    because Petitioner failed to raise this issue at trial, the contemporaneous objection rule creates

9    the procedural bar on this Claim.  (See Resp't's Answer at p. 73.)  Procedural default can only

10    block a claim in federal court if the state court, "clearly and expressly states that its judgment

11    rests on a state procedural bar."  Harris v. Reed, 489 U.. 255, 260-61 (1989).  In this case, the

12    California Court of Appeal expressly rejected any procedural bar and analyzed the Claim on the

13    merits.  Therefore, this Claim is not procedurally barred and the merits shall be analyzed.

14    Petitioner argues the following in his amended federal habeas petition:

15    The form did not use the term "special circumstance" and did not
    even state that the murder was committed during the carjacking.
16    None of the three alternative subsidiary findings – actual killer,
    abetting the murder, or abetting the car jacking as a major
17    participant and with reckless indifference – were stated on the
    verdict.  The reference to section 190.2, subdivision (a)(17), was
18    surely lost on the jury.  The jury would have no idea that section
    190.2, subdivision (a)(17) referred to the special circumstance
19    finding described in the instructions.  The trial court gave the jury
    several instructions on "special circumstances."  But none of those
20    instructions stated that the special circumstance finding would be
    made pursuant to section 190.2, subdivision (a).  The reference to
21    to section 190.2, subdivision (a)(17), does not cure the defect.

22    (Pet'r's Points & Authorities Supp. Am. Pet. p. 131 (internal citation omitted).)

23    If a defective verdict form so infected the entire trial that the resulting conviction violated

24    due procession, Petitioner may be entitled to federal habeas relief.  See, e.g., Henderson v. Kibbe,

25    431 U.S. 145, 154 (1977).  Petitioner failed to show that his due process rights were violated

26    based on the verdict form.  The jury was specifically instructed on the special circumstance as

follows:

And if you find the defendant in this case guilty of murder in the first degree, you must then determine if the following special circumstance is true or not true, the murder was committed in the commission of a carjacking.

The People have the burden of proving the truth of a special circumstance. And if you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true.

And if you are satisfied beyond a reasonable doubt that the defendant actually killed a human being, you need not find that the defendant intended to kill in order to find the special circumstance to be true.

And if you find that the defendant was not the actual killer of a human being, or if you are unable to decide whether the defendant was the actual killer or an aider and abettor, you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill, aided and abetted or assisted any actor in the commission of murder in the first degree, or with reckless indifference to human life and as a major participant, aided and abetted or assisted in the commission of the crime of carjacking which resulted in the death of a human being, namely David Iano.

A defendant acts with reckless indifference to human life when that defendant knows or is aware that his acts involve a grave risk of death to an innocent human being.

In order to find a special circumstance alleged in this case to be true or untrue, you must unanimously agree.

You will state your special finding as to whether this special circumstance is or is not true in the verdict form that will be supplied to you.

To find the special circumstance, referred to in these instructions as murder in the commission of carjacking, is true, it must be proved:

One, that the murder was committed while the defendant was engaged in or was an accomplice in the commission of a carjacking; and
Two, the murder was committed in order to carry out or advance the commission of the crime of carjacking or to facilitate the escape from there or two avoid detection. In other words, the special circumstance referred to in these instructions is not established if the carjacking was merely incidental to the commission of the murder.

(Resp't's Answer Ex. B pt. 5, at p. 190-92.)

Petitioner relies on the fact that during deliberations, the jury inquired as to "What is the differences between carjacking in Count 1 and carjacking in Count 3?" (Resp't's Answer Ex. B pt. 5, at p. 243.) After conferring with the parties, the trial judge answered the jury as follows:

> First of all, the carjacking alleged in Count 3 is a separate crime. You got the definition of the crime. I'm not going to read it again to you. So that's a separate crime. That is alleged in Count 3. And you are going to have to make a finding whether or not the People have proved the defendant guilty beyond a reasonable doubt on that particular offense.
> Of course, if they haven't, it will be your duty to find him not guilty.
> Now, the carjacking that is mentioned in Count 1, which of course is the allegation of murder, is the identical crime of carjacking as described in the instruction. So it is the carjacking alleged in Count 1 has the same elements and requirements as the carjacking alleged in Count 3 except Count 1 is a different crime. So there are other parts of the allegation in Count 1.
> So that is what I'm going to do, I'm just going to leave you with that. Carjacking is mentioned twice. The elements are the same in both alleged offense.
> In Count 1, it's just part of the crime alleged and Count 3, it's the complete and separate crime.
> And it is defined early in the instructions. So, I'm going to leave you with that.

(Id. at p. 243-44.)

The above instructions and response to the jury question laid out the necessary findings that the jury needed to make to find that the special circumstance that the murder was committed during the commission of a carjacking was true. The jury is presumed to have followed these instructions. See Weeks, 528 U.S. at 234. Under these circumstances, Petitioner failed to show that his due process rights were violated due to the language of the special circumstance found as true by the jury on the verdict form. Petitioner is not entitled to federal habeas relief on Claim XXIII.

X.  Claim XXIV

In Claim XXIV, Petitioner asserts that his federal and state constitutional rights were violated when he was convicted of an offense not charged in the information. The California

1   Court of Appeal provided the last reasoned decision on this Claim and stated the following:

2           Defendant correctly notes that the special circumstance allegation
            charged in the information was pursuant to section 190.2,
3           subdivision (a)(17)(A) and alleged that the murder was committed
            while defendant was engaged in the commission of robbery.  He
4           contends that the information was never amended to allege a
            special circumstance allegation that the murder was committed
5           while he was engaged in the commission of carjacking and that he
            was thus convicted of a crime that he was never charged with.

6
            As defendant correctly points out, nowhere in the record is there a
7           specific indication that the special circumstance allegation was
            formally amended to allege that the murder was committed while
8           defendant was engaged in the crime of carjacking rather than
            robbery.  It is apparent, however, that this was the intent of the
9           parties and the court.  By stipulation the robbery count was
            dismissed as being duplicative of the carjacking count.  The
10          instructions given to the jury reflect that the special circumstance
            was based on the defendant being engaged in the crime of
11          carjacking rather than robbery.  The verdict form reflected the
            same thing.  No objections were raised to the use of the carjacking
12          special circumstance in any of these forums.  Indeed when
            defendant's new counsel made a postrial motion to strike the
13          special circumstance allegation, this issue was never raised.
            Although the magic words to formally amend the information were
14          never uttered, in effect that amendment occurred with the
            concurrence of defendant.

15

16  (Slip Op. at p. 40.)

17          At the outset, to the extent that Petitioner relies on the state constitution, that argument is

18  not cognizable in these federal habeas proceedings.  See Estelle, 502 U.S. at 67-68. The Sixth

19  Amendment guarantees a criminal defendant the fundamental right to be clearly informed of the

20  nature and cause of the charges against him in order to permit adequate preparation of a defense.

21  See Cole v. Arkansas, 333 U.S. 196, 201 (1948) ("It is as much a violation of due process to send

22  an accused to prison following conviction on a charge on which he was never tried as it would be

23  to convict him upon a charge that was never made."); see also Gautt v. Lewis, 489 F.3d 993,

24  1002 (9th Cir. 2007).  The Sixth Amendment notice guarantee applies to the States under the

25  Due Process Clause of the Fourteenth Amendment.  See Cole, 333 U.S. at 201; Gautt, 489 F.3d

26  at 1003.

94

1    In some instances, a source other than a charging document can give defendant adequate

2  notice of the charges against him.  See Murtishaw v. Woodford, 255 F.3d 926, 953-54 (9th Cir.

3  2001) (holding that the prosecutor's opening statement, evidence presented at trial, and a jury

4  instruction conference gave the defendant notice of the prosecution's theory); Calderon v. Prunty,

5  59 F.3d 1005, 1009-10 (9th Cir. 1995) (holding that the prosecutor's opening statement and a

6  hearing held after the prosecution's case in chief gave the defendant adequate notice of the

7  prosecution theory); Sheppard v. Rees, 909 F.2d 1234, 1236 n. 2 (9th Cir. 1989) (suggesting that

8  "[a]n accused could be adequately notified of the nature and cause of the accusation by other

9  means - for example, a complaint, an arrest warrant, or a bill of particulars" or "during the course

10  of a preliminary hearing"); see also Gautt 489 F.3d at 1009-10 (noting the possibility that a

11  source other than the charging document can give notice to a defendant of the charges against

12  him).

13    This is not a case where Petitioner was not given notice that the prosecutor intended to

14  advance a felony-murder (carjacking) theory to support a first-degree murder conviction.  As

15  noted by the California Court of Appeal, the parties stipulated to the dismissal of the robbery

16  count.  Petitioner did not object to the inclusion of the first-degree murder with a carjacking

17  special circumstance instructions given to the jury nor to the verdict form.  Under these

18  circumstances, Petitioner fails to show that his due process rights were violated by the prosecutor

19  proceeding and ultimately obtaining a conviction of first-degree murder with a carjacking special

20  circumstance.  Petitioner is not entitled to federal habeas relief on Claim XXIV.

21    Y.  Claim XXV

22    In Claim XXV, Petitioner argues that his separate conviction for carjacking is barred

23  because it is a necessarily included offense of first degree murder while engaged in the

24  commission of a carjacking.  The California Court of Appeal provided the last reasoned decision

25  on this Claim and stated the following:

26    The defendant argues that his conviction of carjacking is barred as

1   that crime is a necessarily included offense of the crime of which
2   he was convicted in count 1, murder with the special circumstance
    allegation that it was committed while defendant was engaged in
3   the commission of carjacking.  A special circumstance allegation is
    a penalty enhancement, however, and is not an element of the
4   crime of murder.  As such it is not subject to greater or lesser
    offense analysis.  (People v. Toro (1989) 47 Ca.3d 966, 972
5   [enhancement allegations not to be considered in determining
    lesser included offenses]; People v. Wolcott (1983) 34 Cal.3d 92,
6   101 [use of firearm allegation not considered in determining lesser
    included offense]; People v. Superior Court (Juardo) (1992) 4
7   Cal.App.3d 1217, 1231 [special circumstance is penalty
    enhancement, not element of murder, and therefore not part of
8   greater or lesser offense analysis].)  [FN 31]
    [FN 31]  The case relied upon by defendant, People v. Contreras
9   (1997) 55 Cal.App.4th 760, is distinguishable as it holds that
    carjacking is a necessarily included offense of the crime of
10  kidnapping to commit carjacking, which is a separate offense
    rather than a penalty enhancement.  The recent United States
11  Supreme Court case cited in defendant's reply brief (Apprendi v.
    New Jersey (2000) 530 U.S. 466) is also not controlling, as the
12  issue before the court there was whether certain sentencing
    allegations had to be proven before the jury, not whether they
13  entered into a lesser included offense analysis.

14  (Slip Op. at p. 42.)

15      As noted previously, federal habeas relief is not available for an alleged error in the

16  interpretation or application of state law.  See Estelle, 502 U.S. at 67-68.  Thus, Petitioner's

17  claim that his carjacking conviction was a necessarily included offense of his felony-murder

18  while engaged in a carjacking conviction is not cognizable on federal habeas review.

19      To the extent that Petitioner alleges that the special circumstance finding violated the

20  Double Jeopardy Clause, that argument does not merit federal habeas relief.  As the Ninth Circuit

21  has noted, "[t]he guarantee against double jeopardy includes three distinct constitutional

22  protections.  "It protects against a second prosecution for the same offense after acquittal.  It

23  protects against a second prosecution for the same offense after conviction.  And it protects

24  against multiple punishment for the same offense."  North Carolina v. Pearce, 395 U.S. 711, 717

25  (1969); Brown v. Ohio, 432 U.S. 161, 165 (1977)."  Plascencia v. Alameida, 467 F.3d 1190,

26  1204 (9th Cir. 2006).  Here, Petitioner argues that he is being given multiple punishments for the

1  same offense in light of the special circumstance finding with respect to the jury's finding that

2  Petitioner was engaged in the commission of the crime of carjacking within the meaning of

3  California Penal Code section 190.2(a)(17) and its finding that Petitioner was guilty of carjacking

4  in violation of California Penal Code section 215(a).

5        Given the presumed correctness of the California Court of Appeal's analysis under state

6  law, this Claim lacks merit.  If the legislature has expressly intended a punishment to be

7  cumulative, such cumulative punishment does not violate double jeopardy prohibitions.

8  Missouri v. Hunter, 459 U.S. 359, 368-69 (1983); Plascencia v. Alameida, 467 F.3d at 1204 (no

9  habeas relief for double jeopardy challenge to 1202.53 firearm enhancement, as legislature

10  intended enhancement statute to permit multiple punishments for same offense).  Furthermore, it

11  is worth noting that Petitioner's sentence with respect to his carjacking conviction in Count 3

12  was stayed.  (See Resp't's Answer Ex. A at p. 250.)  Petitioner is not entitled to federal habeas

13  relief on this Claim.[9]

14        Z.  Claim XXVI

15        In Claim XXVI, Petitioner argues that cumulative error warrants the grant of federal

16  habeas relief.  In Claim XIII, Petitioner argued that the cumulative effect of trial counsel's errors

17  warranted federal habeas relief.  In this Claim, however, Petitioner argues that federal habeas

18  relief is warranted based on all of the Claims he raises in his amended federal habeas petition.

19  "Cumulative error applies where, although no single trial error examined in isolation is

20  sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors has still

21  prejudiced a defendant."  Jackson v. Brown, 513 F.3d 1057, 1085 (9th Cir. 2008).  Under these

22  circumstances, Petitioner fails to show that the cumulative effect of any purported errors caused

23  Petitioner prejudice.  As previously set forth, the Petitioner's statements and admissions to law

24

25        [9] In his state filings, Petitioner cited to Apprendi v. New Jersey 530 U.S. 466 (2000) to
    support this Claim.  He does not so rely in his amended federal habeas petition, thus the issue
26  need not and will not be reached.

enforcement provided sufficiently strong evidence that he was an aider and abettor under the

felony-murder theory.  Petitioner is not entitled to federal habeas relief on Claim XXVI.

VI.  PETITIONER'S REQUESTS

A.  Request for Order to Show Cause

Petitioner requests "an order to show cause" in his amended federal habeas petition.  (See

Pet'r's Points & Authorities Supp. Am. Pet. at p. 136.)  Respondent answered the amended

petition on June 2, 2010.  Accordingly, Petitioner's request for an order to show cause is denied

as moot.

B.  Request for a Hearing

Petitioner also requests a "hearing" in his amended federal habeas petition (See id.)

Presumably, this is a request for an evidentiary hearing.  A court presented with a request for an

evidentiary hearing must first determine whether a factual basis exists in the record to support

petitioner's claims, and if not, whether an evidentiary hearing "might be appropriate."  Baja v.

Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999); see also Earp v. Ornoski, 431 F.3d 1158, 1166

(9th Cir. 2005).  A petitioner requesting an evidentiary hearing must also demonstrate that he has

presented a "colorable claim for relief."  Earp, 431 F.3d at 1167 (citations omitted).  To show

that a claim is "colorable," a petitioner is "required to allege specific facts which, if true, would

entitle him to relief."  Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998) (internal quotation

marks and citation omitted).  In this case, an evidentiary hearing is not warranted for the reasons

stated in supra Part V.  Petitioner failed to demonstrate that he has a colorable claim for federal

habeas relief.  Thus, his request will be denied.

VII.  CONCLUSION

Accordingly, IT IS HEREBY ORDERED that:

1.      Petitioner's request for an order to show cause is DENIED AS MOOT; and

2.      Petitioner's request for an evidentiary hearing is DENIED.

For all of the foregoing reasons, IT IS RECOMMENDED that the amended petition for

1  writ of habeas corpus be DENIED.

2          These findings and recommendations are submitted to the United States District Judge

3  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

4  after being served with these findings and recommendations, any party may file written

5  objections with the court and serve a copy on all parties.  Such a document should be captioned

6  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

7  shall be served and filed within seven days after service of the objections.  The parties are

8  advised that failure to file objections within the specified time may waive the right to appeal the

9  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In any objections he

10 elects to file, Petitioner may address whether a certificate of appealability should issue in the

11 event he elects to file an appeal from the judgment in this case.  See Rule 11, Federal Rules

12 Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability

13 when it enters a final order adverse to the applicant).

14 DATED:  July 12, 2011

15

16

17

18                                        TIMOTHY J BOMMER
                                          UNITED STATES MAGISTRATE JUDGE
19

20

21

22

23

24

25

26